UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30111-MAP

| | | |
|---|---|---|
| James V. Cariddi, | ) | |
| Plaintiff | ) | |
| | ) | PLAINTIFF'S OPPOSITION |
| v. | ) | TO DEFENDANT'S |
| | ) | MOTION TO DISMISS |
| Consolidated Aluminum Corporation, | ) | |
| Defendant | ) | |

This is an action for the recovery of response costs incurred and to be incurred by plaintiff to address releases to the environment resulting from defendant's storage, arrangement for disposal or disposal of oil, hazardous materials and hazardous substances during defendant's and defendant's predecessors' ownership and operation of certain real estate located in North Adams, Massachusetts.  Defendant Consolidated Aluminum Corporation ("Conalco") has moved this Court to dismiss Count I of plaintiff's Complaint for failure to state a claim under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*.  For the reasons set forth below, the Court should deny the motion.

## BACKGROUND

Conalco, a New York corporation, owned and operated the property at 506-508 State Road, North Adams, Massachusetts (the "Facility") between 1967 and 1976, either directly or through its predecessor, Phelps Dodge, an entity that merged into Conalco.  Conalco was in the business of drawing and fabricating aluminum tubing.  Plaintiff alleges that under Conalco's ownership of the Facility oil and mineral spirits were routinely disposed of into the basement.  A response action in May 2003 removed 1,000 gallons of oil and oily water, and in addition a sludge including concentrations of heavy metals, from the basement at the Facility.

Plaintiff alleges three counts of relief: Count I seeks relief under CERCLA; Count II seeks relief under Massachusetts General Laws c. 21E; and Count III seeks a declaration that Conalco is liable to plaintiff for plaintiff's future response costs.  Conalco's motion to dismiss is limited to Count I, arguing that, under CERCLA, it fails to state a claim for which relief can be granted.

<u>ARGUMENT</u>

Last December, in <u>Cooper Industries, Inc. v. Aviall Services, Inc.</u>, 125 S.Ct. 577 (2004), the Supreme Court overturned longstanding federal Court of Appeals interpretations of CERCLA, including decisions of the First Circuit cited by defendant.  In its Memorandum, Conalco recognizes one half of the significance of the Court's holding in <u>Cooper Industries</u>, but ignores the other half altogether.  Plaintiff opposes Conalco's motion to dismiss on the ground that <u>Cooper Industries</u>, taken as a whole, precludes a prejudicial dismissal of Count I of Plaintiff's Complaint.

A threshold question for any action brought under CERCLA is which section of the act grants the plaintiff the right to sue.  Generally speaking, two distinct concepts color the CERCLA rights of action: response and contribution.  Section 107[1] provides for the recovery of response costs incurred in a removal or remedial action, and § 113 provides for contribution from persons liable or potentially liable under § 107 and also § 106 (abatement actions).  In a departure from the rulings of several lower federal courts, <u>Cooper Industries</u> established that contribution under § 113 can only be sought "during or following any civil action under section

---

[1] In this Opposition, the CERCLA section numbers will be used hereafter, outside of direct quotations.  42 U.S.C. § 9607 corresponds with § 107; § 9613 corresponds with § 113.

9606 of this title or under section 9607(a) of this title." Cooper Industries, 125 S.Ct. at 583

(quoting 42 U.S.C. § 9613(f)(1)). Conalco correctly cites Cooper Industries for this proposition.[2]

Significantly, the Court also defined what it did *not* decide in Cooper Industries. The

plaintiff-respondent before the Court had variously relied in its complaint upon §§ 107 and 113.

The Court's foreclosure of relief under § 113 necessarily forced attention upon the vitality of

§ 107 as a private cost recovery vehicle. Specifically, if a Potentially Responsible Party ("PRP")

cannot sue under § 113 without first having been sued under § 106 or § 107, can the PRP sue

under § 107? The Court reserved judgment,[3] and cast into doubt established readings of § 107:

> To hold here that Aviall may pursue a § 107 action, we would have to consider whether
> these [eight circuit court] decisions are correct, an issue that Aviall has flagged but not
> briefed. And we might have to consider other issues, also not briefed, such as whether
> Aviall, which seeks to recover the share of its cleanup costs fairly chargeable to Cooper,
> may pursue a § 107 cost recovery action for some form of liability other than joint and
> several. We think it more prudent to withhold judgment on these matters.

125 S.Ct. at 585. The Court's string citation of circuit opinions cast in doubt includes five relied

upon in Conalco's Memorandum, one of which is a First Circuit opinion, United Technologies

Corp. v. Browning-Ferris Industries, 33 F.3d 96 (1st Cir. 1994). These precedents, through

various rationales, indicated that a PRP must sue under § 113, rather than § 107.

The impact of Cooper Industries upon the reading of § 107 derives in part from the

Court's pronouncing the existing corpus of case law uncertain, and in larger measure from the

practical impact of the opinion's § 113 interpretation. The Second Circuit, recognizing the effect

of Cooper Industries on its own Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998) (cited

four times in Conalco's Memorandum), recently explained the problem:

---

[2] Plaintiff has not alleged that he is being sued under either § 106 or § 107.

[3] The two dissenting justices believed the Court had already decided the question in the affirmative, relying upon
Key Tronic Corp. v. United States, 511 U.S. 809 (1994), which stated that § 107 "unquestionably provides a cause
of action for PRPs to seek recovery of cleanup costs." Cooper Industries, 125 S.Ct at 586 (quoting Key Tronic, 511
U.S. at 818). The Cooper Industries majority deemed that and other statements in Key Tronic non-binding dictum.
Cooper Industries, 125 S.Ct. at 585-86.

> Together, <u>Cooper Industries</u> and <u>Bedford Affiliates</u>, [which held that that a plaintiff who is also a PRP may not bring a cost recovery action under § 107(a) and is instead limited to suing for contribution under § 113,] leave a PRP with no mechanism for recovering response costs until proceedings are brought against the PRP. This might discourage PRPs from voluntarily initiating clean-up, contrary to CERCLA's stated purpose of "induc[ing] such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites." H.R. Rep. No. 96-1016(I), at 17 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6120. This is because if a PRP remediates a facility on its own initiative, it reduces the likelihood that it will be sued under § 106 or § 107(a), and thereby jeopardizes its opportunity to seek contribution under § 113(f) from other PRPs. The combination of <u>Cooper Industries</u> and <u>Bedford Affiliates</u>, if the latter remains unaltered, would create a perverse incentive for PRPs to wait until they are sued before incurring response costs.

<u>Syms v. Olin Corp.</u>, No. 03-6234, 2005 U.S. App. LEXIS 8885, slip op. at 18 n.8 (2d Cir. May 18, 2005) (<u>slip opinion attached</u>).

After remand from the Supreme Court in <u>Cooper Industries</u>, the Fifth Circuit, en banc, issued the following order:

> It is ORDERED that Aviall Services' motion for further decision by the en banc court is DENIED; and the case is REMANDED to the district court with instructions to permit Aviall Services to amend its complaint, if necessary, to assert, free of any challenges of waiver or forfeiture, whatever statutory claims it urges in light of the Supreme Court's decision, without prejudice to Cooper Industries' other defenses.

<u>Aviall Services, Inc. v. Cooper Industries Inc.</u>, No. 00-10197, Feb. 15, 2005 Order (5th Cir. PACER Docket Sheet, viewed June 20, 2005) (en banc) (<u>docket sheet attached</u>). By allowing Aviall Services to reframe its complaint under § 107, free from the defenses of waiver and forfeiture, the Fifth Circuit has cleaned the slate for an examination of CERCLA post-<u>Cooper Industries</u>. The Second Circuit in <u>Syms</u> similarly remanded to "allow the district court to address in the first instance the issue of Somerset's eligibility to sue under § 107(a)." <u>Syms</u>, slip op. at 19 (<u>slip opinion attached</u>).

