UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30111-MAP

JAMES V. CARIDDI, )
    Plaintiff )
)
v. )
)
CONSOLIDATED ALUMINUM CORPORATION, )
    Defendant )

**MEMORANDUM OF LAW OF DEFENDANT, CONSOLIDATED ALUMINUM CORPORATION, IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this action, Plaintiff seeks payment from Defendant of his costs for environmental response actions associated with contamination at his property pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") 42 U.S.C. § 9601 *et seq.* and state law, M.G.L. c. 21E. Defendant now moves for Summary Judgment on the ground that the undisputed material facts demonstrate that Plaintiff's claims under CERCLA and M.G.L. c. 21E are barred because (a) the contamination found on the subject premises fall squarely within CERCLA's so-called "petroleum exclusion," and (b) Plaintiff can not establish an essential element of his claim as required under M.G.L. c. 21E, § 5(a)(5); namely, duty and breach.

**STATEMENT OF MATERIAL FACTS OF RECORD[1]**

Plaintiff, James V. Cariddi ("Mr. Cariddi") is the current owner of property located at 106-108 State Road, North Adams, Massachusetts (the "Property"). (Complaint, ¶¶ 1 & 5).

---

[1] These facts are deemed true and accurate for purposes of this motion only.

Defendant Consolidated Aluminum Corporation ("Conalco") owned the Property between 1967 and 1976, when it transferred the Property to Mr. Cariddi. (Complaint, ¶¶ 10-12).

Between 1967 and 1976, Conalco used the Property for drawing aluminum tubing. (Complaint, ¶¶ 10-11). Mr. Norman R. Lappies ("Mr. Lappies"), the only witness identified by the parties with personal knowledge of the Defendant Conalco's aluminum manufacturing process, worked at the facility between 1961, before Conalco's ownership and operation, until a few months before Conalco ceased all activities in 1976. (Lappies Depo., Trans. pp. 12-15). According to Mr. Lappies, the drawing of aluminum tubing was a messy business. (Lappies Depo., Trans. pp. 56-57). It involved the use of oil which splashed or dripped onto the floor. (Complaint, ¶ 17). Oil then seeped to cracks and holes of the floor or was routinely moved and pushed by mops and squeegees to cracks and holes where it fell into the basement floor below. (Complaint, ¶¶ 17-18). These activities ceased when Conalco closed the facility and sold the Property to Mr. Cariddi in 1976. (Complaint, ¶ 19).

Despite the subsequent promulgation of environmental laws, including CERCLA (1980) and M.G.L. c. 21E (1983), the conditions in the basement apparently remained unchanged until "oily sludgy, material" was found in the basement by a local fire inspector 25 years later, in 2001. Thereafter, Mr. Cariddi commenced response actions under G.L. c. 21E. (Complaint, ¶¶ 20-32).

Mr. Cariddi now contends that Conalco is a party responsible for the contamination present in the basement of the Property (Complaint, ¶¶ 38-43) and brings this action seeking reimbursement of his past and future assessment and clean up costs pursuant to CERCLA (Count I) and state law, M.G.L. c. 21E (Count II). He also seeks a declaratory judgment (Count III) as to Conalco's liability for Mr. Cariddi's future response costs. (Complaint, ¶¶ 37-54).

A.   **Material Facts Concerning the Oil or Petroleum Products used by Conalco and Present at the Property.**

Mr. Lappies, the only witness identified by the parties with personal knowledge of the Defendant Conalco's aluminum manufacturing process at the Property, describes the four types of oil or petroleum products used by Conalco in drawing aluminum tubing: light oil, heavy oil, mineral spirits and kerosene. (Lappies Depo., Trans. pp. 53-54, 70 and 174). Both mineral spirits and kerosene are oils or petroleum products. (Feldman Affidavit, ¶ 5).

