# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**Civil Action No. 05-30111-MAP**

| | |
|---|---|
| **JAMES V. CARIDDI** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CONSOLIDATED ALUMINUM** | ) |
| **CORPORATION** | ) |
| | ) |
| **Defendant.** | ) |

## AFFIDAVIT OF ROBERT D. COX, ESQUIRE

I, Robert D. Cox, Esquire, on oath, hereby depose and state the following to be true to the best of my knowledge, information and belief:

1.      I am an attorney admitted to practice law in the Commonwealth of Massachusetts and the United States District Court of Massachusetts.  I am counsel for Consolidated Aluminum Corporation in this matter.

2.      Attached hereto as Exhibit "A" are true and accurate copies of excerpts from the deposition transcript of Mr. Norman R. Lappies dated September 29, 2004.

3.      Attached hereto as Exhibit "B" is a true and accurate copy of Plaintiff's Responses to Defendant Consolidated Aluminum Corporation's First Set of Interrogatories to James V. Cariddi dated October 14, 2005.

Signed under the pains and penalties of perjury this __ day of January, 2006.


*/s/ Robert D. Cox, Jr.*


## CERTIFICATE OF SERVICE

I, Robert D. Cox, Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on January 20, 2006.


*/s/ Robert D. Cox, Jr.*

# EXHIBIT A

Pages 1 – 20

{}

# EXHIBIT  A

{}

COMMONWEALTH   OF   MASSACHUSETTS


Berkshire, ss.    Department of the Trial Court
                  Superior Court
                  Civil Action No. BECV2004-00214
                  Pages 1-206


IN THE MATTER OF:  PETITION
OF CONSOLIDATED ALUMINUM
CORPORATION TO PERPETUATE
THE TESTIMONY OF NORMAN R. LAPPIES


      DEPOSITION OF:  **NORMAN R. LAPPIES**, taken
before Heather J. Davis, Certified Shorthand
Reporter and Notary Public, pursuant to Rule 30
of the Massachusetts Rules of Civil Procedure,
at the offices of CAIN, HIBBARD, MYERS & COOK,
66 West Street, Pittsfield, Massachusetts on
September 29, 2004, commencing at 10:02 AM.


APPEARANCES:

(SEE PAGE TWO)


                  Heather J. Davis
                  Registered Merit Reporter


**DAVIS & MITCHELL**
P.O. Box 1367
Pittsfield, MA 01202
Tel. (413) 499-0035     Fax (413) 499-7823

DAVIS & MITCHELL
(413) 499-0035

```
 1         Q.    Any education or training programs
 2    that you participated in after you went to high
 3    school?
 4         A.    Pertaining to what?
 5         Q.    Anything.  Your career, your work,
 6    night school, trade school?
 7         A.    Just on-the-job training, that's
 8    all.
 9         Q.    On-the-job training?
10         A.    Mm-hmm.
11         Q.    Now, you grew up on a farm, worked
12    on a farm?
13         A.    Quit, got married.
14         Q.    Quit, got married.  When did you
15    quit and get married?
16         A.    At 18.  1958.
17         Q.    1958.  And referring to your
18    affidavit, you state that you started working
19    at the facility in North Adams?
20         A.    '61.
21         Q.    '61.  So tell me what you did
22    between 1958 and 1961 for work.
23         A.    Construction.
24         Q.    What type of construction?
```

1     A.    Drove truck.

2     Q.    Anything else?

3     A.    No.

4     Q.    Drove a truck?

5     A.    Yup.  Construction.  Supported my

6  family.

7     Q.    Okay.  Who did you work for?

8     A.    I worked for John Kroll in

9  Cheshire, construction.  Worked for Conway

10  Construction.  Worked for Bianchi Construction.

11     Q.    And all the work was driving a

12  truck?

13     A.    Yes.

14     Q.    Did you get a class 3 license?

15     A.    You didn't need them then.  All you

16  need to do is show up and work.

17     Q.    That's what we need.  Now, at the

18  time you first worked at the facility in North

19  Adams, it was owned by Pfister Aluminum --

20     A.    Pfister Aluminum.

21     Q.    -- Tubing?

22     A.    P-F-I-S-T-E-R.

23     Q.    Corporation, is that right?

24     A.    Yes.

1      Q.    And how did it come about that you

2   took a job at that location?

3      A.    I had a wife and two young children

4   that were hungry.

5      Q.    Apart from your need to have

6   income, how did you learn about the job?  How

7   were you qualified for the job?

