UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30111-MAP

| | | |
|---|---|---|
| James V. Cariddi, | ) | |
| Plaintiff | ) | |
| | ) | AFFIDAVIT OF |
| v. | ) | CHRISTOPHER B. MYHRUM, |
| | ) | ESQUIRE |
| Consolidated Aluminum Corporation, | ) | |
| Defendant | ) | |

I, Christopher B. Myhrum, Esquire, state as follows:

1.   I am counsel for Plaintiff, James V. Cariddi.  I make this affidavit to put a sworn statement and pages of a deposition transcript before the Court for purposes of the Motion of Defendant, Consolidated Aluminum Corporation ("Conalco"), for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment.

2.   Attached as Exhibit A is a true and accurate copy of the sworn statement of Norman R. Lappies dated September 10, 2003.  This statement appears at Tab A of Exhibit D to the Complaint in this matter.

3.   Attached as Exhibit B are pages 1–7, 12–15, 68-73, 86, 145, 152, 160 and 167–187 of the Deposition of Norman R. Lappies.

I state under penalty of perjury that the foregoing is true and correct this first day of May, 2006.

/s/ Christopher B. Myhrum
Christopher B. Myhrum

Certificate of Service

       I, Christopher B. Myhrum, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


                     /s/ Christopher B. Myhrum
                     Christopher B. Myhrum

# EXHIBIT A

STATEMENT OF NORMAN LAPPIES
REGARDING OPERATIONS OF
CONSOLIDATED ALUMINUM CORPORATION
AND ITS PREDECESSORS AT
506-508 STATE ROAD, NORTH ADAMS, MA
(DEP RELEASE TRACKING NUMBER 1-13902)

I, Norman R. Lappies, state as follows:

1.    I was born on June 23, 1940.

2.    I reside at 155 River Road, Clarksburg, Massachusetts.

3.    I began working at the facility located at 506-508 State Road, North Adams, Massachusetts ("Facility") as a machine operator for the Pfister Aluminum Tubing Corporation ("Pfister," a.k.a. Pfister Manufacturing Corporation) in 1961.

4.    I continued working at the Facility after the business was acquired first by Phelps Dodge Aluminum Products Corp. ("Phelps Dodge") and subsequently by Consolidated Aluminum Corporation ("Conalco"). (Pfister, Phelps Dodge and Conalco are hereinafter referred to collectively as the "Former Operators.")

5.    During the course of my employment by the Former Operators, the operations at the Facility did not change materially as ownership of the Facility changed.

6.    During my continuous period of employment by the Former Operators, I was promoted initially to Foreman and then to Plant Manager.

7.    I was Plant Manager for Conalco when it decided to close the Facility in 1976 and I continued in that position until approximately one month prior to the final closing.

8.    The primary activity conducted by the Former Operators was the drawing of aluminum tubing down to smaller diameters. In addition, there were fabrication operations that involved the cutting and machining of aluminum.

9.    I have been informed that the presence of oil in the basement of the building has been reported to the Massachusetts Department of Environmental Protection ("DEP"), which assigned the Release Tracking Number 1-13902 to the release. My understanding is that the area where the most oil has been found is located inside and around the outside of a cinder block room west of the stairs descending into the basement from the first floor behind (south of) the current offices of Cariddi Sales Co. This cinder block room was called the Generator Room when I worked there and previously contained electrical equipment.

10.    Throughout the roughly 15 years I worked at the Facility, there were drawing machines located on the first floor of the Facility directly above the Generator Room in the basement.

11.    The drawing of aluminum required the use of large quantities of drawing oil to lubricate the dies through which the tubing was pulled. The operation was a messy one.

Oil would splash onto the wood floor from the machinery and also drip onto the floor from lengths of tubing being transferred from one drawing machine to another using an overhead hoist. In addition, there were occasions when oil-filled hoses burst, spraying oil all over the work area.

12.  To cope with the continuous regular buildup of oil on the floor, it was routine practice throughout the time I worked at the Facility to have workers come in on Sunday (when most operations were shut down) to remove the waste oil. This was done by applying mineral spirits solvent to the floor to thin the oil and then using squeegees to direct the oil through cracks and holes in the wood floor into the basement below, where it accumulated. To the best of my knowledge and information, waste oil was not shipped to an off-site location while I worked at the Facility.

15.  Mineral spirits solvent was also used to clean aluminum and was distilled on site to be reused. The underground storage tank ("UST") located outdoors behind the building to the west of the loading dock was used to store the recycled mineral spirits.

16.  Other than mineral spirits, I have no knowledge of other solvents being used at the Facility during my employment. Similarly, I do not know of any other hazardous materials used by the Former Operators. Wastewater discharges by the Former Operators were limited to sanitary wastes from washroom sinks and toilets.

17.  Throughout the period of my employment, another business, Modern Aluminum Anodizing ("MAA"), occupied (but did not own) the same building. Prior to the time Conalco closed down its operations, there were agreements with MAA that precluded MAA from doing work for any companies other than the Former Operators. While employed by the Former Operators, I observed MAA's use of hazardous materials and its discharge of process wastes (including acids) to the flume located under the building prior to MAA hooking up to the City sewer system. (My later employment by MAA did not begin until about 1983 and continued for about a year.)

18.  There is a hole knocked through the wall of the basement opening into the flume. This hole was already there when I began working for Pfister.

