UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30111-MAP

| | |
|---|---|
| JAMES V. CARIDDI | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CONSOLIDATED ALUMINUM CORPORATION | ) |
| | ) |
| Defendant. | ) |

### AFFIDAVIT OF ROBERT D. COX, ESQUIRE

I, Robert D. Cox, Esquire, on oath, hereby depose and state the following to be true to the best of my knowledge, information and belief:

1. I am an attorney admitted to practice law in the Commonwealth of Massachusetts and the United States District Court of Massachusetts. I am counsel for Consolidated Aluminum Corporation in this matter.

2. Attached hereto as Exhibit "A" are true and accurate copies of excerpts from the deposition transcript of Mr. Norman R. Lappies dated September 29, 2004.

Signed under the pains and penalties of perjury this 12th day of May, 2006.

/s/ *Robert D. Cox, Jr.*

## CERTIFICATE OF SERVICE

      I, Robert D. Cox, Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 12, 2006.

                                              */s/ Robert D. Cox, Jr.*

# EXHIBIT A

```
 1        Q.    How long did you do that?
 2        A.    A couple years.
 3        Q.    So this brings us into the mid
 4   '90s, approximately?
 5        A.    '95, '96, somewhere in there.
 6        Q.    And then what did you do?
 7        A.    Nothing.
 8        Q.    You retired?
 9        A.    I take it easy.
10        Q.    Now I'm going to ask you a series
11   of questions about your background, just to
12   confirm certain things that I suspect, we
13   suspect, are true, so bear with me.  Throughout
14   your career you've never had any type of
15   training or education in chemistry?
16        A.    In chemistry, no.
17        Q.    Chemistry.
18        A.    No.
19        Q.    Never had any type of training,
20   education, or experience in the manufacture of
21   petroleum products?
22        A.    No.
23        Q.    Or lubricating oils?
24        A.    No.
```

1    Q.   No training, education or
2 experience in dealing with the manufacture of
3 mineral spirits or solvents?
4    A.   No.
5    Q.   You've never had any type of
6 education or training with respect to
7 identifying the nature or characteristics of
8 chemicals or oils that are found in the
9 environment?
10   A.   Pertaining to what?  I know what
11 oils we used in the factory.
12   Q.   Apart from that, no type of
13 training or education or experience in
14 identifying the nature or the characteristics
15 of chemicals that you might find in the
16 environment?
17   A.   No. Not if you put it that way.
18   Q.   You're not receiving any type of
19 retirement benefit or payment from or through
20 your former employers where you worked,
21 employers at the facility in North Adams?
22   A.   Oh, my God, no.
23   Q.   You're not employed by Cariddi
24 Sales?

```
 1      Q.   And where did it take place?
 2      A.   In Cariddi's office.
 3      Q.   And --
 4      A.   He called me and asked me to come
 5  over.
 6      Q.   And you did?
 7      A.   Yeah.
 8      Q.   And did he take you to the basement
 9  at that time?
10      A.   Didn't have to.  I know what's in
11  the basement.
12      Q.   Did he ask you to talk with his
13  attorneys or his representatives at that time?
14      A.   He called me later on, I believe,
15  and asked me to talk to his attorney.
16      Q.   Okay.  So you met with him once at
17  his office and then you told him that -- what
18  was -- let me go back.
19           What did you tell him you
20  would do for him when you met with him?
21      A.   He just asked me if I'd make a
22  statement saying I knew about the oil in the
23  cellar and how it got there.
24      Q.   Okay.  And you said yeah?
```

```
 1        A.    Yeah.  It was no --
 2        Q.    Did you give him a statement at
 3   that time?
 4        A.    No. I don't think so, no.  I gave a
 5   statement when the lawyer was there.
 6        Q.    Okay.  You said that he put you in
 7   touch with a lawyer representative later on.
 8        A.    The lawyer was at -- he called me
 9   and the lawyer was going to meet me at his
10   office.
11        Q.    Okay.  And did that happen?
12        A.    Yes.
13        Q.    And do you know who the lawyer was?
14        A.    No, I don't know.  I can't remember
15   his name.  I really can't.
16        Q.    Well, it was not Mr. Myhrum?
17        A.    No.
18        Q.    Was it someone from Mr. Myhrum's
19   law firm?
20        A.    Apparently.
21              MR. MYHRUM:  Do you want me to
22   suggest the name?
23              MR. COX:  Is it Jones?
24              MR. MYHRUM:  If I suggested
```

```
 1   the name Joseph Dale to you, is that helpful?
 2           THE WITNESS:  No.
 3       Q.   (By MR. COX)  It doesn't ring a
 4   bell?
 5       A.   Doesn't ring a bell to me.
 6       Q.   And did you sit down with Mr. -- or
 7   did you sit down with a representative from
 8   Mr. Cariddi?
 9       A.   Yes.
10       Q.   And what did you talk about?
11       A.   How the oil -- how we run the
12   facility, or how the facility was run when I
13   was hired, and how the oil got into the cellar.
14       Q.   Okay.
15       A.   And, you know, over twenty years'
16   time, things happen.  You know, everything was
17   done with oil.
18       Q.   Okay.
19       A.   Oil and mineral spirits, that's all
20   we used.
21       Q.   Okay.  And the representative of
22   Mr. Cariddi took notes, just as I'm taking
23   notes here?
24       A.   Yes.
```

```
 1       Q.    Did he then provide you with a
 2   written statement?
 3       A.    Yes.
 4       Q.    Did he provide you first with a
 5   draft of that written statement?
 6       A.    No.
 7       Q.    Did you --
 8       A.    Not that I remember.  I got a copy
 9   of this statement is what I got.
10       Q.    Okay.
11       A.    Not -- after I made it, a couple
12   weeks later, I got a copy of it.
13       Q.    Were your communications with
14   Mr. Cariddi's representative by mail after your
15   meeting?
16       A.    No.
17       Q.    They were in person?
18       A.    The statement was brought to me by
19   Mr. Cariddi.
20       Q.    Okay.  So I understand the
21   scenario, Mr. Cariddi called you, you met with
22   him once, said you could help out.  The next
23   meeting is with Mr. Cariddi's representative.
24   You meet with him, you go away, Mr. Cariddi
```

```
 1   calls you in again or you come in again to
 2   review a statement?
 3        A.    Yes.
 4        Q.    And sign it?
 5        A.    Yeah.
 6        Q.    Is that the scenario?
 7        A.    Yup.
 8        Q.    And at the time you signed the
 9   statement did you make any changes or
10   modifications to the document?
11        A.    Not that I can remember.
12        Q.    Now, the subpoena that we issued to
13   you, which we've marked as Exhibit 1, asked you
14   to bring in certain documents relating to your
15   employment at the facility.
16        A.    What kind of documents?
17        Q.    Well, hang on.  I just want you to
18   confirm that that's indeed what it says.
19        A.    I read what it says but you're
20   going back forty years.  Why would I have
21   documents from forty years ago?
22        Q.    Do you have any documents with you
23   responsive to the subpoena?
24        A.    No, I don't.  Not at all.
```