The First Circuit has yet to issue an opinion considering the impact of <u>Cooper Industries</u> on First Circuit case law concerning § 107.  Already in 1994, though, the First Circuit acknowledged the possibility

> that, although falling outside the statutory parameters established for an express cause of action for contribution, <u>see</u> 42 U.S.C. § 9613(f)(1), a PRP who spontaneously initiates a cleanup without governmental prodding might be able to pursue an implied right of action for contribution under 42 U.S.C. § 9607(c).  <u>See</u> <u>Key Tronic Corp. v. United States</u>, 511 U.S. 809, 816, 114 S.Ct. 1960, 1966, 128 L.Ed.2d 797 (1994) (explaining that CERCLA now "expressly authorizes a cause of action for contribution in [§ 9613] and impliedly authorizes a similar and somewhat overlapping remedy in [§ 9607]"); <u>cf.</u> <u>In re Hemingway Transp., Inc.</u>, 993 F.2d 915, 931 (1st Cir.) (stating in dictum that "in the event the private-action plaintiff itself is potentially 'liable' to the EPA for response costs, and thus is akin to a joint 'tortfeasor,' section 9607(a)(4)(B) serves as the pre-enforcement analog to the 'impleader' contribution action permitted under section 9613(f)"), <u>cert. denied</u>, 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993).

<u>United Technologies Corp.</u>, 33 F.3d 96, 99 n.8 (1st Cir. 1994).  The possibility identified by the First Circuit more than ten years ago is ripe for reconsideration under the Supreme Court's new CERCLA jurisprudence.

Those precedents relied upon by Conalco for the proposition that § 107 is not available to plaintiff to recover necessary cleanup costs[4] stand, at best, fractured.  Granting the motion to dismiss entails the conclusion that CERCLA itself is in disrepair, incapable of promoting environmental cleanup by the often times best-placed party, a PRP willing to begin recovery efforts.  After <u>Cooper Industries</u>, the assumption that CERCLA gave effect to this policy through

---

[4] Conalco misconstrues these precedents.  For example, Conalco offers the following parenthetical from <u>United Technologies</u> to support the broad claim that only innocent parties may resort to § 107: "only innocent parties – not parties who were themselves liable – [are] permitted to recoup the whole of their expenditures" under Section 9607.  <u>United Technologies</u>, 33 F.3d at 100.  This, however, only states the common sense proposition that a PRP cannot recover from others the costs incurred to cleanup its own share of the pollution.  This says nothing about the right to sue § 107 to recover the fair share from other PRPs.  Conalco's citation to <u>Davis</u> is misleading; Conalco points to pages 28-29 for the same proposition, that only innocent parties may resort to § 107.  The language referred to is the following: "When an innocent party, usually the government, brings a cost recovery action under § 9607, CERCLA imposes strict liability for the costs of cleanup on a party found to be an owner or operator, past operator, transporter, or arranger."  <u>Davis</u>, 261 F.3d at 28-29.  The Court says nothing about the operation of § 107 when a PRP sues.  Thus, contrary to the Second Circuit, with an unequivocal <u>Bedford Affiliates</u>, the First Circuit may face less resistance from its case law in adapting to the "new" CERCLA.

§ 113 is obsolete, and both Courts of Appeal to encounter the problem, the Fifth and Second Circuits, have given their district courts a broad mandate to reexamine the scope of § 107.

<u>CONCLUSION</u>

This Court should deny the motion to dismiss Count I of the complaint.[5]  In the alternative, the Court should withhold judgment on the motion until this rapidly-shifting area of law finds new guideposts.[6]  Should the Court determine it must grant the motion under the state of the law, plaintiff requests that any such dismissal be without prejudice to the later amendment of the complaint following intervening authority approving plaintiff's right to sue under § 107.

The Plaintiff,
James V. Cariddi
By his attorneys:

Dated:  June 22, 2005                    /s/ Christopher B. Myhrum_____

Christopher B. Myhrum
BBO No. 365980
Bulkley, Richardson and Gelinas, LLP
1500 Main Street - Suite 2700
Springfield, MA 01115-5507
Tel:  (413) 781-2820
Fax:  (413) 272-6806

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on June 22, 2005.

/s/ Christopher B. Myhrum

---

[5] A denial of the motion will not prejudice the proceedings.  The scope of discovery in this action, as defined by Count II, will neither increase nor decrease on account of the Court's judgment upon this motion.

[6] Aviall Services has 30 days from June 2, 2005 to file an Amended Complaint in the District Court for the Northern District of Texas, under the parameters set by the Fifth Circuit.

1              **UNITED STATES COURT OF APPEALS**
2                  **FOR THE SECOND CIRCUIT**

3                        August Term, 2004

4    (Argued: November 16, 2004                    Decided: May 18, 2005)

5                      Docket No.  03-6234

6    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

7    EILEEN SYMS, individually and as Administrator of the
8    ESTATE OF JOHN SYMS; THE SOMERSET GROUP,
9    INC.; UNITOOL CORPORATION; LEW-PORT
10   CONSTRUCTION CORPORATION; C&S MACHINERY
11   CORPORATION; SYMS EQUIPMENT RENTAL
12   CORPORATION; LEW-PORT ELECTRIC
13   CORPORATION,

14                  <u>Plaintiff-Appellants,</u>
15          -v.-

16   OLIN CORPORATION; UNITED STATES
17   DEPARTMENT OF DEFENSE; DONALD RUMSFELD,
18   in his official capacity as Secretary of Defense; UNITED
19   STATES DEPARTMENT OF THE ARMY; THOMAS E.
20   WHITE, in his capacity as Secretary of the Army; UNITED
21   STATES DEPARTMENT OF AIR FORCE; DR. JAMES
22   G. ROCHE, in his official capacity as Secretary of the Air
23   Force; UNITED STATES NUCLEAR REGULATORY
24   COMMISSION; RICHARD MESERVE, in his official
25   capacity as chairman of the United States Nuclear
26   Regulatory Commission; UNITED STATES OF
27   AMERICA,

28                  <u>Defendant-Appellees.</u>
29
30   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

1

2    Before: FEINBERG, LEVAL, STRAUB, *Circuit Judges*.

3         Plaintiff-appellants appeal from a judgment of the United States District Court for the
4    Western District of New York (Richard J. Arcara, *J.*), which granted summary judgment in favor
5    of defendant-appellees (collectively "defendants"). The Court of Appeals (Leval, *J.*) holds that
6    (1) plaintiff-appellants are not eligible to seek contribution under CERLCA § 113(f); (2) the
7    radioactive contamination claims under CERCLA are time-barred; (3) a genuine issue of material
8    fact exists as to whether necessary response costs were incurred admitting government officials
9    and contractors to the site; (4) the other response costs allegedly incurred are not recoverable
10   under CERCLA; and (5) the claims under the Federal Tort Claims Act are time-barred.
11   AFFIRMED IN PART, VACATED IN PART, and REMANDED.

12                                Alan J. Knauf and Linda R. Shaw, Knauf Shaw
13                                LLP, Rochester, NY (Ronald L. Kuis, Pittsburgh,
14                                PA, on the brief), for *Plaintiff-Appellants*.

15                                JoAnn T. Sandifer, Husch & Eppenberger, LLC,
16                                (David R. Dyroff, Jr., Michael D. Montgomery, on
17                                the brief), St. Louis, MO, for *Defendant-Appellee*
18                                *Olin Corporation*.

19                                David S. Fishback, Assistant Director,
20                                Environmental Torts Section, Civil Division, and
21                                Todd S. Aagaard, Environment & Natural
22                                Resources Division, Department of Justice (Peter D.
23                                Keisler, Assistant Attorney General, Civil Division;
24                                J. Patrick Glynn, Director, and Timothy B. Walthall,
25                                Attorney, Environmental Torts Section, Civil
26                                Division; Thomas L. Sansonetti, Assistant Attorney
27                                General, and Michele Walter, Attorney,
28                                Environment & Natural Resources Division, on the
29                                brief), Washington, D.C., for *Federal Appellees*.