Mineral spirits and kerosene are commonly used as solvents to dissolve or remove oil, particularly in manufacturing applications. (Feldman Affidavit, ¶ 6). According to Mr. Lappies, "other than mineral spirits, I have no knowledge of other solvents being used at the [Conalco] facility during my employment. Similarly, I do not know of any other hazardous materials used by [Conalco]." (Affidavit of Lappies attached to Complaint at Exhibit D, dated 09/10/03, ¶ 16). Consequently, there is no evidence of Conalco's use of hazardous substances or materials at the Property. Instead, there is only evidence of Conalco's use of oil or petroleum products.

There is no evidence suggesting that hazardous substances or materials were added to, or mixed in with the oils used by Conalco during or after use. There is no evidence indicating that hazardous substances or materials were purposefully introduced into the oils used by Conalco by the supplier or manufacturer of the oils prior to Conalco's use. (Cariddi's Answers to Interrogatories, Nos. 1 and 8). Nor is there any information suggesting that the oils used by Conalco contained hazardous substances or materials not normally present, or not normally found, or at higher than normal levels found in those oils. (Cariddi's Answers to Interrogatories, Nos. 2, 3, 9 and 10). There is no evidence that the oils used by Conalco were contaminated with hazardous substances or materials through their use, or that hazardous substances or materials were added through or as a result of industrial processing. (Cariddi's Answers to Interrogatories, Nos. 5, 8, 12 and 13).

All persons who observed the "oily" material found in the basement of the Property some 25 years after Conalco ceased operations describe it as "oil," not as a hazardous substance or material. Indeed, in 2001, Mr. Cariddi reported to the DEP a release of "oil" at the Property, not "hazardous material." (Feldman Affidavit, ¶ 7). The reports generated by the Licensed Site Professional ("LSP") at the Property, and reported observations of the materials described in the reports, refer to such materials as "oil" or "oily waste," not hazardous materials or substances. (Feldman Affidavit, Exh. 1). Finally, the Massachusetts Department of Environmental Protection ("DEP"), which identifies disposal sites as either "oil" or "hazardous material" sites, identifies the Property on its website as an "oil" site. (Feldman Affidavit, ¶ 8).

Laboratory analysis of samples of soils, solids and groundwater collected from the Property, document the presence of oil or petroleum products, not hazardous materials or substances. (Feldman Affidavit, ¶ 9). While certain metals, semi-volatile organic compounds ("SVOCs") and volatile organic compounds ("VOCs") identified by the laboratories in their analysis of samples of soils, solids and groundwater collected from the Property between 2001 and 2005 are separately identified by CAS number by Mr. Cariddi in his response to Conalco's interrogatories (Mr. Cariddi's Answers to Interrogatories Nos. 15-16) as hazardous substances and materials which Mr. Cariddi contends were present in "oil and hazardous materials at the facility when Conalco owned and operated the facility," the identification of those metals, SVOCs and VOCs in the laboratory analysis does not demonstrate a release of hazardous substances or materials at the Property. (Feldman Affidavit, ¶¶ 10 and 11). [2]

---

[2] As Dr. Feldman explains in his affidavit, the reported presence of metals, SVOCs and VOCs, along with typical petroleum analytes, does not demonstrate a release of hazardous substances or materials at the property because: (1) trace levels of metals are natural components of Massachusetts soils and their presence in samples as reported by the laboratory does not in itself demonstrate a release of hazardous substances of the materials; (2) VOCs are common constituents of petroleum products and their presence in samples taken at the Property is more likely than not tied directly to the presence of petroleum, and not a separate release of VOCs; and (3) several of the SVOCs identified by the laboratory reports are common petroleum constituents, and those which are not are

In sum, the material released at the Property, which Mr. Cariddi attributes to Conalco and for which Mr. Cariddi seeks reimbursement of past response action costs and payment of future response action costs from Conalco, is oil or petroleum, not hazardous materials or substances. (Feldman Affidavit, ¶ 9; Wade Affidavit Exh. 1).[3]

### B.   Material Facts Concerning Spills of Oil at the Property.

Six years before Conalco owned the Property and operated aluminum drawing activities, oil was present in the basement of the Property. (Lappies Depo. Trans., pp. 145-147, 152, 203). Employees who worked at the Property between 1961 and 1976, both before and during the time period of Conalco's ownership, would as part of routine maintenance, use mineral spirits to dissolve the oil present on the floor and then with mops and squeegees, push or direct it to cracks and holes in the floor where it fell to the basement below and accumulated. (Lappies Depo. Trans., pp. 173-175).