8      A.    Just laid off from construction,

9   out looking for a job so I could support my

10  family.  I happened to stop and made an

11  application.

12     Q.    And what was the application for?

13     A.    Anything.  Machine operator.

14     Q.    And your affidavit states that you

15  first worked as a machine operator, is that

16  right?

17     A.    This affidavit?  I don't know what

18  it says.

19     Q.    Let me back out.  When you first

20  worked for the company you worked as a machine

21  operator?

22     A.    Yes.

23     Q.    Did you have any training prior to

24  joining the company --

```
 1          A.    No.

 2          Q.    -- as a machine operator?

 3          A.    No. On-the-job training.

 4          Q.    On-the-job training.  I'm learning.

 5   Are you currently employed?

 6          A.    No. I'm 64 years old.  I'm retired.

 7          Q.    Do you run any businesses?

 8          A.    I dabble in antiques.

 9          Q.    Do you have an antique shop?

10          A.    I have a little warehouse I work

11   out of.

12          Q.    Does it have a name?

13          A.    No. It's for sale.

14          Q.    Where is the warehouse?

15          A.    I work out of my garage most of the

16   time, and I got a little shop down in North

17   Adams I work out of on Houghton Street.

18          Q.    Okay.  Now, focusing on your

19   employment, your affidavit states that you

20   stopped working in 1976 at the facility, is

21   that right?

22          A.    Yeah.  They closed.

23          Q.    What did you do after that?

24          A.    I started a fabricating business
```

1       Q.    If you could first draw a general

2    footprint, outline, of the facility as you

3    recall it in 1961.

4       A.    Okay.  You've got to understand,

5    this is an old cotton mill so there was bays,

6    we called them bays, in here.  We had, they

7    call them drawing benches.  What we done is

8    take raw aluminum, called a bloom, and we'd

9    take a tube and we changed the diameter and the

10   thickness of the wall of that tube by drawing

11   it through a process of dies and mandles.

12   While we stretch it, they are called

13   stretching, they are actually drawing it, they

14   would change the OD of the tubing and the wall

15   thickness.  We'd take a piece of bloom probably

16   fourteen feet long and we'd, it depends on the

17   size we wanted to finish, take say an inch and

18   3/8 piece of tubing, 095, .095 in thickness,

19   and we would draw that three times and we'd

20   take it down to one inch, say 049, on the wall

21   thickness.

22      Q.    Okay.

23      A.    We'd change it from an inch and 3/8

24   down to one inch by drawing it through a

1    process of mandles and dies.  And at the time

2    we had to pump oil on the inside of this tubing

3    and we had to have oil on the outside of the

4    tubing because the friction going through the

5    dies and the mandles would break the tubing.

6    They'd call it tearing.  It would put a white

7    line on the outside of the tubing which we'd

8    have to throw the tube away.  Because the tube

9    had to be perfect.  And we stretched this,

10    probably, a tube fourteen feet long, we'd

11    probably end up on -- with an 049 wall, one

12    inch, we'd probably end up sixty-five feet.

13        Q.    Long?

14        A.    Yeah.

15        Q.    One piece?

16        A.    One piece.  And we'd do one bundle

17    at a time, which weighed approximately a

18    thousand, we tried to keep our bundles about a

19    thousand pounds at all times, because of the

20    cranes, we had to move them from the bays.

21    Like I said, we had bays.  You got to

22    understand, there's posts in these bays, that's

23    what's holding the roof up.

24        Q.    Okay.

1    beneath the floor --

2         A.    Into the cellar.

3         Q.    -- into the cellar?

4         A.    Right.

5         Q.    And how large were these tanks?

6         A.    They probably held -- there's two.

7    We had two different types of drawing oil.

8    There's actually a partition between the tanks.

9    The tanks were square.  They probably held,

10   each tank, probably two hundred gallons.  We

11   used to put them in by fifty-five-gallon drums.

12   Each side would take probably two drums.  So

13   you know, a hundred and ten gallons each side.

14   You had a heavy oil and a finish oil.

15        Q.    Okay.  So each side -- so there was

16   a tank on each side?

17        A.    One big tank with a partition in

18   the middle of it where we had heavy oil on one

19   side and light oil on the other side.  The

20   lighter the oil, the shinier the tube.  For the

21   breakdown bench we just wanted heavy oil.

22        Q.    I'm sorry.  On the breakdown bench

23   you just wanted to have?

24        A.    We used heavy oil.

54

1     Q.     Heavy oil?

2     A.     Yes.

3     Q.     We're still on the breakdown bench?

4     A.     Yes.  Because it's quite a process.

5     After the first bench, you picked it up with

6     cranes again and you moved it down to the next

7     bench.  And the same process.