19.  There is a concrete structure in the basement located north of the hole into the flume, which appears to be an open-top process tank. It also was there when I began working for Pfister, but was not in use then.

20.  The foregoing statements are made based upon my personal knowledge, except as to those stated to be made upon information and belief, and as to such statements, I believe them to be true to the best of the information available to me.

Under penalty of perjury, I declare the foregoing to be true and accurate.

9/10/03
(Date)

Norman R. Lappies

2

# EXHIBIT B (Part 1 of 3)

COMMONWEALTH   OF   MASSACHUSETTS


Berkshire, ss.    Department of the Trial Court
                  Superior Court
                  Civil Action No. BECV2004-00214
                  Pages 1-206


**IN THE MATTER OF: PETITION**
**OF CONSOLIDATED ALUMINUM**
**CORPORATION TO PERPETUATE**
**THE TESTIMONY OF NORMAN R. LAPPIES**




        DEPOSITION OF:  **NORMAN R. LAPPIES,** taken
before Heather J. Davis, Certified Shorthand
Reporter and Notary Public, pursuant to Rule 30
of the Massachusetts Rules of Civil Procedure,
at the offices of CAIN, HIBBARD, MYERS & COOK,
66 West Street, Pittsfield, Massachusetts on
September 29, 2004, commencing at 10:02 AM.


APPEARANCES:

 (SEE PAGE TWO)




                    Heather J. Davis
                    Registered Merit Reporter




                **DAVIS & MITCHELL**
                 P.O. Box 1367
              Pittsfield, MA 01202
 Tel. (413) 499-0035    Fax (413) 499-7823

```
 1              MR. COX: With respect to
 2    stipulations, I'd like to have the witness
 3    read and sign so I don't want to waive that.
 4              MR. MYHRUM:  I agree.
 5              MR. COX:  I think we can agree
 6    to have him sign it in front of any notary.
 7              MR. MYHRUM:  If that's
 8    convenient.  Do you have a notary convenient
 9    to you up in Clarksburg?
10              THE WITNESS:  Oh, sure.  North
11    Adams.
12              MR. COX:  Yeah.
13              MR. MYHRUM:  I'm just aware of
14    impositions already.  And what about waive
15    motions to strike?
16              MR. COX:  Of course.  I think
17    that's already there.
18              MR. MYHRUM:  Motions and
19    objections?
20              MR. COX:  Yes.
21              MR. MYHRUM:  Except as to
22    form.
23              MR. COX:  Yes.
24              S T I P U L A T I O N S
```

APPEARANCES:

BOWDITCH & DEWEY, LLP, 311 Main Street, P.O. Box
15156, Worcester, Massachusetts, 01201
representing the Consolidated Aluminum.
BY: ROBERT D. COX, JR., ESQUIRE

BULKLEY RICHARDSON & GELINAS, 1500 Main Street,
P.O. Box 15507, Springfield, Massachusetts,
01115, representing Cariddi.
BY: CHRISTOPHER B. MYHRUM, ESQUIRE

1                        I N D E X

2        ---------------------------------------------
    WITNESSES:        DIRECT   CROSS   REDIRECT RECROSS
3        ---------------------------------------------

4    NORMAN LAPPIES        6

5
        ---------------------------------------------
6    EXHIBITS:            DESCRIPTION            PAGE
        ---------------------------------------------
7
    Exhibit 1        Subpoena                     6
8
    Exhibit 2        Notice of Taking Deposition 6
9
    Exhibit 3        Sketch                      46
10
    Exhibit 4        Sketch                      74
11
    Exhibit 5        Sketch                      82
12
    Exhibit 6        Sketch                      83
13
    Exhibit 7        Sketch                      92
14
    Exhibit 8        Sketch                     122
15

16

17

18

19

20

21

22

23

24

5

1

2          It is agreed by and between the parties

3     that all objections, except objections as to the

4     form of the question, are reserved to be raised

5     at the time of trial for the first time.

6

7          It is further agreed by and between the

8     parties that all motions to strike unresponsive

9     answers are also reserved to be raised at the

10    time of trial for the first time.

11

12         It is further agreed that the deponent

13    will not waive the reading and signing of the

14    deposition and the sealing of said deposition

15    will be waived.

16

17         It is further agreed by and between the

18    parties that notification to all parties of the

19    receipt of the original deposition transcript is

20    also hereby waived.

21

22                    * * * * *

23         **NORMAN R. LAPPIES**, the Deponent,

24    having been first identified by license and duly

```
1   sworn, deposes and says as follows:

2

3               DIRECT EXAMINATION BY MR.COX

4        Q.    (BY MR. COX) Would you please state

5   your full name?

6        A.    My name is Norman R. Lappies.

7        Q.    And where do you live, Mr. Lappies?

8        A.    155 River Road, Clarksburg, Mass.

9        Q.    And you're here this morning

10  pursuant to a subpoena that was issued to you?

11       A.    Excuse me?

12       Q.    You're here pursuant to a subpoena

13  that was issued to you?

14       A.    Yes.

15       Q.    Is this a copy of the subpoena that

16  you received?

17       A.    Yes.

18       Q.    Do you have your copy?

19       A.    Yes, sir.

20       Q.    Okay.  I'm going to mark this as

21  Exhibit 1.  And let's mark as 2 a Notice Of

22  Taking Deposition.

23                      (Exhibit Numbers 1 & 2
                        offered and marked for
24                      identification)
```