30   LEVAL, *Circuit Judge*:

31         Plaintiff-appellants, all persons and entities related to John Syms and the Somerset Group

32   (collectively "Somerset"), appeal from the grant of summary judgment by the United States

2

1    District Court for the Western District of New York (Richard J. Arcara, *J.*) in favor of the

2    defendant-appellees (collectively "defendants"). The suit sought primarily to recover necessary

3    response costs Somerset had allegedly incurred in the cleanup of hazardous substances, as well as

4    alleged injury to the value of Somerset's property. The judgment dismissed the claims brought

5    under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980

6    (CERCLA) and the Federal Tort Claims Act (FTCA); the court declined to exercise supplemental

7    jurisdiction over the state law claims against defendant-appellee Olin Corporation. We affirm in

8    part because (1) Somerset is not eligible to seek contribution under CERLCA § 113(f); (2) its

9    radioactive contamination claims under CERCLA are time-barred; (3) other costs it incurred are

10    not recoverable under CERCLA; and (4) its claims under FTCA are time-barred. We vacate in

11    part and remand because a genuine issue of material fact exists as to whether Somerset incurred

12    recoverable necessary response costs in admitting government officials and contractors onto its

13    property.

14                                             **BACKGROUND**

15        In 1942, the United States Department of War purchased 7500 acres in Niagara County,

16    New York to establish the Lake Ontario Ordnance Works (LOOW). The Department of War

17    used approximately 2500 acres for a TNT plant and related military activities, leaving the

18    remaining 5000 acres as a buffer zone. TNT production at LOOW ceased in 1943, and the site

19    was thereafter used for the disposal of radioactive waste from uranium processing operations

20    associated with the Manhattan Project and various contaminants from the Army's chemical

21    warfare service. Waste was left in drums that sat along the roadside for months, in a cooling

1    tower not designed to hold hazardous materials, and in outdoor piles.  The government also dug a

2    series of trenches to drain radioactive waste into the Central Drainage Ditch, which flowed into

3    several nearby creeks.

4          During the 1950s, Olin Corp. operated an experimental fuel production facility at LOOW,

5    which manufactured aviation fuel using boron.  The government cancelled Olin's contract before

6    the plant became fully productive, but Olin remained at LOOW to perform decommissioning

7    activities that included dumping, burying, and burning various chemicals.

8          In 1966, the government sold 564 acres of LOOW to Fort Conti Corp., which is not a

9    party to this suit.  Fort Conti in turn sold 132 acres to Somerset Group in 1970, which was owned

10   by John Syms.  Syms also owned or controlled the other plaintiff corporations.

11         Somerset renovated the buildings on the site between 1970 and 1972 and eventually

12   opened the Lew-Port Industrial Park.  In April 1972, the New York Department of Health issued

13   an order restricting the use of the site, citing concern about exposure to radioactive material.  The

14   Department of Health instructed Somerset not to develop the property any further or to allow any

15   existing uses to expand.  It further specified that decontamination efforts undertaken by anyone

16   other than the government could proceed only with the express approval of the Department of

17   Health.

18         Somerset cancelled its tenants' leases, extended fencing around the entire site, and hired

19   guards to secure the property.  John Syms then mounted a lobbying campaign in Albany and

20   Washington, D.C. to obtain relief.  In 1974, the Department of Health issued a supplementary

21   order authorizing Somerset to resume commercial and industrial activities on most of the site.

1     The order continued to prohibit construction in the areas around the Central Drainage Ditch and

2     Six Mile Creek.  After issuance of the order, Somerset began attracting new tenants, but in late

3     1974 the Town of Lewiston cut off the water supply to the site out of concern that contamination

4     would enter the water while it circulated through the site.

5          Somerset filed for bankruptcy in 1980.  At the prompting of the bankruptcy court,

6     Somerset sold 93 acres of the site to its neighbor, which operated an industrial waste landfill on

7     the adjacent property.

8          Between 1982 and 1984, the government began to consolidate radioactive contamination

9     across LOOW into a 191-acre area known as the Niagara Falls Storage Site (NFSS).  The NFSS

10    is located a half-mile from the site and connected to it by the Central Drainage Ditch.  As part of

11    the consolidation, a government contractor removed soil and silt along the Central Drainage

12    Ditch and several other parts of the property.  The Department of Energy wrote to Somerset on

13    December 29, 1986 to inform it that "the results of the post-remedial action radiological surveys

14    have been verified and that remedial action on your property has been satisfactorily completed."

15    The letter explained that the property was "in compliance with the standards and guidelines

16    applicable to the remedial actions at the Niagara Falls Storage Site."  It indicated that a "formal

17    certification statement on your property will be forwarded to you in the near future."  The

18    certificate was not sent until May 7, 1992.

19         Meanwhile, Somerset continued pushing for cleanup of the nonradioactive contamination

20    on its property.  In 1998, the Army Corps of Engineers commenced a Phase I Remedial

21    Investigation/Feasibility Study and performed interim asbestos abatement on Somerset's

1    property.  In 1999, the Army Corps released preliminary results from its investigation at a public

2    meeting where Somerset allegedly learned for the first time that the groundwater was

3    contaminated with lithium and an explosive known as RDX.

4        On August 25, 1999, Somerset submitted a demand and claim letter to the Department of

5    Justice, seeking to recover response costs it allegedly incurred in the cleanup of hazardous

6    substances and damages for injury to the value of its property.  The government denied the claim.

7    Having exhausted its administrative remedies, Somerset filed this suit in the Western District of

8    New York on August 23, 2000.  It alleged fifteen causes of action under CERCLA, 42 U.S.C. §

9    1983, various provisions of New York statutory and common law, and the Federal Tort Claims

10   Act (FTCA).  Somerset asserted all fifteen causes of action against the government, and all but

11   four against Olin.

12       All parties filed for summary judgment.  The magistrate judge recommended granting

13   defendants summary judgment on the CERCLA claims, because it considered Somerset to be a

14   potentially responsible party ineligible for cost recovery under § 107(a), and because Somerset

15   had failed to demonstrate that the response costs it incurred were necessary and in conformance

16   with the national contingency plan.  In the alternative, the magistrate judge concluded that

17   Somerset's CERCLA § 107(a) recovery claim was time-barred with respect to radioactive

18   contamination.  The magistrate judge also recommended granting the government summary

19   judgment on the § 1983 claim, because § 1983 provides a cause of action against persons acting

20   under color of state law, not persons acting under color of federal law.  As for claims under the

21   FTCA, the magistrate judge recommended granting the government summary judgment under

1    the FTCA's two-year statute of limitations.  *See* 28 U.S.C. § 2401(b).  In the alternative, the

2    magistrate judge suggested that the discretionary function exception to the FTCA shielded the

3    government from liability, except on Somerset's claim of failure to warn.  The magistrate judge

4    recommended that the district court decline to exercise supplemental jurisdiction over the state

5    law claims against Olin.

6        The district court partially adopted the reasoning of the magistrate judge's report.  It

7    granted defendants summary judgment on the CERCLA claims on the ground that Somerset had

8    failed to demonstrate the necessity of its response costs.  It granted the government summary

9    judgment on the FTCA claims by reason of untimeliness.  Finally, the district court declined to

10    exercise supplemental jurisdiction over the remaining state law claims against Olin.  Somerset

11    then brought this appeal.

12                                        **DISCUSSION**

13        We review the district court's grant of summary judgment *de novo*, construing the

14    evidence in the light most favorable to Somerset as the nonmoving party and drawing all

15    reasonable inferences in its favor.  *See Anthony v. City of New York*, 339 F.3d 129, 134 (2d Cir.

16    2003).