According to Mr. Lappies, "it was common practice in the old days" to remove oil from the floor by pushing or directing it to cracks and holes in the manner which he describes. (Lappies Depo. Trans. p. 182). The practice was not against company policy. Nor was it contrary to any industry standard or practice. (Lappies Depo. Trans. pp. 184-185). Indeed, Mr. Lappies did not think there was anything wrong with the practice at the time. (Lappies Depo. Trans. pp. 183-184). Mr. Lappies did not think the practice was contrary to any law.

---

commonly encountered in soils on industrial sites, often reflecting the presence of coal, ash, or asphalt fragments. (Feldman Affidavit, ¶ 12).

[3] In response to Conalco's Interrogatories, Mr. Cariddi contends that "waste oil" was present in the "oil and hazardous material at the facility when Conalco owned or operated the facility," as alleged at paragraph 45-50 of Count II of the Complaint. (Cariddi's Answers to Interrogatory Nos. 15-16). The only evidence of any reference to "waste oil" is in an Alpha Analytical Laboratory ("Alpha") report dated May 11, 2004, in which Alpha states "the chromatography most closely resembles a mixture of motor oil/waste oil and some type of heavier petroleum product like coal tar," and for a separate sample "the petroleum hydrocarbon most closely resembles some type of motor oil/waste oil." Alpha's characterization of this oil sample showing "waste oil" is without any scientific support, is not reliable, and is pure speculation. (Wade Affidavit, ¶¶ 4 and 5).

(Lappies Depo. Trans. p. 185). At the time of the practice, he did not contemplate that there might be a future law governing the practice. (Id.)

## ARGUMENT

The standard for summary judgment is well established. See Fed.R.Civ.P. 56(c). Summary judgment is mandated when the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Mendes v. Medtronic, Inc., 18 F.3d 13, 15 (1st Cir. 1994). Where, as here, the nonmoving party bears the ultimate burden of persuasion, "neither conclusory allegations, improbable inferences, unsupported speculation, nor brash conjecture coupled with earnest hope that something will materialize" prevent the court from awarding summary judgment. See J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc, 76 F.3d 1245, 1251 (1st Cir. 1996). In opposing a properly supported motion for summary judgment, the non-moving party may not rest upon the mere allegations or denials in his or her pleadings. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986). Once the moving party comes forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See Celotex Corp. at 322.

**I.   The evidence shows that oils used by Conalco, and the release of oil for which Mr. Cariddi seeks recovery of response action costs, fall within the petroleum exclusion under CERCLA and M.G.L. c. 21E.**

The evidence demonstrates that the oils used by Conalco and contaminants found at the Property for which Mr. Cariddi seeks response action costs from Conalco is "petroleum" or

"oil," and not "hazardous substances" or "hazardous materials" as defined under CERCLA and M.G.L. c. 21E, respectively. As such, the oils used by Conalco and contaminants found at the Property fall within the petroleum exclusion of CERCLA, and limit any potential claims under M.G.L. c. 21E against Conalco to claims which fall under § 5(a)(5).[4]

### A. The contamination present at the Property falls under CERCLA's petroleum exclusion and therefore Mr. Cariddi's claim under CERCLA is barred.

Plaintiff's CERCLA claim (Count I) is founded upon CERCLA Section 107(a)(2)(3) and (4), or 42 USC § 9607(a)(2)(3) and (4), which imposes liability against persons who are former owners of *hazardous substance* disposal facilities, or who dispose, or transport for disposal, *hazardous substances* at any facility. 42 USC § 9607(a)(2) (3) and (4). The term "Hazardous Substances" is defined by CERCLA Section 101(14), or 42 USC § 9601(14), to mean various substances, elements, compounds, mixtures or solutions designated by other laws. The term "does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance." 42 USC at § 9601(14). See Clark Oil Company v. Chevron USA, Inc., Case No. CIV-00-331-N-EJL (Idaho 2002).