8                    We put it up on top of a rack,

9     the rods come up, you put three of them on

10    the tubes, you have rollers that roll the

11    tubes right onto the rods.  You've got to

12    understand, these machines are long.

13    Q.     Yes.

14    A.     You push them onto the rods, had to

15    push them on a little bit by hand, drop the

16    rods, hit the pedal, and move them forward into

17    the dies again.  Bring the truck in, boom, draw

18    them through another set of dies.  Change the

19    OD and wall again, the thickness of the wall.

20    Q.     OD?

21    A.     Outside diameter.

22    Q.     Okay.

23    A.     And the thickness of the wall.  And

24    that would draw it another -- you could

1          Q.      You're doing pretty good.

2          A.      I know it by heart, I can tell you.

3     I got everything up here. (Indicating)

4          Q.      The product would be stretched from

5     a fourteen-foot length, approximately?

6          A.      Approximately fourteen.

7          Q.      To about what length?

8          A.      We ended up probably with

9     sixty-four feet.  We didn't want much scrap so

10    we figured out -- because we'd have to cut

11    these -- after this is finished, you have to

12    understand, there's saw benches here, saw

13    horses, and there would be a saw here, with

14    benches on the other side.

15               You'd pick up this bundle

16    after it was finished.  This is the third

17    draw of this finished product.  First,

18    second, third draw.  You picked up the bundle

19    with all the oil dripping off of it.  You got

20    to understand, this thing is saturated with

21    oil.  Full.  Tubes are full of oil.  There's

22    oil on the outside, there's oil on the

23    inside.  So you pick it up and you move it

24    over to the saw.  We had two people working

1    on the saw.  They'd grab say five or six

2    tubes, whatever they could handle, and you're

3    talking the sixty-foot tube, and they'd pull

4    them up and they put them on a radio arm saw

5    and they cut the points off, because that was

6    scrap.  Okay?  And then you had the saw set,

7    if you wanted twenty-foot lengths --

8    or usually -- well, you had to cut them

9    twenty -- it depends.  Say twenty foot.  It

10   depended on the length of the finished tube.

11   If you wanted it four-foot lengths at the

12   end, you had to roll it straight.

13            And there's another process

14   that's run on mineral spirits spraying all

15   over the place.

16       Q.    We'll get to that in a bit.

17       A.    But cut this, say, four, eight,

18   twelve, sixteen -- if you cut it say twenty

19   foot four, this is what you'd cut the tubing,

20   and you got -- well, it would have to be more

21   than sixty.  Say sixty-five feet it would be.

22   But you got twenty foot, four inches.  Twenty

23   foot, four inches, so you'd get three cuts out

24   of a tube.  And the end of the tube would be

70

1       A.    No. Number two draw, number three

2   draw, number one draw. (Indicating)

3       Q.    Got it.   Okay.   With the number

4   three draw, I think you said that a lighter oil

5   was used in connection with that bench.

6       A.    Yup.

7       Q.    Could you explain that for us?

8       A.    The lighter the oil -- because on

9   the finish draw you wanted a bright finish on

10   the tubing, like chrome, so you used the light

11   oils.   Sometimes you could mix your oil with

12   kerosene.   You could put just a dab of kerosene

13   in the oil and that's how you cheated to get a

14   good shine.

15       Q.    Okay.

16       A.    What we do is we'd dunk a kerosene

17   rag in a pail of kerosene, or a rag, and put it

18   in the oil, and we'd wrap it around the tube as

19   it was going through the die and make it like

20   chrome.

21       Q.    And that would be for the third

22   draw?

23       A.    Finish draw.

24       Q.    The third draw is the same as the

1    slipped out of your hand, they'd fall down them

2    holes in the basement.  So every day, yeah, you

3    were probably down the basement retrieving a

4    pipe wrench.

5         Q.    And the machines we're talking

6    about are over here? (Indicating)

7         A.    Are the benches.

8         Q.    Are the benches?

9         A.    Yes.

10         Q.    So you'd go in the basement?

11         A.    To try to find your pipe wrenches,

12    sure.  But you had to watch where you walked

13    because there was lakes down there.

14         Q.    Now explain that.

15         A.    All the oil that was in the

16    basement, they used to dig like ditches to

17    divert the oil into like little ponds in the

18    basement.

19         Q.    Okay.

20         A.    So people wouldn't, when you were

21    down getting your tools, employees wouldn't get

22    hurt down there, if you'd fall in.  Some of

23    them holes were deep.