DAVIS & MITCHELL

(413) 499-0035

1        Q.    (BY MR. COX) Did you also receive a
2    Notice of Taking Deposition?
3        A.    Yes, sir.
4        Q.    Mr. Lappies, my name is Bob Cox,
5    I'm an attorney for Consolidated Aluminum
6    Corporation, or Conalco, as I believe you would
7    know it.  Conalco has received a notice letter
8    from James V. Cariddi, a notice letter that was
9    issued pursuant to Chapter 21E in our state
10    law.  That notice letter sets forth a claim for
11    cleanup costs, past cleanup costs and future
12    cleanup costs, associated with contamination
13    that has been found at the Cariddi property.
14    That notice included a copy of an affidavit
15    that you provided in September of last year,
16    and it was appended to Mr. Cariddi's notice
17    letter, or the letter that was sent on behalf
18    of Mr. Cariddi in support of Mr. Cariddi's
19    claims.
20                During this proceeding I'm
21    going to ask you a series of questions
22    relating to your affidavit or relating to
23    your observations of the facility that you've
24    worked at for fifteen years.  And when I'm

```
 1          Q.     Any education or training programs

 2     that you participated in after you went to high

 3     school?

 4          A.     Pertaining to what?

 5          Q.     Anything.  Your career, your work,

 6     night school, trade school?

 7          A.     Just on-the-job training, that's

 8     all.

 9          Q.     On-the-job training?

10          A.     Mm-hmm.

11          Q.     Now, you grew up on a farm, worked

12     on a farm?

13          A.     Quit, got married.

14          Q.     Quit, got married.  When did you

15     quit and get married?

16          A.     At 18.  1958.

17          Q.     1958.  And referring to your

18     affidavit, you state that you started working

19     at the facility in North Adams?

20          A.     '61.

21          Q.     '61.  So tell me what you did

22     between 1958 and 1961 for work.

23          A.     Construction.

24          Q.     What type of construction?
```

1      A.    Drove truck.

2      Q.    Anything else?

3      A.    No.

4      Q.    Drove a truck?

5      A.    Yup.  Construction.  Supported my

6   family.

7      Q.    Okay.  Who did you work for?

8      A.    I worked for John Kroll in

9   Cheshire, construction.  Worked for Conway

10  Construction.  Worked for Bianchi Construction.

11     Q.    And all the work was driving a

12  truck?

13     A.    Yes.

14     Q.    Did you get a class 3 license?

15     A.    You didn't need them then.  All you

16  need to do is show up and work.

17     Q.    That's what we need.  Now, at the

18  time you first worked at the facility in North

19  Adams, it was owned by Pfister Aluminum --

20     A.    Pfister Aluminum.

21     Q.    -- Tubing?

22     A.    P-F-I-S-T-E-R.

23     Q.    Corporation, is that right?

24     A.    Yes.

DAVIS & MITCHELL
(413) 499-0035

1     Q.     And how did it come about that you
2   took a job at that location?
3     A.     I had a wife and two young children
4   that were hungry.
5     Q.     Apart from your need to have
6   income, how did you learn about the job?  How
7   were you qualified for the job?
8     A.     Just laid off from construction,
9   out looking for a job so I could support my
10  family.  I happened to stop and made an
11  application.
12    Q.     And what was the application for?
13    A.     Anything.  Machine operator.
14    Q.     And your affidavit states that you
15  first worked as a machine operator, is that
16  right?
17    A.     This affidavit?  I don't know what
18  it says.
19    Q.     Let me back out.  When you first
20  worked for the company you worked as a machine
21  operator?
22    A.     Yes.
23    Q.     Did you have any training prior to
24  joining the company --

```
 1          A.    No.

 2          Q.    -- as a machine operator?

 3          A.    No. On-the-job training.

 4          Q.    On-the-job training.  I'm learning.

 5   Are you currently employed?

 6          A.    No. I'm 64 years old.  I'm retired.

 7          Q.    Do you run any businesses?

 8          A.    I dabble in antiques.

 9          Q.    Do you have an antique shop?

10          A.    I have a little warehouse I work

11   out of.

12          Q.    Does it have a name?

13          A.    No. It's for sale.

14          Q.    Where is the warehouse?

15          A.    I work out of my garage most of the

16   time, and I got a little shop down in North

17   Adams I work out of on Houghton Street.

18          Q.    Okay.  Now, focusing on your

19   employment, your affidavit states that you

20   stopped working in 1976 at the facility, is

21   that right?

22          A.    Yeah.  They closed.

23          Q.    What did you do after that?

24          A.    I started a fabricating business
```

1    them.  There was no drains in them.

2         Q.    So the oil just stayed in the pan?

3         A.    Yeah.  Yeah.  And after eight

4    hours, they would be overflowing.

5         Q.    And they would overflow onto the

6    surface of the floor?

7         A.    Onto the floor.

8         Q.    Okay.

9         A.    And they didn't clean up after --

10   the only time they cleaned these pans are

11   usually on Sundays.

12        Q.    Okay.

13        A.    You understand, everybody walked in

14   oil.

15        Q.    That was working in this area, they

16   were walking in oil?

17        A.    The whole area.  Everybody walked

18   in oil.