17    **I. CERCLA**

18        CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986

19    (SARA), provides two primary mechanisms for private parties to recover costs incurred in

20    response to the release or threatened release of a hazardous substance: a cost recovery action

21    under § 107(a), and suit for contribution under § 113(f).  Somerset filed claims under both §

1    107(a) and § 113(f) seeking to recover costs incurred for: (1) security fencing installed in the

2    mid-1970s; (2) security guards and guard dogs; (3) the provision of an alternative water supply;

3    (4) the presence of John and Eileen Syms to admit contractors to the site; (5) John Syms's travel

4    to meet with government officials in the late 1970s; (6) a set of as-built drawings purchased in

5    the late 1970s; (7) maintenance of the property; (8) damage caused by workers removing asbestos

6    in 1998; (9) the investigative activities of counsel; (10) a survey conducted in 2000 of radioactive

7    contamination in the Central Drainage Ditch; and (11) future medical monitoring.

8            While this case was pending on appeal, the Supreme Court held that a private party

9    cannot obtain a judgment for contribution under § 113(f) unless it has been sued under § 106 or §

10   107(a).  *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 125 S. Ct. 577 (2004).  Because Somerset has

11   not been sued under § 106 or § 107(a), it is ineligible to seek contribution under § 113(f).  We

12   therefore affirm the district court's grant of summary judgment to defendants on Somerset's §

13   113(f) claim, and focus for the remainder of this discussion on Somerset's § 107(a) claim.

14           Section 107(a) imposes strict liability, subject to certain defenses, on four classes of

15   potentially responsible persons (PRPs): (1) current owners and operators of contaminated

16   facilities; (2) previous owners and operators of such facilities; (3) generators of hazardous

17   substances; and (4) transporters of hazardous substances.  42 U.S.C. § 9607(a); *Bedford Affiliates*

18   *v. Sills*, 156 F.3d 416, 423 (2d Cir. 1998).  The definition of "person" includes the federal

19   government.  42 U.S.C. § 9601(21).  A private party may sue a PRP under § 107(a) to recover

20   "necessary costs" of responding to the release, or threatened release, of hazardous substances,

21   "consistent with the national contingency plan."  *Id*. § 9607(a)(4)(B); *Bedford Affiliates*, 156 F.3d

8

1    at 427.

2        CERCLA defines the term "response" as encompassing both "removal" efforts and

3    "remedial actions." 42 U.S.C. § 9601(25). Broadly speaking, removal includes efforts to clean

4    up a site, prevent the threatened release of hazardous substances, and dispose of removed

5    material. *Id*. § 9601(23).[1] Remedial action includes more permanent efforts to store, confine,

6    recycle, or destroy hazardous substances. *Id*. § 9601(24).[2]

---

[1] Section 101(23) of CERCLA states:
The terms "remove" or "removal" means [sic] the cleanup or removal of released
hazardous substances from the environment, such actions as may be necessary
taken in the event of the threat of release of hazardous substances into the
environment, such actions as may be necessary to monitor, assess, and evaluate
the release or threat of release of hazardous substances, the disposal of removed
material, or the taking of such other actions as may be necessary to prevent,
minimize, or mitigate damage to the public health or welfare or to the
environment, which may otherwise result from a release or threat of release. The
term includes, in addition, without being limited to, security fencing or other
measures to limit access, provision of alternative water supplies, temporary
evacuation and housing of threatened individuals not otherwise provided for,
action taken under [42 U.S.C. § 9604(b)], and any emergency assistance which
may be provided under the Disaster Relief Act and Emergency Assistance Act.
42 U.S.C. § 9601(23).

[2] Section 101(24) of CERCLA states:
The terms "remedy" or "remedial action" means [sic] those actions consistent
with permanent remedy taken instead of or in addition to removal actions in the
event of a release or threatened release of a hazardous substance into the
environment, to prevent or minimize the release of hazardous substances so that
they do not migrate to cause substantial danger to present or future public health
or welfare or the environment. The term includes, but is not limited to, such
actions at the location of the release as storage, confinement, perimeter protection
using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released
hazardous substances and associated contaminated materials, recycling or reuse,
diversion, destruction, segregation of reactive wastes, dredging or excavations,
repair or replacement of leaking containers, collection of leachate and runoff,
onsite treatment or incineration, provision of alternative water supplies, and any
monitoring reasonably required to assure that such actions protect the public

9

1    **A. *Statute of Limitations***

2       The applicable statute of limitations under CERCLA varies depending on whether

3    response costs were incurred in connection with a removal or remedial action.  For suits under §

4    107(a), a plaintiff has three years after completion of a removal action to file suit.  42 U.S.C. §

5    9613(g)(2)(A).  If a remedial action is commenced within three years of the completion of a

6    removal action, the statute of limitations for removal costs is tolled and the plaintiff may recover

7    the removal costs at the time he recovers any remedial costs.  *Id.* § 9613(g)(2)(B).  A suit to

8    recover remedial costs must be filed within six years after "initiation of physical on-site

9    construction of the remedial action."  *Id.*

10      The district court did not discuss the statute of limitations in dismissing Somerset's §

11   107(a) claims for radioactive contamination, but the magistrate judge concluded that these claims

12   are time-barred.[3]  We agree with the magistrate judge.  *See ACEquip Ltd. v. Am. Eng'g Corp.,*

13   315 F.3d 151, 155 (2d Cir. 2003) ("Our court may, of course, affirm the district court's judgment

---------------------

health and welfare and the environment.  The term includes the costs of
permanent relocation of residents and businesses and community facilities where
the President determines that, alone or in combination with other measures, such
relocation is more cost-effective than and environmentally preferable to the
transportation, storage, treatment, destruction, or secure disposition offsite of
hazardous substances, or may otherwise be necessary to protect the public health
or welfare; the term includes offsite transport and offsite storage, treatment,
destruction, or secure disposition of hazardous substances and associated
contaminated materials.

42 U.S.C. § 9601(24).

[3] We refer only to the contamination that was discovered in the 1970s and cleaned up in
1986.  Somerset has alleged that the NFSS is leaking new radioactive contamination.  The survey
of the Central Drainage Ditch conducted in 2000, which is the only cost arguably incurred in
response to this new contamination, is discussed separately below.

1    on any ground appearing in the record, even if the ground is different from the one relied on by

2    the district court.").

3         The government completed cleaning Somerset's property in 1986. It informed Somerset

4    of its progress in December 1986, and sent Somerset a formal certificate of compliance on May

5    7, 1992. Even if the six-year statute of limitations had not begun running until Somerset received

6    the certificate, the time for filing a cost recovery action for all response costs resulting from

7    radioactive contamination expired at the latest on May 7, 1998. Somerset did not file its demand

8    and claim letter until August 25, 1999. Its action under § 107(a) with respect to radioactive

9    contamination cleaned up in 1986 is accordingly time-barred.[4]

10   **B. *Necessity of Other Response Costs***

11        Section 107(a)(4)(B) establishes liability for "*necessary* costs of response." 42 U.S.C. §

12   9607(a)(4)(B) (emphasis added). The district court concluded that the response costs incurred by

13   Somerset were not necessary to address a threat to human health or the environment. We affirm

14   the judgment of the district court with respect to non-time-barred costs involving physical

15   maintenance of the site; damage caused during asbestos removal; the activities of counsel; the

16   2000 survey of the Central Drainage Ditch; individual medical monitoring; and time spent on the

---

[4] Specifically, the statute of limitations has run on Somerset's attempt to recover the costs of security fencing installed in the mid-1970s to protect trespassers against exposure to radioactive contamination; security guards deployed from 1972-1980; guard dogs purchased in 1972; the alternative water supply Somerset provided after the Town of Lewistown cut off service in 1974; John Syms's travel to meet with government officials in the late 1970s; a set of as-built drawings purchased in the late 1970s; and the effort John and Eileen Syms expended admitting contractors to the site and maintaining the property during the radiological clean-up. There is no evidence in the record that these costs were incurred in response to anything other than radioactive contamination. Because the statute of limitations has run, we express no opinion on whether any of the costs would have been recoverable in a timely action.