CERCLA's petroleum exclusion "has been universally interpreted by both the Environmental Protection Agency and the courts to remove from the coverage of CERCLA those otherwise hazardous substances which are *inherent* in petroleum, but not hazardous substances that are added to, or mixed with, a petroleum product during or after use." Niecko v. Emro Marketing Co., 769 F.Supp. 973, 981. The U.S. Environmental Protection Agency provided guidance in a Final Rule published on April 4, 1985, which states that "EPA interprets the

---

[4] G.L. c. 21E, § 5(a)(2)(3) and (4) *only* impose liability in connection with a release or threat of release of hazardous materials. M.G.L. c. 21E, § 5(a)(1) imposes liability upon the current "owner or operator" of a site where there has been a release of oil or hazardous material. Conalco is not the current owner or operator and therefore has no liability under Section 5(a)(1). Section 5(a)(5) imposes liability upon "any person who otherwise caused or legally responsible for a release or threat of release of oil or hazardous material." Thus, because the contamination present at the property is oil, and not hazardous material, Plaintiff's claims are limited to those under Section 5(a)(5).

petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, *even if a specifically listed or designated hazardous substance is present* in such products." 50 Fed.Reg. 13, 460 (April 4, 1985) (emphasis added). Where a specifically listed hazardous substance is indigenous to petroleum and is present as a result of the release of petroleum, that substance will fall within the petroleum exclusion under CERCLA. See Cose, 4 F.3d 700, 704 (1993).

CERCLA's petroleum exclusion "applies to both used and unused petroleum products and includes hazardous substances inherent in unused petroleum products or added to unused petroleum products in the refining process; it does not apply to hazardous substances which are added to petroleum products during use." Organic Chemical Site PRP Group v. Total Petroleum Inc., 58 F.Supp.2d 755, 763 (W.D. Mich. 1999) citing to United States v. Alcan Aluminum Corp., 964 F.2d 252, 266 (3d Cir. 1992); Wilshire Westwood Assoc. v. Atlantic Richfield Corp., 881 F.2d 801, 805 (9th Cir. 1989); Dartron Corp. v. Uniroyal Chemical Co., 917 F.Supp. 1173, 1183 (N.D. Ohio 1996); Niecko v. Emro Marketing Co., 769 F.Supp. 973, 981-82 (E.D. Mich. 1991). "Thus, courts have not applied the petroleum exclusion where the concentration of hazardous substances in released petroleum products was higher than their concentration in the virgin product." Id. citing to Cose v. Getty Oil Co., 4 F.3d 700, 704 (9th Cir. 1993); Washington v. Time Oil Co., 687 F.Supp. 529, 532 (W.D. Wash. 1988). To avoid the petroleum exclusion, the hazardous substances in a petroleum product must be elevated at the time of release. Id. at 764. The material evidence in this case demonstrates that the materials released at the Property fit squarely within CERCLA's petroleum exclusion.

Defendant's expert, Lawrence Feldman, LSP, Ph.D., opines that "the material released at the Cariddi site that Mr. Cariddi attributes to Conalco, and for which Mr. Cariddi seeks reimbursement of past response action costs and payment of future response action costs from

Conalco, is oil or petroleum, as those terms are used in CERCLA, not hazardous materials or substances." (Feldman Affidavit, ¶3)[5]. Dr. Feldman explains that the presence of certain metals in samples, cited to by Mr. Cariddi in his Answers to Interrogatories as evidence of the release of hazardous materials, are, in fact, "natural components of Massachusetts soils and their presence in samples as reported by the laboratory does not itself demonstrate a release of a hazardous substances or materials." (Feldman Affidavit, ¶11). In his evaluation of the materials found on the property, Dr. Feldman states that the volatile organic compounds ("VOCs") listed by Mr. Cariddi as being found on the property are common constituents of petroleum products and their presence in samples at the Property is more likely than not tied directly to the presence of petroleum, not to a separate release of VOCs. (Feldman Affidavit, ¶11). Dr. Feldman also notes that several VOCs identified by the laboratory report are common constituents, and those which are not are commonly encountered in soils on industrial sites, often reflecting the presence of coal, ash, or asphalt fragments. (Feldman Affidavit, ¶11).