24         Q.    Tell me about the ditch digging.

1          A.    I didn't have nothing to do -- it

2     was before even I got there.  They had all

3     these canals dug into the basement.  I'd say

4     when the company first started they were having

5     trouble down there, so they dug like little

6     ditches around the machines and diverted all

7     the oil like into what I call little ponds.  I

8     don't know what the heck they were.

9          Q.    Okay.  What is your source of

10    information of the digging, the actual digging?

11         A.    I saw them.

12         Q.    Did you see people digging?

13         A.    No. But I saw the damn canals.

14         Q.    Okay.  And these were dug in --

15         A.    They had to have been dug.  They

16    didn't grow that way, you know.

17         Q.    Did prior employees, earlier

18    employees, tell you about putting these

19    trenches in, if you remember?

20         A.    I don't remember that.  I mean I

21    know they were there because I used to have to

22    jump over them and watch where I was going.

23    There was no lights in the basement.  You went

24    down there with a flashlight trying to find

147

1    your wrenches.  You're responsible for your

2    tools and you're making a dollar and fifteen

3    cents an hour, you don't want to lose an

4    eight-dollar wrench.  You had to pay for it.

5         Q.    Okay.  So you go in the basement.

6    Your first experience in the basement was you

7    retrieve a tool?

8         A.    My first experience was, oh, my

9    God, let me out of here.

10        Q.    And you saw places where it was dug

11   in order to --

12        A.    Divert the oil.

13        Q.    To divert oil.

14        A.    Yes.  Away from the machines, you

15   know.

16        Q.    Okay.  And there was no lighting in

17   the basement?

18        A.    There was like basement windows to

19   let some light in but I mean, you know, I'm not

20   an owl, I can't see that good in the dark.

21        Q.    Okay.  You described before in this

22   plan the generator room which went into the

23   basement --

24        A.    Yes.

DAVIS & MITCHELL
(413) 499-0035

1    they'd wheel it in in wheelbarrows, that's how

2    they'd pour it.

3         Q.    What you described, what I had you

4    describe, of going in the basement was in 1961,

5    is that right?

6         A.    Yes.

7         Q.    Did the conditions in the basement

8    that you described with respect to oil dripping

9    change?

10        A.    No.

11        Q.    Constant throughout the time period

12   that you were there?

13        A.    Of course.  The oils on the

14   machines never changed.  The breakage on the

15   lines, it never changed.

16        Q.    And the nature of the oils, or the

17   type of oils that were dripping through into

18   the basement, were the drawing oils from the

19   bench area?

20        A.    Yes.  Yes.

21        Q.    With respect to the basement, in

22   your affidavit you refer to a flume, a flume

23   structure.

24        A.    Yes.

1          A.    Mop the floor the best we could.

2     Then take squeegees and squeegee the whole

3     floor all the way down, all the way down the

4     bay, and everything went right into the cellar.

5          Q.    All right.  And during the time

6     that you did this the squeegeeing activity was

7     all toward one direction?

8          A.    Towards the generator room.  From

9     the back to the front.  Always from the back to

10    the front.  Because all your pans were coming

11    in this way, your oil pans.  We cleaned the

12    pans, we'd clean everything.

13         Q.    Okay.  Help me out on the pans.

14         A.    The pans are underneath the draw

15    benches.  I told you, they are an inch and a

16    half high.

17         Q.    So you'd clean those out as well?

18         A.    Oh, yes, sure.

19         Q.    How would you clean out the pans?

20         A.    Squeegee them out, mop them out

21    with solvent afterwards.

22         Q.    Could you move the pans, lift the

23    pans?

24         A.    Oh, no, no.

1          Q.    So you put solvent in the pans?

2          A.    We'd squeegee the oil out the best

3    we could, or mop it out with the mops and the

4    solvent, and then keep mopping until they were

5    spotless.  With solvent.

6          Q.    So the oil that was in the pans

7    would get solvent, which are mineral spirits --

8          A.    Correct.

9          Q.    -- put into it, right?  That would

10   all get squeegeed out and go into the floor?

11         A.    Exactly.

12         Q.    And as the floor is cleaned, after

13   it is mopped and you said scrubbed, you mean

14   scrubbed with a mop?

15         A.    A big mop, industrial mop.  You

16   know.

17         Q.    Cloth mop?

18         A.    Yeah.

19         Q.    After it was mopped, the material

20   would be squeegeed in one direction?