19        Q.    Because oil -- just so we're clear

20   here, what you describe with respect to the oil

21   tank --

22        A.    Mm-hmm.

23        Q.    -- and the hard line piping to

24   provide oil to the head and drain to the

```
1    head --
2         A.    Mm-hmm.
3         Q.    -- was a feature that was present
4    in each of the lines?
5         A.    Every bench, yes.
6         Q.    Every bench?
7         A.    Yes.
8         Q.    So at bench number two, identical
9    setup was present there, is that right?
10        A.    Yes.
11        Q.    And at bench number three,
12   identical setup was provided at that bench?
13        A.    Well, first of all, that ain't one,
14   two and three.  They numbered the benches as
15   they put them in.  This is bench number one.
16   Okay?  This is bench number three.  This is
17   bench number four.  This is bench number two.
18        Q.    Okay.  But not to confuse us too
19   much, the process by which the tubing --
20        A.    Right.  I got it marked.
21        Q.    You have it marked?
22        A.    Yup.
23        Q.    The numbers are not even in
24   reverse?
```

1    A.    No. Number two draw, number three

2    draw, number one draw. (Indicating)

3    Q.    Got it.  Okay.  With the number

4    three draw, I think you said that a lighter oil

5    was used in connection with that bench.

6    A.    Yup.

7    Q.    Could you explain that for us?

8    A.    The lighter the oil -- because on

9    the finish draw you wanted a bright finish on

10   the tubing, like chrome, so you used the light

11   oils.  Sometimes you could mix your oil with

12   kerosene.  You could put just a dab of kerosene

13   in the oil and that's how you cheated to get a

14   good shine.

15   Q.    Okay.

16   A.    What we do is we'd dunk a kerosene

17   rag in a pail of kerosene, or a rag, and put it

18   in the oil, and we'd wrap it around the tube as

19   it was going through the die and make it like

20   chrome.

21   Q.    And that would be for the third

22   draw?

23   A.    Finish draw.

24   Q.    The third draw is the same as the

# EXHIBIT B (Part 2 of 3)

1    finish draw?

2        A.    Not all the time.

3        Q.    Okay.

4        A.    I could draw a tube -- I could

5    actually take an inch and three-eighth tube and

6    draw it down to a half inch if you wanted me

7    to.

8        Q.    At the first bench?

9        A.    I'd have to draw it several times

10   but you could do it several times through the

11   tubing.  I could even draw one that looked like

12   you.

13       Q.    With respect to the kerosene, was

14   that stored in --

15       A.    Kerosene was not a problem.  Very

16   seldom used the kerosene.  We'd have a pail of

17   kerosene that we'd use for that purpose, you

18   know.

19       Q.    To soak a rag?

20       A.    Very seldom.  It all depended on

21   the product.  If it was going to be a hospital

22   product, we wanted a good bright finish so we'd

23   do that.

24       Q.    Okay.

1          A.    Most of the time -- it caused a lot

2    of trouble because you got a lot of breakage,

3    because we lost the friction of the oil.  The

4    rag would rub it off.

5          Q.    With respect to the oils that were

6    used, there was a heavier drawing oil?

7          A.    And a light drawing oil.

8          Q.    And a lighter drawing oil?

9          A.    Yes.

10          Q.    And I think you said that the oils

11    were put into the tanks --

12          A.    Mm-hmm.

13          Q.    -- by fifty-five-gallon drums?

14          A.    Mm-hmm.

15          Q.    You have to say yes.

16          A.    Yes.  I'm sorry.

17          Q.    With what sort of frequencies were

18    the oils put into the tanks?

19          A.    It depended on how much you lost

20    transporting tubing from bay to bay, how much

21    went on the floor.  If a line broke, you lost

22    your whole tank.  It fluctuated from day to

23    day, from hour to hour.  You could put up to

24    two hundred gallons a day in a tank or you

1    might go two days and put one barrel in.  You

2    couldn't --

3        Q.    And, I'm sorry, I missed it, what

4    is the variable, that if it would break --

5        A.    If an oil line broke -- we had oil

6    lines that went to the inside of the rods,

7    they'd come from the tanks, also.  You had

8    three, I told you, three rods, a head full of

9    oil --

10        Q.    Yes.

11        A.    Well, they were rubber lines

12    because they had to move with the rods.  If

13    them lines broke, you had oil spraying, there

14    would be oil dripping off the ceiling.

15        Q.    All right.  So you need to give us

16    more detail of that oil application mechanism.

17    This is to provide oil to the interior of the

18    tube?

19        A.    Yes.

20        Q.    And you described before that you

21    drill a hole in the tube?

22        A.    You had rods, three rods, inside of

23    the pipes, of say three-inch diameter pipes,

24    three-and-a-half-inch diameter pipes.

A.    Exactly.

Q.    -- to the other cranes over the drawing benches, is that right?

A.    That's right.

Q.    And the product would be brought over to the quench -- do you call them quench tanks?

A.    No. I call them wash tanks.

Q.    Wash tanks.  Would be brought over to the wash tanks and dipped into the wash tanks?

A.    Mm-hmm.  Yes.

Q.    For five or ten minutes?

A.    Soaked, yup.

Q.    And the purpose of the soaking was to remove the oil --

A.    From the inside of the tubing.

Q.    -- from inside the tubes?

A.    And the other side of the tubing. Inside and outside.  And saw chips.

Q.    And when you say saw chips, what do you mean?

A.    From the saw when they cut them, because they would stick to the oil.

145

slipped out of your hand, they'd fall down them
holes in the basement.  So every day, yeah, you
were probably down the basement retrieving a
pipe wrench.