1    site merely in anticipation that a government official or contractor might need to be given access.

2    We conclude, however, that a genuine issue of material fact precludes summary judgment with

3    respect to non-time-barred costs incurred in actually providing the government with access to the

4    site.

5    1. *Physical Maintenance of Site*

6         Somerset seeks recovery of costs it incurred to patch roadways, mow grass, and plow

7    snow. This routine physical maintenance helped government contractors access Somerset's

8    property. Somerset has not demonstrated, however, that it undertook the maintenance to

9    facilitate clean-up efforts. In fact, John Syms candidly admitted in his deposition that the

10   roadway patching and snow removal did not "relate to the investigation or cleanup of any

11   contamination."

12   2. *Damage Caused During Asbestos Removal*

13        Somerset seeks compensation for damage allegedly caused in 1998 by government

14   contractors performing asbestos abatement. Somerset initially wrote the Army Corps of

15   Engineers demanding $184,018 for the damage. At his deposition, however, John Syms could

16   recall spending only $1000 to replace a broken telephone pole.

17        Costs incurred to repair damage caused by clean-up crews are not usually recoverable

18   under CERCLA. *See Bello v. Barden Corp.*, 180 F. Supp. 2d 300, 309 (D. Conn. 2002). In

19   *Bello*, the plaintiff intended to spend $2680 to clear debris left behind after a clean-up operation

20   conducted by the EPA and sought a declaratory judgment under CERCLA forcing the

21   government to pay for it. *Id*. at 304. The district court denied the claim because the plaintiff had

1    failed to indicate in its complaint that it would incur the future costs consistent with the national

2    contingency plan. *Id*. at 308. In the alternative, the district court stated that even if the complaint

3    were amended, the plaintiff would not be able to recover the debris-clearing expenses under

4    CERCLA. The district court reasoned that a response is necessary within the meaning of the

5    statute only when it addresses a threat to human health or the environment posed by a hazardous

6    substance. Any such threat had abated when the EPA finished its clean-up, and therefore the

7    plaintiff should have sought compensation through a suit for property damage. *Id*. at 309. We

8    agree with the reasoning of the *Bello* court. Repair of damage caused during clean-up of

9    contamination gives rise to an ordinary tort action, not a cost recovery action under CERCLA.

10   3. *Activities of Counsel*

11          Somerset seeks to recover the costs associated with counsel's efforts reviewing historical

12   documents, analyzing boxes of data related to contamination, attempting to identify other PRPs,

13   commenting on work plans, and facilitating site access. The leading case dealing with the

14   recovery of attorney's fees is *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994). The

15   Supreme Court held in *Key Tronic* that private litigants may not recover litigation-related and

16   settlement-related attorney's fees as a necessary cost under CERCLA, but that not "all payments

17   that happen to be made to a lawyer are unrecoverable expenses" and "some lawyers' work that is

18   closely tied to the actual cleanup may constitute a necessary cost of response." *Id*. at 819-20.

19   Specifically, it held that the expenses counsel had incurred uncovering the Air Force's disposal

20   of wastes, which in turn prompted the EPA to initiate an enforcement action against the Air

21   Force, were recoverable. The Court reasoned that tracking down other polluters benefits overall

1   clean-up efforts in a way that litigation to apportion costs does not. *Id*. at 820. We have

2   similarly stated that "expenses incurred solely in preparation for litigation cannot be recovered as

3   response costs unless they significantly benefitted the entire cleanup effort and served a statutory

4   purpose apart from the reallocation of costs." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85,

5   92 (2d Cir. 2000) (per curiam) (internal quotation marks omitted).

6          Somerset has not presented evidence that its efforts uncovered the identity of any PRPs.

7   The government was already aware of Olin's activities, and there is no evidence in the record that

8   Somerset's duplicative identification of Olin significantly benefitted the overall clean-up effort.

9          The other legal activities, such as negotiating site access, also fail to qualify as necessary

10  response costs. In *Key Tronic*, counsel supervised studies during its negotiations with the EPA

11  that may have affected the scope and form of the clean-up. 511 U.S. at 820. The Supreme Court

12  held that Key Tronic could not recover these costs because counsel was "primarily protecting

13  Key Tronic's interests as a defendant in the proceedings that established the extent of its

14  liability." *Id*. The same reasoning applies in this case. Even though the site access negotiations

15  were not directly related to litigation, they primarily protected the interests of Somerset as the

16  landowner and do not constitute necessary response costs.

17  4. *Survey of Radioactive Contamination in the Central Drainage Ditch*

18         Somerset's attorneys hired contractors to perform a limited radiological investigation of

19  the Central Drainage Ditch after learning in 2000 that the government had no intention of

20  reinvestigating the ditch. Somerset was concerned by recent reports of radioactive contamination

21  leaking from the NFSS, which is located a half-mile from its property and connected to it by the

14

1    Central Drainage Ditch.  The study found trace levels of radiation, but the results were

2    inconclusive.  Somerset forwarded the results to the Army Corps of Engineers.

3         Defendants claim the tests were not necessary response costs because they were

4    performed in preparation for litigation.  Although John Syms admitted in his deposition that the

5    testing was not done for the purpose of preparing to clean-up the Central Drainage Ditch, he

6    denied that the testing was litigation-related.  A genuine issue of material facts therefore exists as

7    to the motivation for the testing.

8         Summary judgment was nevertheless appropriate for a different reason.  The parties do

9    not dispute that Somerset's attorneys paid for the testing.  Somerset has not reimbursed them,

10   and there is no evidence in the record that it is obligated to do so.  Somerset therefore has not

11   actually incurred any response costs related to the 2000 testing, as far as the record discloses, and

12   cannot maintain a suit under § 107(a) to recover those costs.

13   5. *Medical Monitoring*

14        Eileen Syms seeks a declaratory judgment requiring defendants to pay for future medical

15   monitoring.  Although district courts have split on the issue, the only two courts of appeals to

16   consider the matter have concluded that such private monitoring of an individual's health is not a

17   valid response cost under CERCLA.[5]  *See Price v. U.S. Navy*, 39 F.3d 1011, 1015-17 (9th Cir.

18   1994); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1537 (10th Cir. 1992).  In *Daigle*, the plaintiffs

19   argued that CERCLA covers medical monitoring for two reasons.  First, the definition of

_____

[5] The one court of appeals case cited by Somerset in support of its argument involved a
claim for medical monitoring brought under state law, not CERCLA.  *See In re Paoli R.R. Yard
PCB Litig.*, 113 F.3d 444 (3d Cir. 1997).

1    removal includes "such actions as may be necessary to *monitor*, assess, and evaluate the release

2    or threat of release of hazardous substances, the disposal of removed material, or the taking of

3    such other actions *as may be necessary to prevent, minimize, or mitigate damage to the public*

4    *health* or welfare or to the environment, which may otherwise result from a release or threat of

5    release." 42 U.S.C. § 9601(23) (emphasis added).  Second, the definition of remedial action

6    includes "any monitoring reasonably required to assure that such actions protect the public health

7    and welfare." *Id.* § 9601(24).

8         The Tenth Circuit concluded that the monitoring mentioned by the statute, when read in

9    context, refers to monitoring necessary to prevent contact with hazardous substances, not

10   monitoring to detect future disease based on prior exposure to hazardous substances. *Daigle*, 972

11   F.2d at 1535.  It noted that both houses of Congress had rejected bills providing damages for

12   personal injury and medical expenses. *Id.* at 1535-36.  In addition, CERCLA separately provides

13   for public health monitoring through the Agency for Toxic Substances and Disease Registry. *See*

14   42 U.S.C. § 9604(i).

15        We agree with the Tenth and Ninth Circuits.  Eileen Syms is not entitled under CERCLA

16   to a declaratory judgment requiring defendants to pay for individual medical monitoring related

17   to her prior exposure to hazardous substances.