Mr. Cariddi can come forward with no evidence to substantiate his assertions that Conalco is responsible for a release of hazardous substances or materials at the Property. Given that all of the evidence identifies only oil being used by Conalco and found at the Property, CERCLA's petroleum exclusion must bar any claims made by Mr. Cariddi under CERCLA in this action.

> **B.** **The contamination found at the Property is "oil," not "waste oil" and therefore not "hazardous materials" under M.G.L. c. 21E, § 2.**

Under M.G.L. c. 21E § 5(a), only present owners and operators of a site or persons who fall within the "catch-all" category, Section 5(a)(5), can be held liable for a release or a threat of

---

[5] Dr. Feldman reached his conclusion after reviewing the reports generated by the Licensed Site Professional of record for the Property, visiting the Property, touring the interior of the building and reviewing the deposition transcript of Norman P. Lappies, a former Conalco employee. (Feldman Affidavit, Exh. 1)

a release of oil. The remaining provisions of Section 5(a) impose liability only where there is or has been the release of "hazardous materials."

The term "hazardous material" is defined broadly by M.G.L. c. 21E to include any materials which constitute a present or potential harm to human health, safety, welfare or the environment when improperly stored, treated, transported, disposed of, used or otherwise managed. M.G.L. c. 21E § 2. The term, however, "shall not include oil." Id. The term "oil" means "insoluble or partial soluble oils of any kind or origin or in any form, including, and without limitation, crude or fuel oils, *lube oil* or sludge, asphalt, insoluble or partially insoluble derivatives of *mineral*, animal or vegetable *oils*." M.G.L. c. 21E, § 2 (Emphasis added). Excluded from the term "oil" is "waste oil." Id. The term "waste oil," however, is not defined by M.G.L. c. 21E.[6]

The aluminum drawing process described by Mr. Lappies in his deposition demonstrates that the drawing oil used by Conalco was a "lube oil," an example of an "oil" in the definition at M.G.L. c. 21E § 2. (Lappies Depo. Trans., pp. 38-39). While Mr. Cariddi contends in his Answers to Interrogatories that "waste oil" is a "hazardous material" which was found at the Property in samples analyzed in connection with the response actions performed (Mr. Cariddi's Answers to Interrogatories No. 16 and Exhibit B), the laboratory testing analysis does not

---

[6] MADEP, in its regulations found at 310 CMR 40.000 et seq. and known as the Massachusetts Contingency Plan ("MCP"), defines "waste oil" to mean "used and/or reprocessed, but not subsequently re-refined, oil that has served its original intended purpose. Waste oil includes, but is not limited to, used and/or reprocessed fuel oil, engine oil, gear oil, cutting oil, and transmission fluid and dielectric fluid." 310 CMR 40.0006. The MCP defines "hazardous material" as the term is defined in M.G.L. c. § 2, but modifies the oil exclusion of M.G.L. c. 21E, § 2: "The term [hazardous material] shall not include oil, but shall include waste oil…" 310 CMR 40.0006. The MCP defines "oil" in the same manner as M.G.L. c. 21E § 2 as set forth in the text above.

Even under the MCP definition of waste oil, the drawing oil used by Conalco is deemed "oil". The MCP's definition of waste oil seeks to capture engine oil, and the like, not lubricating oil or a mixture of oil or waste oil and hazardous materials, as used at the Conalco facility according to Mr. Lappies. Moreover, despite the different definitions for "waste oil" and "oil" in the MCP, they are treated in the same manner. For example, pursuant to 310 CMR 40.0318(4), up to 100 cubic yards of soil contaminated by oil or waste oil may be removed without prior approval from the MADEP, whereas only 20 cubic yards of soil contaminated by hazardous material, or mixture of oil or waste oil and hazardous material, may be so managed. If the legislature or the MADEP intended to make soil contaminated by oil or waste oil a hazardous material, it would have done so.