21         A.    Exactly.

22         Q.    Now, you've depicted here a number

23   of bays, where you have five bays there.

24         A.    Exactly.

# EXHIBIT A
Continued Pages 21 – 27

{}

1  activity?

2       A.    Be part of a Sunday cleanup

3  activity.

4       Q.    Would the points then be pushed to

5  the end?

6       A.    No, no.  They'd be picked up and

7  thrown in the barrel and taken later on to the

8  baler.  You always save your scrap.  You

9  weren't allowed to get rid of scrap.

10      Q.    Apart from the points, were there

11 metal shavings that were on the floor as a

12 result of the drawing process?

13      A.    No.

14      Q.    How many employees did it take to

15 do the cleanup operation in four to five hours?

16      A.    Well, probably six or eight.

17      Q.    And would you normally have six or

18 eight employees?

19      A.    Volunteers, sure.

20      Q.    If --

21      A.    In the old days, yes, sure.

22 Everybody wanted to eat.

23      Q.    And when you say the old days, what

24 do you mean by that?

1     A.    Early '60s.

2     Q.    And this is when you were involved

3  in doing this yourself?

4     A.    I was a machine operator, yes.

5     Q.    Because later on you didn't do that

6  because you were in management.

7     A.    Hell, no.  I didn't want to get

8  dirty.

9     Q.    Would there be occasions when the

10  cleanup would not occur because six or eight

11  employees did not volunteer to do the work?

12     A.    Yes.

13     Q.    So you'd skip a week or a couple

14  weeks?

15     A.    Yeah, sure.

16     Q.    With what sort of frequency would

17  that occur?

18     A.    When it got that bad you usually

19  shut down, like say on a Friday afternoon,

20  you'd shut the machines off.  You understand,

21  we didn't want to lose production.  You were

22  doing volume, you hated to lose production,

23  because you were pushed to make a quota.  So

24  when you shut a machine down you were loosing

1        A.    Mops and squeegees.

2        Q.    Same process?

3        A.    Yes.

4        Q.    Go over and get a bucket full of

5    mineral spirits?

6        A.    And try to mop it up the best they

7    could.  I mean you just didn't blatantly get

8    buckets and throw them on the floor.  You went

9    over and got a mop pail full for your mop and

10   then you got maybe a twelve-gallon pail full to

11   throw and mop them around, and bring the mop

12   out and mop it around some more and squeegee

13   out the excess into the cellar.  I mean nobody

14   was trying to do nothing bad, you know.  And it

15   was common practice in the old days to do that.

16   Nobody ever thought nothing about it.  You go

17   to any factory around North Adams that's got

18   trouble.  You got Mass. MoCA up there sitting

19   on -- if you fell in the cellar of Mass. MoCA

20   you come out glowing.

21       Q.    So how do you know this is a common

22   practice for any of these factories up there?

23       A.    How about General Electric?

24       Q.    I'm asking you.

1      A.    Well, you're an educated man.  Look

2    at Pittsfield.  It's contaminated by General

3    Electric.  Sprague Electric contaminated North

4    Adams.  It was a practice in the old days.

5    They didn't think nothing's wrong with it.  You

6    got a whole section in North Adams, they had to

7    tear every house down over there because it's

8    contaminated with PCBs from Sprague's.  People

9    were dying from cancer over there.  The land is

10   contaminated.  It was practice to do things

11   like that.

12       Q.    Okay.  And --

13       A.    There was nothing thought wrong of

14   it.

15       Q.    And the practice that you're

16   talking about is to clean floors?

17       A.    To clean your area, sure.  Clean

18   your floor, clean your factory.  You wanted to

19   work in a clean environment.

20       Q.    And this particular practice you're

21   talking about is applying mineral spirits to

22   the floor?

23       A.    I'm not saying it's right but I'm

24   saying at the time it was right.

1        Q.    At the time it was right?

2        A.    You were told to do it, it was the

3   right thing to do.  You followed instructions.

4        Q.    And you didn't think there was

5   anything wrong with it at the time?

6        A.    At the time, no, of course not.  Of

7   course not.  I mean I know better now but I

8   mean I'm forty years older than I was then.  Of

9   course it's wrong, but I didn't know it at the

10  time.  Your boss comes out and tells you to mop

11  the floor with mineral spirits, you mop it.

12       Q.    So it's fair to say then that this

13  practice of cleaning the floor the way you

14  described it, using mineral spirits to mop it

15  up and then to squeegee it into the floor and

16  to go down to the basement below, that that

17  practice was not against any company policy?