Q.    And the machines we're talking
about are over here? (Indicating)

A.    Are the benches.

Q.    Are the benches?

A.    Yes.

Q.    So you'd go in the basement?

A.    To try to find your pipe wrenches,
sure.  But you had to watch where you walked
because there was lakes down there.

Q.    Now explain that.

A.    All the oil that was in the
basement, they used to dig like ditches to
divert the oil into like little ponds in the
basement.

Q.    Okay.

A.    So people wouldn't, when you were
down getting your tools, employees wouldn't get
hurt down there, if you'd fall in.  Some of
them holes were deep.

Q.    Tell me about the ditch digging.

1    they'd wheel it in in wheelbarrows, that's how

2    they'd pour it.

3         Q.    What you described, what I had you

4    describe, of going in the basement was in 1961,

5    is that right?

6         A.    Yes.

7         Q.    Did the conditions in the basement

8    that you described with respect to oil dripping

9    change?

10        A.    No.

11        Q.    Constant throughout the time period

12   that you were there?

13        A.    Of course.  The oils on the

14   machines never changed.  The breakage on the

15   lines, it never changed.

16        Q.    And the nature of the oils, or the

17   type of oils that were dripping through into

18   the basement, were the drawing oils from the

19   bench area?

20        A.    Yes.  Yes.

21        Q.    With respect to the basement, in

22   your affidavit you refer to a flume, a flume

23   structure.

24        A.    Yes.

1      Q.   Can you tell us briefly where that

2  is located underneath the floor plan that you

3  sketched here?

4      A.   It's a canal.  That factory used to

5  run by water power when it was built.  You call

6  it a flume, I call it a canal.

7      Q.   Okay.  When you arrived in 1961,

8  was it a working canal?

9      A.   There was water there.

10     Q.   Was there water running through it?

11     A.   Some, yeah.  Probably still is.  I

12  don't know.  I haven't been down there in forty

13  years.

14     Q.   When was the last time you were in

15  the basement?

16     A.   Probably before the mill closed.

17  '75 or so.  I don't know.  I don't make a habit

18  of going to visit that basement.

19     Q.   With respect to the basement, you

20  described going down to retrieve wrenches.

21     A.   Right.

22     Q.   Were there other activities taking

23  place in that basement?  Any employees working

24  in the basement?

1    of any occasions when the sprinkler system

2    discharged water and thereby flooded the

3    basement?

4                MR. MYHRUM:  Object to the

5    form of the question.  You may answer.

6          Q.    (By MR. COX)    Go ahead.

7          A.    No, not flooding the basement, but

8    there was an occasion where the sprinklers went

9    off and a lot of water would have run, but

10   not -- the factory caught on fire.  One of the

11   generators shorted out, caught -- you

12   understand now, this mill was saturated with

13   mineral spirits, this area, a spark flew from

14   the generator, it just went poof, and there was

15   flames.  The ceiling was on fire, the whole

16   place was on fire, all the oil is burning.

17   People were screaming, running out through the

18   doors, the windows.  They had big huge fire

19   extinguishers there on wheels, two on a cart.

20   I grabbed a guy by his neck as he's going by me

21   and I told him to push the cart.  We got in

22   there and we went through about three of them,

23   we put the fire out.  There was a lot of

24   damage, all the sprinklers went off, but I

1          A.     No, we didn't use machine oil.

2          Q.     Do you know whether cutting oil was

3     used?

4          A.     We didn't use cutting oil, neither.

5          Q.     You did not use cutting oil?

6          A.     We had lubricants for the saw but

7     it was a mixture of water and soap like for the

8     saws.  It wasn't a cutting oil.  And it

9     recycled itself.  Just spray it on and it

10    recycled itself.

11         Q.     Okay.

12         A.     Everything had to be lubricated.

13    We didn't use no cutting oils, that I'm aware

14    of, when I was there.  Maybe the last month

15    they used some, I don't know.  God only knows.

16         Q.     I'm going to another topic.  Have

17    you worked at other shops or locations where

18    oils were used?

19         A.     No.

20         Q.     This is the only place?

21         A.     Yes.

22         Q.     Never been around machining

23    operations where machines were cutting metal?

24         A.     No.

1    Q.    Never been into a facility where

2    machining operations were cutting metal?

3    A.    I've been into machine shops.

4    Q.    You've been in machine shops?

5    A.    I've been in machine shops but I

6    didn't pay much attention to what oils they

7    were using.  Didn't care.

8    Q.    Okay.  I want to return now to the

9    oil on the floor, on the first floor.  You've

10   described on several occasions what was on the

11   floor near the drawing machines, the drawing

12   oil?

13   A.    Yeah, okay.

14   Q.    And you described how on Sundays

15   periodically the oil was cleaned up?

16   A.    Right.

17   Q.    And then on occasion, when you knew

18   folks from St. Louis would come out --

19   A.    We'd shut the whole mill down and

20   do a cleanup.  You had to clean your work

21   station.

22   Q.    The cleanup activities with respect

23   to the first floor, how long would they take to

24   complete?