18   6. *Presence on Site to Admit Contractors*

19        Somerset claims that various site access agreements with the government "required" John

20   and Eileen Syms "to be present every business day" to let government officials and contractors

21   onto the property.  This "requirement" allegedly arose because contractors failed to provide

16

1    proper notice of their visits as mandated by the site access agreement.  Because the Syms could

2    have easily avoided the need to remain constantly on the site by insisting that contractors

3    announce their visits in advance, time spent on the site merely in anticipation that a government

4    official or contractor might show up cannot be considered a necessary response cost.

5          As for the amount of time spent actually admitting contractors to the site, the extent of

6    which is unclear from the record, we conclude that a genuine issue of material fact precludes

7    summary judgment.  Somerset has failed to specify precisely what steps it took to admit

8    contractors, when it took those steps, and what the circumstances were at the time.  The record

9    does indicate in general terms, however, that John and Eileen Syms spent some time admitting

10    government officials and contractors to the site in connection with the Remedial

11    Investigation/Feasibility Study commenced in 1998 and the interim asbestos abatement

12    conducted in the same year.  This is sufficient to raise a genuine issue of material fact as to

13    whether the Syms incurred necessary response costs while actually admitting government

14    officials and contractors to the site.[6]  We therefore remand the case to the district court on this

15    limited point.[7]

16    **C. *Somerset's Eligibility to Sue Under § 107(a)***

17          We held in *Bedford Affiliates* that a plaintiff who is also a PRP may not bring a cost

---

[6] Section 104(e) provides the government with a qualified right to enter contaminated property and the right to commence a civil action to compel access if it is denied.  *See* 42 U.S.C. § 9604(e)(3)-(5).  Defendants have not argued that this provision evinces an intent to exclude from the definition of response costs time spent admitting government officials to a contaminated site.  We therefore do not address that question.

[7] The scope of the remand is also limited by our holding that the statute of limitations has run on costs incurred in response to radioactive contamination cleaned up in 1986.

1    recovery action under § 107(a) and is instead limited to suing for contribution under § 113.  156

2    F.3d at 424.  Defendants allege that Somerset is a PRP because it contributed to the

3    contamination of its property by leasing a parcel to its neighbor to use as a landfill.  Defendants

4    accordingly argue that Somerset cannot sue under § 107(a).  Somerset responds that it is not a

5    PRP and that the Supreme Court's ruling in *Cooper Industries* has fatally undermined *Bedford*

6    *Affiliates*.[8]

7         The district court did not expressly consider whether Somerset was eligible to sue under §

8    107(a) because, assuming Somerset could sue, it reasoned that the costs incurred were not

9    necessary within the meaning of CERCLA.  Because we conclude that summary judgment

10   should not have been granted with respect to certain costs Somerset incurred while admitting

11   government officials and contractors to the site, we must decide whether to address Somerset's

12   eligibility to sue under § 107(a).  Although we have the authority to affirm the district court

---

[8] *Bedford Affiliates* expressed concern that § 113(f) would be rendered superfluous if PRPs could choose whether to bring suit under § 107(a) or § 113(f), because PRPs would always choose to proceed under § 107(a), which provides a more generous statute of limitations in certain circumstances, *compare* 42 U.S.C. § 9613(g)(2), *with id.* § 9613(g)(3), and provides for joint and several liability unless a defendant proves the harm is divisible.  *Bedford Affiliates*, 156 F.3d at 424.  Somerset, in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j), argues that *Cooper Industries* partially undermines this portion of *Bedford Affiliates*' reasoning by clarifying that a PRP can seek contribution under § 113(f) only after being sued under § 106 or § 107(a).  Together, *Cooper Industries* and *Bedford Affiliates* leave a PRP with no mechanism for recovering response costs until proceedings are brought against the PRP.  This might discourage PRPs from voluntarily initiating clean-up, contrary to CERCLA's stated purpose of "induc[ing] such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites."  H.R. Rep. No. 96-1016(I), at 17 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120.  This is because if a PRP remediates a facility on its own initiative, it reduces the likelihood that it will be sued under § 106 or § 107(a), and thereby jeopardizes its opportunity to seek contribution under § 113(f) from other PRPs.  The combination of *Cooper Industries* and *Bedford Affiliates*, if the latter remains unaltered, would create a perverse incentive for PRPs to wait until they are sued before incurring response costs.

1    opinion on any basis supported by the record, *ACEquip*, 315 F.3d at 155, we decline to exercise

2    that authority with respect to determining whether Somerset is a PRP or whether the rule

3    announced in *Bedford Affiliates* remains viable after *Cooper Industries*. *Cooper Industries* was

4    decided after oral argument was held in this case, and the parties have not fully briefed or argued

5    its impact on *Bedford Affiliates*. We therefore believe the best course is simply to vacate the

6    judgment and to allow the district court to address in the first instance the issue of Somerset's

7    eligibility to sue under § 107(a).[9]

8    **III. Federal Tort Claims Act**

9    The FTCA waives the federal government's sovereign immunity "under circumstances

10   where the United States, if a private person, would be liable to the claimant in accordance with

11   the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The statute

12   looks to state substantive law to determine whether the plaintiff has a valid cause of action. The

13   federal government, however, does not stand on the same footing as a private party with respect

14   to the accrual and timeliness of claims. The FTCA's statute of limitations provides that a "tort

15   claim against the United States shall be forever barred unless it is presented in writing to the

16   appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b).

17   The date on which an FTCA claim accrues is determined as a matter of federal law. *See*

18   *Kossick v. United States*, 330 F.2d 933, 935 (2d Cir. 1964); *Quinton v. United States*, 304 F.2d

19   234, 235 (5th Cir. 1962); *see also Tyminski v. United States*, 481 F.2d 257, 262-63 (3d Cir. 1973)

---

[9] We similarly express no opinion on defendants' argument, upon which the district court made no ruling, that Somerset is ineligible to recover response costs because it failed to comply with the national contingency plan, as required by § 107(a)(4)(A). *See* 42 U.S.C. 9607(a)(4)(A). We leave it to the district court to rule on this contention in the first instance.

1    (collecting cases). *But see Hau v. United States*, 575 F.2d 1000, 1002 (1st Cir. 1978) (following

2    *lex loci* rule, but noting uniqueness of this position among circuits).  Depending on the

3    circumstances, claims accrue either at the time of injury or when the plaintiff discovered, or in

4    the exercise of reasonable diligence should have discovered, the facts giving rise to the cause of

5    action. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 120 (1979); *Kronisch v. United States*,

6    150 F.3d 112, 121 (2d Cir. 1998); *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982).  In

7    environmental cases involving latent contamination, courts have generally applied the discovery

8    rule. *See, e.g., Plaza Speedway, Inc. v. United States*, 311 F.3d 1262, 1268 (10th Cir. 2002);

9    *Muth v. United States*, 1 F.3d 246, 249 (4th Cir. 1993).

10          The statute of limitations has clearly run on the harm caused by radioactive

11    contamination.  Somerset was aware of this contamination by 1972 at the latest, but failed to file

12    an administrative claim for over twenty-seven years.

13          The nonradioactive contamination requires further discussion.  The district court

14    concluded that Somerset was sufficiently aware of the existence of contamination on its land that

15    its claim accrued under federal law more than two years before it filed its administrative claim.

16    The district court accordingly considered Somerset's FTCA claims to be time-barred.  Somerset

17    argues on appeal that its action was timely because (1) new causes of action keep arising each

18    day under the continuing tort doctrine; (2) its claims based on the presence of lithium and RDX

19    were separate and distinct injuries and timely because the contamination was only revealed in

20    1999; and (3) the government is estopped from arguing that Somerset should have discovered the

21    contamination earlier because it fraudulently advised Somerset that its property was clean.