support this contention. All of the test reports produced by Conalco, but one, make no reference to "waste oil;" and the report that does, references the term in a narrative portion that disagrees with the analytical results provided. (Wade Affidavit, ¶¶ 3-4). Indeed, Conalco's expert who reviewed the chromatograms provided for samples from the Property opines that the reference to "waste oil" in the narrative portion of this report is without any scientific support by laboratory results, is not scientifically reliable, and is pure speculation. (Wade Affidavit, ¶¶. 4 and 5). Consequently, Mr. Cariddi's Interrogatory Answers may not be relied upon to support the presence of "waste oil" at the Property.[7]

**II.     Plaintiff has failed to show that Defendant had a duty to prevent oil from being released at the Property and therefore Plaintiff's claim under M.G.L. c. 21E, § 5(a)(5) must fail.**

Chapter 21E, § 5(a)(5) of the Massachusetts General Laws provides in pertinent part that "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable; without regard to fault,... to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release...." Massachusetts courts, in construing this section, have focused on what it means for a prior owner or operator to "cause" or be "legally responsible" for oil contamination.

In Griffith v. New England Telephone and Telegraph Company, 420 Mass. 365 (1995), the Massachusetts Supreme Judicial Court, in determining liability under Chapter 21E, § 5(a)(5), focused on whether the defendant had a duty to maintain the leaking oil tanks at issue in the case. The Court found that evidence that the defendant had brought oil onto the property and stored it there was insufficient to establish liability, ultimately concluding that the plaintiff needed to produce evidence of a duty in order to establish causation. Id. at 369. The Court in Griffith held

---

[7] Because the contamination found at the Property is "oil" as defined by M.G.L. c. 21E, § 2, and not "hazardous materials," Plaintiff's claims under M.G.L. c. 21E, § 5(a)(2)(3) and (4) must be dismissed. Plaintiff's remaining claim under Section 5(a)(5) of Chapter 21E fails for the reasons in Section 2 above.

"absent some duty on the part of the defendant to prevent contamination of the site… the judge's finding [regarding the cause of the contamination] adds nothing to the case that was previously before us in Griffith I.[8] Griffith at 369.

This sentiment was further supported in the Massachusetts Supreme Judicial Court's decision in Marenghi v. Mobil Oil Corporation, 420 Mass.371 (1995). In Marenghi, the Court analyzed the language of a lease entered into by the defendant in order to determine whether it was under a duty to maintain the oil tank which subsequently leaked, contaminating the site with oil. The Court found that notwithstanding the fact that the lease made the defendant legally responsible for the repair and maintenance of the tanks, there was no evidence from which to find that the defendant was legally responsible for the subsequent contamination, adding, "there is nothing in the Equipment Loan Agreement to suggest that the defendant had any duty of preventative maintenance nor was there any evidence that the Defendant did not fulfill its duties under the Equipment Loan Agreement." Id. at 373-74. In reaching its decision, the Court, as it did in Griffith, employed a negligence-based theory of liability requiring not only the existence of a duty, but also an identifiable breach of that duty.

Cases decided after Griffith and Marenghi also required proof of a breach of duty for purposes of determining liability under M.G.L. Chapter 21E, § 5(a)(5). See Commonwealth v. Boston Edison Company, 444 Mass. 324 (2005); See also Domestic Loan and Investment Bank v. Ernst, 1998 WL 1284185 (Mass. Super.). In fact, in Newly Weds Foods, Inc. v. Westvaco Corporation, 14 Mass.L.Rptr. 728, the Superior Court concluded that even in a situation where a defendant had been the sole owner and operator of underground storage tank at the time it leaked, the plaintiff was not entitled to response costs absent proof that defendant breached a

---

[8] Griffith v. New England Telephone & Telegraph Company, 414 Mass. 824 (1993) ("Griffith I"). In Griffith I, the SJC noted that given the definitions of "oil" and "hazardous material" and the liability structure of Section 5(a)(2) – (4), "past owners or operators of sites contaminated by oil . . . can not be held strictly liable for oil contamination occurring while they owned or operated the site." Griffith I, 414 Mass. at 829.