18       A.    Oh, no, of course not.

19       Q.    And that practice was not contrary

20  to any type of directive from St. Louis or

21  management or anyone within the facility?

22       A.    They didn't care how you cleaned it

23  up as long as when the outsiders come in they

24  wanted the place clean.  That's all.

1      Q.    I may have asked this before, and I

2   apologize, did the condition of the basement

3   and what you observed there first in 1961 and

4   then later on, did it change in any fashion?

5      A.    Just got worse.  That's all.

6      Q.    And in what sense did it get worse?

7      A.    More oil.

8      Q.    Were there any changes in the

9   ditches during the time period --

10     A.    I had nothing to do with them

11  ditches.  I don't know nothing about nothing.

12     Q.    Did you observe any different

13  ditches or different ditch configurations?

14     A.    No. We never sent nobody down to

15  dig ditches.  We had nothing -- nobody was made

16  to go in that cellar.

17     Q.    Okay.

18     A.    We certainly didn't send somebody

19  down to dig ditches.  No way.

20     Q.    Just so I'm clear on this, during

21  the time period that you worked at the

22  facility, no one dug any ditches in the

23  basement?

24     A.    Not that I'm aware of.  I am not --

# EXHIBIT B

Pages 1 – 12

{}

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30111-MAP

| | |
|---|---|
| JAMES V. CARIDDI,<br>Plaintiff<br><br>v.<br><br>CONSOLIDATED ALUMINUM CORPORATION,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S RESPONSES TO DEFENDANT
## CONSOLIDATED ALUMINUM CORPORATION'S
## FIRST SET OF INTERROGATORIES TO JAMES V. CARIDDI

The plaintiff, James V. Cariddi ("Cariddi"), pursuant to Rule 33 of the Federal Rules of Civil Procedure, answers the First Set of Interrogatories from Consolidated Aluminum Corporation ("Conalco"), as follows.

## INTERROGATORIES

Interrogatory No. 1

With respect to the alleged presence of "contaminated waste oil and other hazardous substances at the Facility when Conalco owned and operated the Facility" referenced in paragraphs 38-43 of Count I of the Complaint (hereinafter "Substances"), do you contend that the Substances contained Hazardous Substances which had been purposefully introduced into the Substances by the manufacturer or supplier of the Materials prior to Conalco's use?  If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the

discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**:  Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 2

Do you contend that the Substances contained Hazardous Substances not normally present in such Substances?  If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**:  Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 3

Do you contend that Hazardous Substances, normally found in such Substances, were present in the Substances at higher than normal levels?  If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the

discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**:  Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 4

Do you contend that Hazardous Substances were mixed with the Substances?  If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, (3) is not within the scope of Fed. R. Civ. P. 26(b)(1), and (4) is unclear, vague or ambiguous.

**RESPONSE**:  Without waiving and subject to all objections, and to the extent I understand interrogatory 4, I answer as follows: If the mixing asked about refers to the current mixing of Hazardous Substances with the Substances, I answer in the affirmative. The basis for my answer would be numerous tests performed in connection with response actions performed at the Facility, which test results have been produced to Conalco.  If the mixing asked about refers to the act of mixing, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

3

Interrogatory No. 5

Do you contend that the Substances were contaminated with Hazardous Substances through use? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 6

Do you contend that Hazardous Substances were added to the Substances as result of industrial processing? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 7

Do you contend that Hazardous Substances are an indigenous component or inherent in the Substances? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 8

Do you contend that the Substances contained Hazardous Substances which had been purposefully introduced into the Substances by the manufacturer or supplier of the Substances prior to Conalco's use? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 9

With respect to the alleged presence of "oil and hazardous materials at the Facility when

Conalco owned and operated the Facility" referenced in paragraphs 45-50 of Count II of

the Complaint (hereinafter "Materials"), do you contend that the Materials contained

Hazardous Materials not normally present in such Materials?  If your response to the

foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to

the subject matter of the pending action, (2) is not reasonably calculated to lead to the

discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P.

26(b)(1).

**RESPONSE**:  Without waiving and subject to all objections, I answer in the

negative since at this time I am without information or knowledge sufficient to form a

belief as to the truth of the contention.

Interrogatory No. 10

 Do you contend that Hazardous Materials, normally found in such Materials, were

present in the Materials at higher than normal levels?  If your response to the foregoing is

in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to

the subject matter of the pending action, (2) is not reasonably calculated to lead to the

discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P.