1    A.    Probably four or five hours.  You

2  had to move metal, you had to move racks, you

3  had to move saw horses.  You had to get the

4  stuff out of the aisles so you could clean the

5  floors.

6    Q.    Okay.  The floor cleaning

7  operations took place where you've shown here,

8  where the benches are on Exhibit 8?

9    A.    Yes.

10    Q.    And before you could get to the

11  floor, you had to move equipment around?

12    A.    Not equipment.  Aluminum.

13  Aluminum, the racks they were stored in, saw

14  horses that were in the way.

15    Q.    Saw horses were there in front of

16  the saw?

17    A.    They were in back of the saws but

18  that the bundles went on.

19    Q.    Okay.

20    A.    Like your saw was here, the saw

21  horses would be up through this way.  Because

22  the bundles would come off the bench and have

23  to be put on the saw horses so they could cut

24  them.  (Indicating)

1     Q.   Okay.

2     A.   We'd have to move a lot of stuff.

3     Q.   And you personally were involved in

4 these cleaning activities?

5     A.   When Pfister was there.  Not later

6 on, no.  I didn't have to clean nothing.

7     Q.   And employees volunteered to do

8 this on Sunday, is that what I understood you

9 to say?

10     A.   When I worked for Pfister, you

11 volunteered, because it was extra money.

12     Q.   Overtime?

13     A.   Yes.  They were asked to do it.

14 They asked, does anybody want to volunteer to

15 work Sunday, and you raised your hand.

16     Q.   Okay.  So take us through the

17 process of cleaning the floor.  First you move

18 the --

19     A.   You move the aluminum.

20     Q.   You move the saw horses?

21     A.   You move the saw horses.  We had

22 racks, pipes.  We had a piece of angle iron,

23 say it was about eight-feet long, and every

24 three feet you had a pipe welded to it that

1    made a rack.

2         Q.    Yup.

3         A.    And they were like this high.

4    About four feet high. (Indicating)

5         Q.    Okay.

6         A.    And you put the bundles in them.

7    You'd have to take all the bundles out of the

8    racks, move the steel racks, move the horses

9    from the saws.  We literally cleaned everything

10   out of the bay.  Then we would get pails of

11   solvent out of the tank.

12        Q.    So you'd dip a pail right into the

13   tank and pull it out?

14        A.    Sure.  Pull it out, spread it on

15   the floor.

16        Q.    And spread it on the floor, you

17   were using a motion as if you're throwing --

18        A.    We dumped the pail on the floor, of

19   the solvent.  Took mops, tried to get -- we'd

20   scrub the floor with the solvent, get the oil

21   off the floor the best we could, dunking the

22   mops in regular mop pails, you know, wringing

23   them out, with solvent in the pails.

24        Q.    Yup.

1          A.    Mop the floor the best we could.

2     Then take squeegees and squeegee the whole

3     floor all the way down, all the way down the

4     bay, and everything went right into the cellar.

5          Q.    All right.  And during the time

6     that you did this the squeegeeing activity was

7     all toward one direction?

8          A.    Towards the generator room.  From

9     the back to the front.  Always from the back to

10    the front.  Because all your pans were coming

11    in this way, your oil pans.  We cleaned the

12    pans, we'd clean everything.

13         Q.    Okay.  Help me out on the pans.

14         A.    The pans are underneath the draw

15    benches.  I told you, they are an inch and a

16    half high.

17         Q.    So you'd clean those out as well?

18         A.    Oh, yes, sure.

19         Q.    How would you clean out the pans?

20         A.    Squeegee them out, mop them out

21    with solvent afterwards.

22         Q.    Could you move the pans, lift the

23    pans?

24         A.    Oh, no, no.

# EXHIBIT B (Part 3 of 3)

1        Q.    So you put solvent in the pans?

2        A.    We'd squeegee the oil out the best

3  we could, or mop it out with the mops and the

4  solvent, and then keep mopping until they were

5  spotless.  With solvent.

6        Q.    So the oil that was in the pans

7  would get solvent, which are mineral spirits --

8        A.    Correct.

9        Q.    -- put into it, right?  That would

10 all get squeegeed out and go into the floor?

11       A.    Exactly.

12       Q.    And as the floor is cleaned, after

13 it is mopped and you said scrubbed, you mean

14 scrubbed with a mop?

15       A.    A big mop, industrial mop.  You

16 know.

17       Q.    Cloth mop?

18       A.    Yeah.

19       Q.    After it was mopped, the material

20 would be squeegeed in one direction?

21       A.    Exactly.

22       Q.    Now, you've depicted here a number

23 of bays, where you have five bays there.

24       A.    Exactly.

1       Q.   On the bays that were furthest from

2    the generator room, would the direction turn

3    and be squeegeed toward the generator room?

4       A.   No, no.  Every bay was squeegeed

5    down the bay.  You asked me what direction they

6    went.  They went in the direction towards the

7    tanks.

8       Q.   The direction towards the tanks?

9       A.   Right.

10       Q.   Was there a wall in the middle of

11    this room, where you have a line separating the

12    benches from where the wash tanks are?

13       A.   No. All open.

14       Q.   Was there any type of feature on

15    the floor that would contain fluid or liquid

16    that would be on the floor at that location?

17       A.   No. All one floor.  All connected.

18       Q.   With respect to the squeegeeing

19    activities, were there particular holes that

20    were identified for the material to go

21    through --

22       A.   No.

23       Q.   -- at the end of the bay area?

24       A.   No. You mean did I have a hole I

1    liked better so I take that bay?  No.