1    **A. *Continuing Tort Doctrine***

2         Somerset argues that the district court erred when it refused to apply the continuing tort

3    doctrine to its case. The continuing tort doctrine is based on the idea that certain torts continually

4    give rise to new causes of action, which can be brought notwithstanding the expiration of the

5    limitations period for prior causes of action. For example, the operation of a nuisance on one

6    piece of land might diminish the enjoyment of the neighboring piece of land. Awarding damages

7    for permanent loss of property value suffered by the neighbor would not necessarily be

8    appropriate because the operation of the nuisance might cease at any time. The continuing tort

9    doctrine instead recognizes new causes of action as long as the nuisance continues and thereby

10   allows the plaintiff to return to court periodically to recover the damages suffered since the last

11   period compensated. A disadvantage to the use of this doctrine is that it results in serial

12   litigation, potentially without end, at enormous cost and great inefficiency.

13        A handful of cases have applied the continuing tort doctrine to claims against the federal

14   government under the FTCA. *See, e.g., Hoery v. United States*, 324 F.3d 1220, 1223-24 (10th

15   Cir. 2003); *Arcade Water Dist. v. United States*, 940 F.2d 1265, 1269 (9th Cir. 1991); *Gross v.*

16   *United States*, 676 F.2d 295, 300 (8th Cir. 1982); *Kennedy v. United States*, 643 F. Supp. 1072,

17   1079 (E.D.N.Y. 1986).

18        The government argues that these cases were incorrectly decided. It contends that

19   allowing a state continuing tort theory to create new causes of action under the FTCA would

20   effectively undermine Congress's interest in creating a nationally uniform limitations period and

21   interfere with the principle that accrual is a matter of federal law. In the alternative, the

21

1    government argues that a continuing tort theory resets the accrual date for a claim only when

2    there are "continuing wrongful overt acts, not simply continuing injury."

3         Somerset responds that the government overstates Congress's interest in uniformity

4    because, by incorporating state substantive law, the FTCA already tolerates a great deal of

5    variation from state to state in whether behavior will be considered tortious.  Somerset also

6    contends that the continuing tort doctrine, properly understood, is not an accrual rule, but rather a

7    rule of substantive state law authorizing multiple causes of action that sequentially arise as

8    tortious behavior persists.

9         We need not decide whether a continuing tort claim might be valid under the FTCA,

10   notwithstanding the fact that accrual is governed by federal law, in order to resolve the FTCA

11   claim before us.  Even assuming a continuing tort claim could be brought under the FTCA to

12   recover damages for injuries sustained in the two years before the filing of the claim, such a

13   claim would have to be valid under local law, and Somerset may not bring such a suit because

14   New York law no longer recognizes the existence of the continuing tort doctrine in latent

15   exposure cases seeking money damages.

16        Historically, New York's statute of limitations generally began to run at the time of

17   injury.  Over the years, however, a "narrow common-law exception evolved to ameliorate the

18   harshness of this accrual rule with respect to some particular continuous wrongs."  *Jensen v.*

19   *General Elec. Co.*, 82 N.Y.2d 77, 85, 623 N.E.2d 547, 550, 603 N.Y.S.2d 420, 423 (1993).  In a

20   seminal case, for example, the New York Court of Appeals allowed a landowner to sue an

21   elevated railroad for nuisance a year after the limitations period expired because the continued

22

1    operation of the railroad cut off light, air, and access to plaintiff's property. *Galway v. Metro.*

2    *Elevated Ry. Co.*, 128 N.Y. 132, 28 N.E. 479 (1891). *See also 509 Sixth Ave. Corp. v. New York*

3    *City Transit Auth.*, 15 N.Y.2d 48, 51-53, 203 N.E.2d 486, 487-88, 255 N.Y.S.2d 89, 91-92

4    (1964) (extending *Galway* to subterranean encroachment by railway line not discovered for

5    twenty-one years). New York courts also applied the continuing tort doctrine in some

6    environmental contamination cases. *See Kearney v. Atl. Cement Co.*, 33 A.D.2d 848, 849, 306

7    N.Y.S.2d 45, 46-47 (App. Div. 3d Dep't 1969) (continuing production of noise, vibrations, and

8    dust at cement plant); *Kulpa v. Stewart's Ice Cream*, 144 A.D.2d 205, 207, 534 N.Y.S.2d 518,

9    520 (App. Div. 3d Dep't 1988) (continuing contamination from leaking gasoline tank drained

10   and replaced more than three years earlier); *Amax, Inc. v. Soho Indus. Prods. Co.*, 469 N.Y.S.2d

11   282, 284-85 (Sup. Ct. 1983) (radioactive contamination from plant which ceased production

12   fourteen years before plaintiff discovered contamination and nineteen years before plaintiff filed

13   suit); *State v. Schenectady Chems., Inc.*, 459 N.Y.S.2d 971, 977 (Sup. Ct. 1983) (applying

14   doctrine to dumping of chemicals that polluted water fifteen to thirty years later), *aff'd as*

15   *modified*, 103 A.D.2d 33, 479 N.Y.S.2d 1010 (App. Div. 3d Dep't 1984); *see also Rapf v. Suffolk*

16   *County*, 755 F.2d 282, 290-92 (2d Cir. 1985) (applying continuing tort doctrine under New York

17   law). But many courts adhered to the rule that the statute of limitations begins running on the

18   date of injury. *See, e.g., Snyder v. Town Insulation, Inc.*, 81 N.Y.2d 429, 433, 615 N.E.2d 999,

19   1001, 599 N.Y.S.2d 515, 517 (1993); *Steinhardt v. Johns-Manville Corp.*, 54 N.Y.2d 1008,

20   1010, 430 N.E.2d 1297, 1299, 446 N.Y.S.2d 244, 246 (1981); *see also Jensen*, 82 N.Y.2d at 85,

21   623 N.E.2d at 550, 603 N.Y.S.2d at 423 (citing cases).

23

1          In 1986, the legislature enacted a discovery rule for environmental contamination cases.

2     *See* N.Y. C.P.L.R. § 214-c.  The relevant part of the statute states:

3          Notwithstanding the provisions of section 214, the three year period within which
4          an action to recover damages for personal injury or injury to property caused by
5          the latent effects of exposure to any substance or combination of substances, in
6          any form, upon or within the body or upon or within property must be commenced
7          shall be computed from the date of discovery of the injury by the plaintiff or from
8          the date when through the exercise of reasonable diligence such injury should
9          have been discovered by the plaintiff, whichever is earlier.

10    *Id.* § 214-c(2).

11         The New York Court of Appeals considered in *Jensen v. General Electric Co.* whether

12    the continuing tort doctrine remains applicable in latent exposure cases following passage of §

13    214-c.  *Jensen* involved contamination at a General Electric (GE) plant operated between 1958

14    and 1969.  Pursuant to a settlement with the State Department of Environmental Conservation,

15    GE obtained plaintiff Perkett's permission to install monitoring wells on her nearby property.

16    The wells revealed a large toxic plume extending beneath Perkett's property.  GE sent Perkett a

17    letter in 1984 informing her of the contamination and a copy if its report with her property

18    outlined in black ink.  When plaintiff Jensen took title to the property as Perkett's co-tenant in

19    1986, GE forwarded the same information to him.  Plaintiffs eventually filed suit in 1990.

20    *Jensen*, 82 N.Y.2d at 82, 623 N.E.2d at 548, 603 N.Y.S.2d at 421.  The Supreme Court granted

21    GE's motion to dismiss the case as time-barred under § 214-c, but the Appellate Division

22    reversed on a continuing trespass and continuing nuisance theory.  The New York Court of

23    Appeals subsequently reversed the Appellate Division.  It acknowledged that the legislature had

24    enacted § 214-c "to open otherwise closed courthouse doors" kept shut by the time of injury rule,

24

1   but concluded that the legislature had intended to create a single discovery rule and thereby

2   eliminate the continuing tort doctrine. *Id.*, 82 N.Y.2d at 83-85, 623 N.E.2d at 549-50, 603

3   N.Y.S.2d at 422-23. The court reasoned that the continuing tort doctrine had grown "out of a

4   jurisprudential climate and landscape where there was no discovery rule," and that § 214-c had

5   eliminated the need for the doctrine by creating a new regime that carefully balances plaintiffs'

6   interest in recovering damages for undiscovered latent injuries against defendants' interest in

7   repose.[10] *Id.*, 82 N.Y.2d at 87-88, 623 N.E.2d at 551-52, 603 N.Y.S.2d at 424-25; *see also Town*

8   *of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 674-75 (S.D.N.Y. 1996) (holding that

9   *Jensen* bars application of the continuing tort doctrine to public nuisance suits for money

10  damages).