{Client Files\LIT\303730\0001\PLD\00632377.DOC;3}

duty that caused the contamination. Perhaps most indicative of the Court's employment of a negligence-based theory of liability were the instructions given to the jury on the causation issue. Note the Court's use of negligence-based causation standard, which is properly analyzed under a "reasonable person" test:

> If the plaintiff establishes, as it alleges here, by a fair preponderance of the credible evidence, that the defendant acted *unreasonably* in some manner with the [underground storage tank], by for instance leaving the tank in the ground for an *unreasonable* length of time, or by failing to detect a leak by *reasonably* monitoring or maintaining the tank, or by leaving the tank in the ground when it *knew or should have known* that it was releasing or was likely to release oil or if defendant *knew or should have known* that oil was released into the ground from the tank and *unreasonably* failed to remove the contaminated soil, then that would be sufficient conduct to establish liability provided that plaintiff has also shown that that conduct caused the contamination which required remediation.

Newly Weds Foods, Inc. at 3. (Emphasis added).

See Commonwealth v. Boston Edison Company, 444 Mass. 324, 333-336 (2005) (discussing Section 5(a)(5) and concluding that the Commonwealth "had no duty" to exercise its enforcement discretion not take an enforcement action and was simply "too far removed from causation" to give rise to a claim). See also Marina Bay Realty Trust LLC v. U.S., 2004 WL 1175121 (D. Mass. 2004); affirmed by Marina Bay Realty Trust LLC v. U.S., 407 F.3d 418 (1st Cir. 2005). (Discussing Section 5(a)(5) in the context of FTCA claims).

In accordance with the above-referenced case law, in order for a plaintiff to recover under M.G.L. c. 21E § 5(a)(5), it must be established that the alleged act or omission of the defendant which gives rise to the contaminating event was unreasonable in consideration of all the circumstances at the time or based on the failure to comply with some duty that would have prevented the contamination. Conalco's acts with respect to the release of oil at the Property were not unreasonable at the time, in fact, Conalco's methods of disposal were commonplace in the industry. (Lappies Depo. Trans., pp. 182-185). Based on the testimony of Mr. Lappies, a former Conalco employee, at the time such activities took place, Conalco did not foresee the

potential environmental impact of such activities. (Lappies Depo. Trans., pp. 182-185). Further, there was no company policy prohibiting such activities. Conalco was under no duty to prevent the release of oil at the Property.

Under the negligence-based theory of liability used by the Courts in interpreting M.G.L. c. 21E § 5(a)(5), because Conalco was under no duty to prevent the release of oil at the Property and could not have foreseen the effects of such activities, it can not be held liable for the payment of past, present or future response costs incurred by Mr. Cariddi and his claims under M.G.L. c. 21E § 5(a)(5) should be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, Consolidated Aluminum Corporation respectfully requests that this Honorable Court take the following action:

1. Enter summary judgment in its favor on Plaintiff's CERCLA claims (Counts I and III) on the ground that it is barred by CERCLA's petroleum exclusion;

2. Entry summary judgment in its favor on Plaintiff's M.G.L. c. 21E claims (Counts II and III) on the ground that Plaintiff can not establish an essential element of his claim as required under M.G.L. c. 21E, § 5(a)(5);

3. Award the Defendant its reasonable expenses, including attorneys' fees, relating to this Motion; and

4. Grant such further relief as the Court deems just and appropriate.

CONSOLIDATED ALUMINUM CORPORATION

By its attorneys,

*/s/ Robert D. Cox, Jr.*
Robert D. Cox, Jr. BBO#546486
Ryan T. Killman BBO# 654562
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, Massachusetts 01615-0156
Telephone: (508) 926-3409
Facsimile: (508) 929-3012
rcox@bowditch.com

Dated: January 20, 2006

## CERTIFICATE OF SERVICE

      I, Robert D. Cox, Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on January 20, 2006.

                                          */s/ Robert D. Cox, Jr.*