26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 11

Do you contend that Hazardous Materials were mixed with the Materials? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, (3) is not within the scope of Fed. R. Civ. P. 26(b)(1), and (4) is unclear, vague or ambiguous.

**RESPONSE**: Without waiving and subject to all objections, and to the extent I understand interrogatory 11, I answer as follows: If the mixing asked about refers to the current mixing of Hazardous Materials with the Substances, I answer in the affirmative. The basis for my answer would be numerous tests performed in connection with response actions performed at the Facility, which test results have been produced to Conalco. If the mixing asked about refers to the act of mixing, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 12

Do you contend that the Materials were contaminated with Hazardous Materials through use? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 13

Do you contend that the Hazardous Materials were added to the Materials as result of industrial processing? If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE**: Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 14

Do you contend that Hazardous Materials are an indigenous component or inherent in the Materials?  If your response to the foregoing is in the affirmative, please explain, in detail, the factual basis for your answer.

**OBJECTIONS:** The interrogatory (1) seeks information that is not relevant to the subject matter of the pending action, (2) is not reasonably calculated to lead to the discovery of admissible evidence, and (3) is not within the scope of Fed. R. Civ. P. 26(b)(1).

**RESPONSE:**  Without waiving and subject to all objections, I answer in the negative since at this time I am without information or knowledge sufficient to form a belief as to the truth of the contention.

Interrogatory No. 15

Please identify by chemical name and CAS number the Hazardous Substances you contend are present in the "oil and hazardous materials at the Facility when Conalco owned and operated the Facility" as referenced in paragraphs 45-50 of Count II of the Complaint.

**RESPONSE:**  Please see attached Exhibit A for a table listing the Hazardous Substances found at the Facility in samples analyzed in connection with response actions performed at the Facility.

Interrogatory No. 16

Please identify by chemical name and CAS number the Hazardous Materials you contend

are present in the "oil and hazardous materials at the Facility when Conalco owned and

operated the Facility" as referenced in paragraphs 45-50 of Count II of the Complaint.

**RESPONSE**:  Please see attached Exhibit B for a table listing the Hazardous

Materials found at the Facility in samples analyzed in connection with response actions

performed at the Facility.

Interrogatory No. 17

Do you contend that the Defendant Conalco is responsible for the Substances and/or

Materials present in the basement of the Facility prior to August 1967?  If your response

to the foregoing question is in the affirmative, please explain, in detail, the factual basis

for your response.

**OBJECTION**:  The interrogatory calls for legal conclusions which Cariddi, who

is not a lawyer, is not qualified to render or cannot be answered without disclosing

confidential opinions of Cariddi's counsel as communicated to him concerning the

relationships between the various facts and various legal theories.

**RESPONSE**:  I believe Conalco is responsible for all releases it caused, exacerbated or

failed to prevent or clean up, based upon, among other things, Mr. Lappies' descriptions

of Conalco's practices.

Interrogatory No. 18

Please identify any and all spills, releases and/or disposal of oil and/or hazardous

materials as defined under Massachusetts General Laws, Chapter 21E and/or Petroleum

and/or Hazardous Substances as defined under CERCLA at the Facility occurring between 1976 and the present.

**RESPONSE**: Maxymillian Technologies reported in the *Phase I Initial Site Investigation Report and Phase II Scope of Work*, at pages 9 and 14, two releases at the Facility since 1976, both at Modern Aluminum Anodizing:

    (1) a release of 50-100 gallons of 35% phosphoric acid on October 4, 1989; and

    (2) a release of 50-100 gallons of fuel oil that was identified on December 6, 1989.

I understand a copy of the report has been provided to Conalco.

As to Objections:

Dated: October 14, 2005

Christopher B. Myhrum, Esq.
  BBO# 365980
Gastón de los Reyes
  BBO# 662200
Bulkley, Richardson and Gelinas, LLP
1500 Main Street
Suite 2700
Springfield, MA 01115-5507
Tel: (413) 781-2820

I state under penalty of perjury the foregoing is true and correct.