2           Q.    Exactly.

3           A.    No.

4           Q.    Well, were there -- well, there are

5    holes that were constantly used --

6           A.    No.

7           Q.    -- for squeegeeing material to go

8    through?

9           A.    The floor was full of holes, it

10   didn't make much difference.  It all went in

11   the cellar, trust me.

12          Q.    Well, were there any holes that

13   were drilled or created by the facility or

14   workers at the facility?

15          A.    No. No.  Didn't have to.

16          Q.    So we're clear on this, these are

17   all preexisting holes that were used?

18          A.    Sure.  We never done them or

19   anything like that.

20          Q.    Was there any effort made to pick

21   up off the floor the material that was

22   squeegeed?

23          A.    No. How were you going to do that?

24          Q.    You mentioned before that

1    Speedy-Dri was sometimes used in the bench

2    area.

3         A.    In the saw area.

4         Q.    In the saw area.

5         A.    So the saw people wouldn't slip,

6    lose their footing.

7         Q.    Would the Speedy-Dri material --

8    let me go back.

9              Would the Speedy-Dri, when

10   mixed with oil in the saw area, be picked up

11   from the floor?

12        A.    Sometimes they'd shovel it up, the

13   saw operators would shovel it up and throw it

14   in the barrel, yeah.  Sometimes they wouldn't.

15        Q.    And if they didn't then the

16   Speedy-Dri would be mixing in with the mineral

17   spirits and oil during the Sunday cleanup?

18        A.    Exactly.

19        Q.    The drawing process did not -- just

20   to make sure I'm clear on this, the drawing

21   process did not generate any type of metal

22   shavings?

23        A.    No.

24        Q.    The metal shavings, if any, that

1    were generated were created near or in the

2    bench area and was solely from the sawing?

3        A.    No. You would have a certain

4    amount -- going back to the points we made on

5    the tubing.

6        Q.    Yes.

7        A.    If you didn't get enough oil inside

8    the tubing, when the truck grabbed the points,

9    it would break them off and they would fall

10   inside the bench around the chain.  So you

11   always had, around every draw bench, you always

12   had points, which would be six to eight inches

13   long, and that's another thing we used to have

14   to clean up every Sunday, get all them points

15   out of there, because they'd get caught in the

16   chains.  And if the chain picked one up it

17   would bring it up and cut you, you could take

18   your arm off or something.

19       Q.    With respect to the points that

20   you're describing that either broke off or cut

21   off, they'd go on the floor?

22       A.    Oh, yes.

23       Q.    And would they be picked up from

24   the floor or be part of the Sunday cleanup

1     activity?

2          A.    Be part of a Sunday cleanup

3     activity.

4          Q.    Would the points then be pushed to

5     the end?

6          A.    No, no.  They'd be picked up and

7     thrown in the barrel and taken later on to the

8     baler.  You always save your scrap.  You

9     weren't allowed to get rid of scrap.

10          Q.    Apart from the points, were there

11     metal shavings that were on the floor as a

12     result of the drawing process?

13          A.    No.

14          Q.    How many employees did it take to

15     do the cleanup operation in four to five hours?

16          A.    Well, probably six or eight.

17          Q.    And would you normally have six or

18     eight employees?

19          A.    Volunteers, sure.

20          Q.    If --

21          A.    In the old days, yes, sure.

22     Everybody wanted to eat.

23          Q.    And when you say the old days, what

24     do you mean by that?

1        A.      Early '60s.

2        Q.      And this is when you were involved

3    in doing this yourself?

4        A.      I was a machine operator, yes.

5        Q.      Because later on you didn't do that

6    because you were in management.

7        A.      Hell, no.  I didn't want to get

8    dirty.

9        Q.      Would there be occasions when the

10   cleanup would not occur because six or eight

11   employees did not volunteer to do the work?

12       A.      Yes.

13       Q.      So you'd skip a week or a couple

14   weeks?

15       A.      Yeah, sure.

16       Q.      With what sort of frequency would

17   that occur?

18       A.      When it got that bad you usually

19   shut down, like say on a Friday afternoon,

20   you'd shut the machines off.  You understand,

21   we didn't want to lose production.  You were

22   doing volume, you hated to lose production,

23   because you were pushed to make a quota.  So

24   when you shut a machine down you were loosing

1    tonnage.  But when it got so bad you shut

2    down -- like say your shift was over at 3:30,

3    we'd shut down at 2:00 and make every operator

4    clear their work area.

5         Q.    Okay.  So when the operators

6    would clean their work areas -- let me go back.

7    By the operators, you're talking about the

8    operators of the benches?

9         A.    This is in later years when we

10   couldn't get cleanup crews.

11        Q.    And the operators were directed to

12   clean up their --

13        A.    Work area.

14        Q.    -- work areas?

15        A.    But their work area is probably a

16   hundred feet long.

17        Q.    Which is the whole length of the

18   bench?

19        A.    Exactly.  Exactly.  But some bays

20   later on had two benches in each bay.  That's

21   what I told you, they doubled.  So you had like

22   two men cleaning their work area.

23        Q.    What would those workers do in

24   order to clean their work area?

1    A.    Mops and squeegees.

2    Q.    Same process?

3    A.    Yes.

4    Q.    Go over and get a bucket full of

5  mineral spirits?