11         Because there is no longer any basis in New York law for applying the continuing tort

12  doctrine to Somerset's suit for damages, we need not decide whether the continuing tort doctrine

13  can be used to revive an otherwise untimely suit under the FTCA.

14  **B. *Application of the Discovery Rule***

15         Somerset's FTCA claims will be considered untimely if Somerset knew, or should have

16  known, about the nonradioactive contamination on its land by August 25, 1997, two years before

17  it filed its demand and claim letter. The record contains numerous indications that Somerset

18  knew about nonradioactive contamination well before 1997. John Syms attended a public

---

[10] The New York Court of Appeals determined that § 214-c, which by its terms covers actions "to recover damages," does not alter the availability of injunctive relief in equity under a continuing tort theory. *Jensen*, 82 N.Y.2d at 89-90, 623 N.E.2d at 553, 603 N.Y.S.2d at 426; *see also Bano v. Union Carbide Corp.*, 361 F.3d 696, 713 (2d Cir. 2004). This exception does not help Somerset, however, because it has not sought injunctive relief.

25

1    meeting in 1988 at which the government briefed the public about nonradioactive contamination

2    at the LOOW.  A document recounted a separate 1988 meeting with a government contractor at

3    which Syms discussed the TNT production plant and pointed out both asbestos and a pit

4    containing PCBs.  Another document from 1988 reported on the presence of asbestos, PCBs, and

5    a reservoir containing an "odd smelling liquid."  Somerset's complaint states: "In 1988, pressure

6    began to mount from Mr. Syms and others in the community to conduct a more thorough

7    investigation of not only the Radioactive Contamination but *other types* of Contamination at the

8    LOOW."  (emphasis added).

9        John Syms admitted in his deposition that he knew by 1990 that his property had been

10    contaminated.  In that year, he wrote a letter with an attachment identifying "chemical waste

11    lands" at Air Force Plant 68.  Somerset later received a letter from the Army Corps of Engineers

12    in 1992 informing it in no uncertain terms that the "[r]esults of the [site investigation] confirmed

13    the presence of contamination at the site."  Somerset then wrote a letter to President Clinton four

14    months later complaining about the Army Corps' decision to take additional samples when

15    existing surveys already "show[ed] the type of materials that have to be removed."  This

16    evidence, viewed in the light most favorable to Somerset, nevertheless indicates that Somerset

17    clearly knew by 1993 at the latest that its land was polluted by nonradioactive contaminants.

18    Somerset has not argued to the contrary.

19        A jury could reasonably find, however, that Somerset's actual knowledge was limited to

20    the presence of asbestos and PCBs.  The question under the discovery rule, therefore, is whether

21    Somerset should have discovered the presence of other contaminants through the exercise of

26

1    reasonable diligence.[11]

2    We agree with the district court that the presence of so many warning signs—the history

3    of TNT production near the site, the asbestos, the PCBs, the unidentified "odd smelling" liquid,

4    and the presence of a hazardous waste dump next door—should have prompted an investigation.

5    Such an inquiry easily could have uncovered the New York State Assembly's 1981 public report

6    documenting a "vast network of underground waste lines with TNT wastes and residues" and

7    reporting that "neither the areas above or below-ground were ever fully decontaminated by the

8    Army when the property was declared surplus."

9    **C. *Estoppel Based on Fraud***

10   Somerset claims the government is estopped from arguing that it should have known

11   about RDX and lithium contamination because the government assured it in 1986 and 1992 that

12   it had cleaned the property.  The 1986 letter and 1992 certificate of compliance discuss only the

13   clean-up of radioactive contamination.  They do not purport to say anything about nonradioactive

14   contamination, and there is consequently no basis for concluding that the government

15   fraudulently led Somerset to believe its property was free from nonradioactive contamination.

16   **<u>CONCLUSION</u>**

---

[11] Somerset argues that under New York's "two-injury" rule it may bring separate causes of action for soil contamination and groundwater contamination, and that notice (whether actual or constructive) of one injury does not necessarily provide notice of the other.  *See Bimbo v. Chromalloy Am. Corp.*, 226 A.D.2d 812, 815-16, 640 N.Y.S.2d 623, 625-26 (App. Div. 3d Dep't 1996).  We need not decide whether the two-injury rule creates distinct causes of action in a suit under the FTCA because the relevant question under the two-injury rule and the federal discovery rule is the same in the context of this case: Given Somerset's knowledge of other nonradioactive contamination, did Somerset know, or through the exercise of reasonable diligence should it have known, about the presence of RDX and lithium in its groundwater?

1           We have considered Somerset's remaining arguments and find them to be without merit.

2       For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part,

3       and remanded for proceedings consistent with this opinion.

 

If you view the full docket, you will be charged for 15 Pages    $ 1.20

## US Court of Appeals for the Fifth Circuit
## Case Summary

```
Court of Appeals Docket #: 00-10197                    Filed: 2/24/00
Nsuit: 3893 Environmental Matters
Aviall Services Inc v. Cooper Indust Inc
Appeal from: Northern District of Texas, Dallas

Lower court information:
     District: 0539-3 : 3:97-CV-1926-D
     Ordering Judge: Sidney A Fitzwater, US District Judge
```

3/1/04        Record on appeal requested from the district court for the
              Supreme Court. [00-10197] (vds)

12/16/04      Supreme Court opinion (dated 12/13/04) filed. [00-10197]
              Supreme Court Judgment due on 1/18/05. (ksw)

1/13/05       Motion filed by Appellant Aviall Services Inc to file
              supplemental briefs. [5054739-1]  Supplemental brief
              included? (Y/N): N., establish briefing schedule and page
              limits proposed in appellant's motion to file supplemental
              briefs [5054739-2], for oral argument [5054739-3]    Date
              of COS: 1/12/05  Sufficient [Y/N]: Y [00-10197] (ksw)

1/19/05       Supreme Court judgment filed. [00-10197]  Supreme Court
              Judgment ddl satisfied. (ksw)

1/25/05       Response/opposition filed by Appellee Cooper Industries to
              motion to file supplemental briefs [5054739-1] by Appellant
              Aviall Services Inc, motion establishing briefing notice
              [5054739-2] by Appellant Aviall Services Inc, motion for
              oral argument [5054739-3] by Appellant Aviall Services Inc
              Date of COS: 1/24/05  Sufficient [Y/N]: Y [5061226-1]
              [00-10197] (ksw)

1/31/05       Reply filed by Appellant Aviall Services Inc to
              response/opposition [5061226-1], motion to file
              supplemental briefs [5054739-1], motion establishing
              briefing notice [5054739-2], motion for oral argument
              [5054739-3] Sufficient [Y/N]: Y [5066253-1] [00-10197] (ksw)

2/15/05       On remand from the Supreme Court, the En Banc Court has
              considered Aviall Services' motions and has filed a COURT
              Order.  It is ordered that Aviall Services' motion for
              further decision by the en banc court is DENIED; and the
              case is REMANDED to the district court with instructions to
              permit Aviall Services to amend its complaint, if
              necessary, to assert, free of any challenges of waiver or
              forfeiture, whatever statory claims it urges in light of
              the Supreme Court's decision, without prejudice to Cooper
              Industries' other defenses. Copies to all counsel.
              [00-10197] (ewd)

3/14/05       Record on appeal returned to 5CCA by Supreme Court.