Dated: October 14, 2005

James V. Cariddi

# EXHIBIT B
Continued Pages 13 – 21

{}

# EXHIBIT A

Exhibit A
CERCLA Hazardous Substances
(Listed at 40 CFR Part 302 - Table 302.4)

| Name of Chemical | CAS Number |
| --- | --- |
| *Metals*: | |
| Arsenic | 07440-38-2 |
| Cadmium | 07440-43-9 |
| Chromium | 07440-47-3 |
| Copper | 07440-50-8 |
| Lead | 07439-92-1 |
| Mercury | 07439-97-6 |
| Nickel | 07440-02-0 |
| Silver | 07440-22-4 |
| Zinc | 07440-66-6 |

Exhibit A (Continued)
CERCLA Hazardous Substances
(Listed at 40 CFR Part 302 - Table 302.4)

| Name of Chemical | CAS Number |
| --- | --- |
| *Semi-Volatile Organic Compounds*: | |
| Acenaphthene | 00083-32-9 |
| Anthracene | 00120-12-7 |
| Benzo (a) anthracene | 00056-55-3 |
| Benzo (b) fluoranthene | 00205-99-2 |
| Benzo (k) fluoranthene | 00207-08-9 |
| Benzo (a) pyrene | 00050-32-8 |
| Benzo (g,h,i) perylene | 00191-24-2 |
| Chrysene | 00218-01-9 |
| Fluoranthene | 00206-44-0 |
| Fluorene | 00086-73-7 |
| Indeno(1,2,3-cd) pyrene | 00193-39-5 |
| Phenanthrene | 00085-01-8 |
| Pyrene | 00129-00-0 |

Exhibit A (Continued)
CERCLA Hazardous Substances
(Listed at 40 CFR Part 302 - Table 302.4)

Name of Chemical [and Synonym]                                    CAS Number

*Volatile Organic Compounds*:

Isopropylbenzene [Benzene, (1-Methylethyl)- ; Cumene]            00098-82-8

Naphthalene                                                      00091-20-3

o-Xylene                                                         00095-47-6

p-Xylene                                                         00106-42-3

m-Xylene                                                         00108-38-3

Xylene (mixed isomers)                                           01330-20-7

Doc. No. 309023

# EXHIBIT B

Exhibit B
Massachusetts Hazardous Materials
(Listed at 310 CMR 40.1600)

| Name of Chemical | CAS Number |
|---|---|
| *Metals*: | |
| Arsenic | 07440-38-2 |
| Barium | 07440-39-3 |
| Cadmium | 07440-43-9 |
| Calcium | 07440-70-2 |
| Chromium | 07440-47-3 |
| Cobalt | 07440-48-4 |
| Copper | 07440-50-8 |
| Lead | 07439-92-1 |
| Lithium | 07439-93-2 |
| Magnesium | 07439-95-4 |
| Mercury | 07439-97-6 |
| Nickel | 07440-02-0 |
| Silver | 07440-22-4 |
| Vanadium | 07440-62-2 |
| Zinc | 07440-66-6 |

Exhibit B (Continued)
Massachusetts Hazardous Materials
(Listed at 310 CMR 40.1600)

| Name of Chemical | CAS Number |
| --- | --- |
| *Semi-Volatile Organic Compounds*: | |
| Acenaphthene | 00083-32-9 |
| Anthracene | 00120-12-7 |
| Benzo (a) anthracene | 00056-55-3 |
| Benzo (b) fluoranthene | 00205-99-2 |
| Benzo (k) fluoranthene | 00207-08-9 |
| Benzo (a) pyrene | 00050-32-8 |
| Benzo (g,h,i) perylene | 00191-24-2 |
| Chrysene | 00218-01-9 |
| Fluoranthene | 00206-44-0 |
| Fluorene | 00086-73-7 |
| Indeno(1,2,3-cd) pyrene | 00193-39-5 |
| 2-Methylnaphthalene | 00091-57-6 |
| Phenanthrene | 00085-01-8 |
| Pyrene | 00129-00-0 |

Exhibit B (Continued)
Massachusetts Hazardous Materials
(Listed at 310 CMR 40.1600)

| Name of Chemical [and Synonyms] | CAS Number |
|---|---|
| *Volatile Organic Compounds*: | |
| 2-Chlorotoluene [o-Chlorotoluene, 1-Methyl-2-Chlorobenzene] | 00095-49-8 |
| Isopropylbenzene [Benzene, (1-Methylethyl)- ; Cumene] | 00098-82-8 |
| Isopropyltoluene [p-Cymene] | 00099-87-6 |
| Naphthalene | 00091-20-3 |
| n-Propylbenzene | 00103-65-1 |
| 1,2,4-Trimethylbenzene | 00095-63-6 |
| 1,3,5-Trimethylbenzene | 00108-67-8 |
| o-Xylene | 00095-47-6 |
| p-Xylene | 00106-42-3 |
| m-Xylene | 00108-38-3 |
| Xylene (mixed isomers) | 01330-20-7 |

*Other Hazardous Material*:

Waste Oil                                                                    None

Doc. No. 308976