6    A.    And try to mop it up the best they

7  could.  I mean you just didn't blatantly get

8  buckets and throw them on the floor.  You went

9  over and got a mop pail full for your mop and

10 then you got maybe a twelve-gallon pail full to

11 throw and mop them around, and bring the mop

12 out and mop it around some more and squeegee

13 out the excess into the cellar.  I mean nobody

14 was trying to do nothing bad, you know.  And it

15 was common practice in the old days to do that.

16 Nobody ever thought nothing about it.  You go

17 to any factory around North Adams that's got

18 trouble.  You got Mass. MoCA up there sitting

19 on -- if you fell in the cellar of Mass. MoCA

20 you come out glowing.

21   Q.    So how do you know this is a common

22 practice for any of these factories up there?

23   A.    How about General Electric?

24   Q.    I'm asking you.

1    A.    Well, you're an educated man.    Look

2    at Pittsfield.    It's contaminated by General

3    Electric.    Sprague Electric contaminated North

4    Adams.    It was a practice in the old days.

5    They didn't think nothing's wrong with it.    You

6    got a whole section in North Adams, they had to

7    tear every house down over there because it's

8    contaminated with PCBs from Sprague's.    People

9    were dying from cancer over there.    The land is

10    contaminated.    It was practice to do things

11    like that.

12    Q.    Okay.    And --

13    A.    There was nothing thought wrong of

14    it.

15    Q.    And the practice that you're

16    talking about is to clean floors?

17    A.    To clean your area, sure.    Clean

18    your floor, clean your factory.    You wanted to

19    work in a clean environment.

20    Q.    And this particular practice you're

21    talking about is applying mineral spirits to

22    the floor?

23    A.    I'm not saying it's right but I'm

24    saying at the time it was right.

184

1          Q.    At the time it was right?

2          A.    You were told to do it, it was the

3    right thing to do.  You followed instructions.

4          Q.    And you didn't think there was

5    anything wrong with it at the time?

6          A.    At the time, no, of course not.  Of

7    course not.  I mean I know better now but I

8    mean I'm forty years older than I was then.  Of

9    course it's wrong, but I didn't know it at the

10   time.  Your boss comes out and tells you to mop

11   the floor with mineral spirits, you mop it.

12         Q.    So it's fair to say then that this

13   practice of cleaning the floor the way you

14   described it, using mineral spirits to mop it

15   up and then to squeegee it into the floor and

16   to go down to the basement below, that that

17   practice was not against any company policy?

18         A.    Oh, no, of course not.

19         Q.    And that practice was not contrary

20   to any type of directive from St. Louis or

21   management or anyone within the facility?

22         A.    They didn't care how you cleaned it

23   up as long as when the outsiders come in they

24   wanted the place clean.  That's all.

1          Q.    The practice of cleaning up the

2     floor and causing all of the material to go

3     down the holes into the basement, you didn't

4     understand that to be against any type of

5     industry standard or contrary to any industry

6     standard?

7          A.    At the time, no.

8          Q.    Yeah.

9          A.    No. No, of course not.  No more

10    than General Electric thought they were

11    poisoning Pittsfield.

12         Q.    And you didn't think that this

13    practice was contrary to law?

14         A.    At the time, no.  I don't think

15    there was a law at the time.

16         Q.    And you didn't contemplate at the

17    time that there might be a future law?

18         A.    Of course not.

19         Q.    Okay.

20         A.    Of course not.

21         Q.    With respect to the squeegeeing

22    activities that took place, did you ever go

23    into the basement immediately after that

24    occurred --

1    A.    Oh, no.

2    Q.    -- to observe what it appeared like

3  in the basement below?

4    A.    No. I knew it was -- no.  You

5  couldn't walk in there as it was.  There was

6  always oil dripping.  You didn't want to go in

7  the basement.  Never mind if there was mineral

8  spirits running on your head.  If someone threw

9  a match at you, you'd explode.

10    Q.    Did you as plant manager ever

11  report to St. Louis your observations of the

12  condition of the basement?

13    A.    No.

14    Q.    Did you have any concerns about the

15  condition of the basement at the time?

16    A.    No.

17    Q.    Did you have any understanding at

18  the time you worked there that the material

19  that was squeegeed through the floor and into

20  the basement might somehow adversely impact the

21  environment?

22    A.    Of course not.  If I did, I

23  wouldn't have done it.  But, you know, our

24  thinking was, you know, it's going into a dirt

1    floor, it's going to dissolve, you know,

2    disappear.  That was everybody's thinking at

3    the time.

4          Q.    Okay.

5                MR. COX:  I'd like to take a

6    five-minute break right now.

7                     THE WITNESS:  Okay.

8                MR. COX:  You can time me.

9                     THE WITNESS:  I want to get

10   out of here.

11               MR. COX:  I'm almost done.

12                  (Break taken)

13               MR. COX:  Back on the record.

14         Q.    (BY MR. COX) I started to ask you

15   earlier about what you did when you received

16   the subpoena, and if you talked to anyone after

17   you received the subpoena.  And I don't think I

18   continued my complete line of questioning

19   there.  We went on to talk about your earlier

20   communications leading up to your signing of

21   this document.  So let me come back to that

22   question, which is, you were served with a

23   subpoena, which we've marked as --

24         A.    Is this the one you're talking