UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES V. CARIDDI,                      )
                    Plaintiff          )
                                       )
                                       )
                                       )
            v.                         )      Civil Action No. 05-30111-MAP
                                       )
                                       )
                                       )
CONSOLIDATED ALUMINUM CORP.,           )
                    Defendant          )


REPORT AND RECOMMENDATION WITH REGARD TO CROSS
MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 22 and 30)
November 15, 2006

NEIMAN, C.M.J.

In this case, James V. Cariddi ("Plaintiff") seeks recovery of environmental clean

up costs under both the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, and Mass. Gen. L. ch. 21E

("chapter 21E"), from the former owner of his property, Consolidated Aluminum Corp.

("Defendant").  Defendant has moved for summary judgment and Plaintiff, in response,

seeks partial summary judgment as to liability on his chapter 21E causes of action.  At

issue are the definitions of "hazardous substances" (CERCLA) and "hazardous

materials" (chapter 21E) as well as the standard of liability for one aspect of Plaintiff's

chapter 21E claims.

The parties' cross motions for summary judgment have been referred to this

court by District Judge Michael A. Ponsor for a report and recommendation.  *See* 28

U.S.C. § 636(b)(1)(B).  As detailed below, the court will recommend that Defendant's motion be allowed with respect to Plaintiff's CERCLA claims, but denied with respect to Plaintiff's chapter 21E claims.  The court will further recommend that Plaintiff's cross motion for partial summary judgment be denied.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the nonmoving party.  *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).  Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For this purpose, an issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law.  *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact.  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

The mere fact that both parties move for summary judgment does not change the foregoing analysis.  *United Paperworkers Int'l Union, Local 14 v. Int'l Paper Co.*, 64 F.3d 28, 32 n.2 (1st Cir. 1995).  Barring special circumstances, a court must consider each motion separately, drawing inferences against each movant in turn.  *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 608 n.8 (1st Cir. 1995).

2

II. B̲ACKGROUND̲

For summary judgment purposes, the following facts are undisputed.  Further background facts are outlined in the court's September 26, 2005 Report and Recommendation with Regard to Defendant's Motion to Dismiss Plaintiff's CERCLA Claims (Document No. 18) which, on February 28, 2006, Judge Ponsor declined to adopt (Document No. 29).[1]  Yet additional facts are addressed in the discussion section below.

Plaintiff is the current owner of property located at 106-108 State Road, North Adams, Massachusetts.  Defendant owned the property from 1967 to 1976 when it transferred the property to Plaintiff.  (See pages 1-2 of Defendant's Statement of Material Facts of Record (hereinafter "Def.'s Facts") which are located at pages 1-6 of the Memorandum of Law of Defendant, Consolidated Aluminum Corporation, in Support of its Motion for Summary Judgment (hereinafter "Def.'s Brief").)

Between 1967 and 1976, Defendant used the property for drawing aluminum tubing.  Norman R. Lappies ("Lappies"), the only witness identified by the parties with personal knowledge of Defendant's aluminum manufacturing process, worked at the facility from 1961, before Defendant's ownership and operation, until a few months before Defendant ceased all activities there in 1976.  Much of the case turns on

---

[1]  Recognizing that "developments subsequent to the issuance of the Report and Recommendation had somewhat overtaken the normal procedure," Judge Ponsor denied Defendant's motion to dismiss "without prejudice."  (Id. at 2.)  Although Judge Ponsor allowed Defendant to seek reconsideration of that denial, so that the court might address the substantive issues raised by the motion to dismiss (see id.), Defendant opted instead to pursue the motion for summary judgment currently at issue.

Lappies' testimony.  According to Lappies, the drawing of aluminum tubing was a "messy business."  It involved the use of oil which splashed or dripped onto the floor.  Oil then seeped into cracks and holes in the floor or was routinely moved and pushed by mops and squeegees to cracks and holes where it fell onto the basement floor below.  These activities ceased when Defendant closed the facility and sold the property to Plaintiff in 1976.  (Def.'s Facts at 2.)

According to Lappies, four types of oil or petroleum products were used by Defendant in drawing aluminum tubing: light oil, heavy oil, mineral spirits and kerosene.  It is undisputed that both mineral spirits and kerosene are oils or petroleum products and are commonly used as solvents to dissolve or remove oil, particularly in manufacturing applications.  According to Lappies: "other than mineral spirits, I have no knowledge of other solvents being used at [Defendant's] facility during my employment.  Similarly, I do not know of any other hazardous materials used by [Defendant]."  (Def.'s Facts at 3.)

Oil was present in the basement as well six years before Defendant owned the property and operated aluminum drawing activities.  Employees who worked at the property between 1961 and 1976, *i.e.,* both before and during Defendant's ownership, would as part of routine maintenance, use mineral spirits to dissolve the oil present on the floor and then, with mops and squeegees, push or direct it to cracks and holes in the floor where it fell to the basement below and accumulated.  According to Lappies, that was the "common practice in the old days."  It was not against company policy or contrary to any industry standard or practice.  Indeed, Lappies did not think there was

4

anything wrong with the practice at the time or that it was contrary to any law.  (Def.'s
Facts at 5-6.)

Despite the subsequent promulgation of environmental laws, including CERCLA
in 1980 and chapter 21E in 1983, the conditions in the basement apparently remained
unchanged until "oily sludgy, material" was found in the basement by a fire inspector in
2001.  Plaintiff thereafter commenced response actions pursuant to chapter 21E.
(Def.'s Facts at 2.)

According to Plaintiff, hazardous substances and materials were found in
laboratory samples from the basement.  (See page 2 of Plaintiff's Response to
Defendant's Concise Statement of Material Facts, which are located at pages 2-4 of
Plaintiff's Opposition and Cross-Motion for Summary Judgment ("Pl.'s Motion").)
However, Plaintiff does not dispute Defendant's somewhat conclusory contention that
"there is no evidence of [Defendant]'s use of hazardous substances or materials at the
Property[;] . . . there is only evidence of [Defendant]'s use of oil or petroleum products."
(Def.'s Facts at 3.)  Nor does Plaintiff appear to quibble with the conclusion reached by
Defendant's expert, Lawrence Feldman, LSP, Ph.D., that hazardous substances
purportedly found in the laboratory samples taken from the basement were likely
"natural components of Massachusetts soils," "commonly encountered in soils of
industrial sites," or "common constituents of petroleum products."  (See *id.* at 4 & n.2.)

Plaintiff contends in the case at bar that Defendant is a party responsible for the
contamination present in the basement of the property.  He brings this action seeking
reimbursement of his past and future assessment and clean up costs pursuant to

CERCLA (Count I) and chapter 21E (Count II).  Plaintiff also seeks a declaratory

judgment -- apparently implicating both CERCLA and chapter 21E -- as to Defendant's

liability for his future response costs (Count III).

### III. DISCUSSION

As indicated, Defendant seeks summary judgment on Plaintiff's entire case,

whereas Plaintiff has filed a partial cross-motion for summary judgment with respect to

chapter 21E only.  In the end, as indicated, the court will conclude that Defendant's

motion for summary judgment should be allowed with respect to Plaintiff's CERCLA

claims, but not otherwise, and that Plaintiff's partial motion for summary judgment

should be denied.  The court's reasons follow.

### A. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant raises essentially three arguments in support of its motion: (1) that

CERCLA does not apply because "hazardous substances" are not at play; (2) that

section 5(a)(2) of chapter 21E similarly does not apply because the substances at issue

are not "hazardous materials," the term used in *that* statutory provision; and (3) that yet

another portion of chapter 21E, section 5(a)(5) -- which covers both "hazardous

materials" and "oil" -- does not apply because the required standard of care cannot be

met.  The court will address Defendant's CERCLA argument first and then turn to the

arguments arising under chapter 21E.

### 1. CERCLA

CERCLA imposes liability against former owners of "hazardous substance"

disposal facilities or those who dispose, or transport for disposal, "hazardous

6

substances" at any facility.  *See* 42 U.S.C. § 9607(a)(2)-(4).  Defendant argues that CERCLA liability is unavailable here since "hazardous substances" are not at play. Rather, Defendant asserts, CERCLA's so-called "petroleum exclusion" applies.  The court agrees.

CERCLA defines "hazardous substances" to mean various substances, elements, compounds, mixtures or solutions designated "hazardous" by other environmental laws.  *See* 42 U.S.C. § 9601(14).  Significant for purposes here, "[t]he term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance." *Id.*  This so-called "petroleum exclusion" "has been universally interpreted by both the Environmental Protection Agency and the courts to remove from the coverage of CERCLA those otherwise hazardous substances which are inherent in petroleum, but not hazardous substances that are added to, or mixed with, a petroleum product during or after use." *Niecko v. Emro Mktg. Co.*, 769 F. Supp. 973, 981 (E.D. Mich. 1991) (citing cases), *aff'd*, 973 F.2d 1296 (6th Cir. 1992).  Plaintiff concedes that, for purposes of Defendant's motion, his CERCLA claims rise or fall on the applicability of the petroleum exclusion.

According to Defendant's expert, Dr. Feldman, the material at issue in this case consists solely of "oil or petroleum, as those terms are used in CERCLA, and not a hazardous material or substance."  (Document No. 23 ("Feldman Aff.") ¶ 3.)  That may be so, Plaintiff asserts, but it is not enough to justify summary judgment in Defendant's favor.  According to Plaintiff, the burden remains with Defendant to establish the

applicability of the petroleum exclusion. *Johnson v. James Langley Operating Co.*, 226 F.3d 957, 963 n.4 (8th Cir. 2000). "Given that there is no dispute that the oil now on and in the soil at the Property was used to draw aluminum and certainly came into contact with other substances at the Property," Plaintiff argues, Defendant "has failed to eliminate all issues of material fact concerning the applicability of the petroleum exception." (Pl.'s Mem. in Opp'n to Def.'s Motion for Summ. J. and in Support of Pl.'s Cross-Motion for Summ. J. ("Pl.'s Brief") at 13 (citing *United States v. Gurley*, 43 F.3d 1188, 1199 (8th Cir. 1994)).)

In the court's view, Plaintiff's argument, while superficially appealing, is belied by the undisputed facts. First, it is undisputed that Defendant used only "four types of oil or petroleum products," *i.e.*, "light oil, heavy oil, mineral spirits and kerosene." (Def.'s Facts at 3.) Second, there is no dispute that "light oil" and "heavy oil" are "petroleum products." Third, it is also undisputed, Lappies' lay speculation to the contrary, that "[b]oth mineral spirits and kerosene are oils or petroleum products." (*Id.*) Finally, Plaintiff has not challenged the following allegations from Defendant's Statement of Material Facts of Record:

- In 2001, Plaintiff reported to the state Department of Environmental Protection ("DEP") a release of "oil."

- The reports generated by the Licensed Site Professional at the property refer to the materials released as "oil" or "oily waste."

- The DEP identified the property on its web-site as an "oil" site.

- Dr. Feldman submitted an expert opinion that

8

> hazardous substances purportedly found in the
> basement samples likely natural components of
> Massachusetts soils, found in soils of industrial sites,
> or common constituents of petroleum products.

(See *id.* at 4 & n.2.)

In sum, the court believes that there exists no triable issue as to the applicability

of CERCLA's petroleum exclusion.  Since "hazardous substances" under CERCLA are

not in play, the court will recommend that Defendant's motion with respect to the

CERCLA claims -- *i.e.*, Count I and that portion of Count III dealing with CERCLA -- be

granted.

2.  Chapter 21E

The analysis under chapter 21E of the Massachusetts General Laws, while

somewhat similar to the CERCLA analysis, is more nuanced.  In the end, the court will

conclude and recommend that Defendant is not entitled to summary judgment on

Plaintiff's chapter 21E claims.

There is no dispute that Plaintiff's chapter 21E claims arise, if at all, pursuant to

either section 5(a)(2) and/or section 5(a)(5).  In pertinent part, these provisions provide

as follows:

> (a) Except as otherwise provided in this section, . . . (2) any
> person who at the time of storage or disposal of
> any hazardous material owned or operated any site at or upon
> which such hazardous material was stored or disposed of
> and from which there is or has been a release or threat of
> release of hazardous material; . . . and (5) any person who
> otherwise causes or is legally responsible for a release or
> threat of release of oil or hazardous material from a vessel
> or site, shall be liable; without regard to fault, . . . to any
> person for damage to his real or personal property incurred

9

or suffered as a result of such release or threat of release . .

. .

Mass. Gen. L. ch. 21E, § 5(a)(2), (5).  The court will address each provision in turn.

(a) *Section 5(a)(2)*

Section 5(a)(2) imposes liability "without regard to fault" on "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material."  Mass. Gen. L. ch. 21E, § 5(a)(2).  This is a strict liability standard.  *See Byrnes v. Massachusetts Port Auth.*, 2 Mass. L. Rptr. 3, 1994 WL 879644, at *8 (Mass. Super. Ct. Mar. 2, 1994). Accordingly, Defendant, as one who "owned" a site where the storage or disposal of any hazardous material occurred, is strictly liable for release of the hazardous material. *See id.  See also Griffith v. New Eng. Tel. & Tel. Co.*, 649 N.E.2d 766, 768 (Mass. 1995) (noting that section 5(a)(2) "imposes liability 'without regard to fault' . . . for a release of hazardous materials if [the defendant] . . . was a prior owner of a tank or a site where the hazardous materials were being stored").

Defendant acknowledges the strict liability of section 5(a)(2), but argues that it never stored or disposed of any "hazardous material," only "oil."  Defendant asserts that, not unlike CERCLA's petroleum exclusion, "oil" is statutorily excluded from the term "hazardous material" in section 21E.

Both parties' arguments on this point revolve around chapter 21E's definitional section.  There, the term "hazardous material" is defined broadly by the statute to

10

include any materials which constitute a present or potential harm to human health, safety, welfare or the environment when improperly stored, treated, transported, disposed of, used or otherwise managed.  Mass. Gen. L. ch. 21E, § 2.  The term, however, "shall not include oil."  *Id.*  And "oil," in turn, is defined as "insoluble or partial soluble oils of any kind or origin or in any form, including, and without limitation, crude or fuel oils, lube oil or sludge, asphalt, insoluble or partially insoluble derivatives of mineral, animal or vegetable oils."  *Id.*

It appears undisputed that the oil used by Defendant at the property was "lube oil."  Thus, at least at first blush, it appears that Defendant was not involved with a "hazardous material" as that term is used in section 5(a)(2).  Plaintiff, however, asserts that Defendant's oil became "waste oil" which, unlike the definitions in CERCLA, is specifically *excluded* from Chapter 21E's definition of "oil."  *See* Mass. Gen. L. ch. 21E, § 2 ("The term ['oil'] shall not include waste oil.").  Consequently, Plaintiff asserts, Defendant's oil, as "waste oil," is effectively *included* within the definition of "hazardous material."

"Waste oil" is not statutorily defined.  Chapter 21E's implementing regulations, however, define "waste oil" as follows: "Waste oil means used and/or reprocessed, but not subsequently re-refined, oil that has served its original intended purpose.  Waste oil includes, but is not limited to, used and/or reprocessed fuel oil, engine oil, gear oil, cutting oil, and transmission fluid and dielectric fluid."  Massachusetts Contingency Plan, 310 C.M.R. § 40.0006 (2006).  This definition, Plaintiff asserts, "encompasses the spilled oil that [Defendant], according to the undisputed evidence in Mr. Lappies's [sic]

11

sworn statement, disposed of at the Property." (Pl.'s Brief at 9.) Defendant disagrees.

For its part, the court finds that a genuine issue of material fact exists as to whether Defendant's oil in particular is excluded from chapter 21E's definition of "hazardous material" or is "waste oil" not so exempted. First, Lappies has averred that the oil spilled during Defendant's operation was "waste oil." (Document No. 32, Exhibit A ("Lappies Aff.") ¶ 12.) That informal description, of course, may not equate to the term of art used in Chapter 21E's regulations. Second, however, the fact that "waste oil," according to the regulations, also includes "used . . . oil" could well encompass the situation here. As the following excerpts from Lappies' sworn statement certainly suggest, the oil at issue here may fall within the definition of "used," *i.e.*, "employed in accomplishing something," *Webster's Third New International Dictionary* (unabridged ed. 1967):

> 11. The drawing of aluminum required the *use* of large quantities of drawing oil to lubricate the dies through which the tubing was pulled. The operation was a messy one. *Oil would splash onto the wood floor from the machinery and also drip onto the floor from lengths of tubing being transferred from one drawing machine to another using an overhead hoist.* In addition, there were occasions when oil-filled hoses burst, spraying oil all over the work area.

> 12. To cope with the continuous regular buildup of oil on the floor, it was routine practice throughout the time I worked at the Facility to have workers come in on Sunday (when most operations were shut down) to remove the *waste oil*. This was done by *applying mineral spirits solvent to the floor to thin the oil* and then *using squeegees to direct the oil through cracks and holes in the wood floor into the basement below*, where it accumulated. To the best of my knowledge and information, *waste oil* was not shipped to an off-site location while I worked at the Facility.

12

15. [sic] *Mineral spirits solvent was also used to clean aluminum and was distilled on site to be reused.* The underground storage tank ("UST") located outdoors behind the building to the west of the loading dock was used to store the recycled mineral spirits.

(Lappies Aff. ¶¶ 11-15 (emphasis added).)  Thus, at the very least, Lappies' affidavit raises a genuine issue of material fact as to whether the oil or petroleum products present at Defendant's site were "used" such that they became "waste oil."

In light of chapter 21E's focus on "waste oil," the court will recommend that Defendant's motion with respect to Counts II and III -- insofar as those counts may be read to allege liability under section 5(a)(2) -- be denied.

(b) *Section 5(a)(5)*

Defendant also argues that there can be no liability under section 5(a)(5) of chapter 21E because Plaintiff has failed to show that Defendant had a duty to prevent a release at the property.  Section 5(a)(5), like section 5(a)(2), applies to "hazardous material."  Accordingly, if the court's recommendation with regard to section 5(a)(2) is adopted -- *i.e.*, that there exists a genuine issue of material fact as to whether the material released was "waste oil" and, hence, "hazardous material" -- the same issue of material fact necessarily exists with respect to section 5(a)(5).  For that reason alone, the court is prepared to recommend that Defendant's motion with respect to section 5(a)(5) be denied as well.

Nevertheless, the court will consider Defendant's alternative "duty" argument with regard to section 5(a)(5) for at least three reasons.  First, the parties have expended much energy on this issue.  Second, should this court's "hazardous material"

13

analysis not be adopted -- *e.g.*, should Judge Ponsor conclude that only "oil," not "waste oil," was released by Defendant -- he will need to construe section 5(a)(5) since it, unlike section 5(a)(2), "pertain[s] to both releases of oil and releases of hazardous materials."  *Griffith*, 649 N.E.2d at 768.  Third, the difference between sections 5(a)(2) and 5(a)(5) might loom large with respect to Plaintiff's cross motion for summary judgment.  (See discussion, *infra*.)

As indicated, section 5(a)(5) provides, in pertinent part, that "any person who otherwise causes or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable; without regard to fault, . . . to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release . . . ."  Mass. Gen. L. ch. 21E, § 5(a)(5).  According to Defendant, this is not a strict liability standard.  Rather, Defendant argues, the Massachusetts Supreme Judicial Court ("SJC"), in construing this provision, has required proof of a breach of duty -- *i.e.*, a negligence standard -- for purposes of determining liability.  (See Def.'s Brief at 11-13 (citing, *inter alia*, *Griffith*, *supra*, and *Marenghi v. Mobil Oil Corp.*, 649 N.E.2d. 764 (Mass. 1995).)  Moreover, Defendant asserts, Plaintiff cannot show a negligent breach of duty since, as supported by Lappies' testimony, Defendant's activities were commonplace and not unreasonable as a matter of law.

For his part, Plaintiff asserts that section 5(a)(5) does *not* establish a negligence standard.  In support, Plaintiff cites a recent First Circuit decision which describes section 5(a)(5) as follows:

> Chapter 21E states that "any person who otherwise caused
> or is legally responsible for a release or threat of release of
> oil or hazardous material from a . . . site, shall be liable,
> without regard to fault."  Chapter 21E § 5(a)(5).  Although
> the "without regard to fault" language suggests that the
> statute imposes strict liability, the Supreme Judicial Court of
> Massachusetts has held that the causation requirement of
> Chapter 21E, Section 5(a)(5) requires showing of more than
> mere ownership.  Contrary to Appellants' contention,
> however, this does not mean that any violation of Chapter
> 21E is "negligent or wrongful" for purposes of the FTCA--it
> simply means that *a prior owner cannot be held liable absent
> a showing that the prior owner caused the contamination.
> The plaintiff need not show that the prior owner was
> negligent or wrongful in doing so.*

*Marina Bay Realty Trust LLC v. United States*, 407 F.3d 418, 424 (1st Cir. 2005)

(citations and footnotes omitted; emphasis added by Plaintiff).

In the court's view, Defendant is correct that section 5(a)(5) does not establish a

strict liability standard.  However, Plaintiff is also correct that section 5(a)(5) does not

establish a negligence standard.  Rather, as the First Circuit observed in *Marina Bay*,

liability typically exists under section 5(a)(5) simply if the plaintiff can show "that the

prior owner *caused* the contamination."  *Id.* (emphasis added).  More to the point, the

First Circuit explained, "[t]he plaintiff need not show that the prior owner was negligent

or wrongful in doing so."  *Id.*

To be sure, as Defendant notes, the SJC in *Griffith* focused on whether the

defendant had a "duty" to maintain leaking oil tanks to determine whether or not the

defendant had liability under section 5(a)(5).  The question which the SJC was trying to

answer, however, was whether there was a "showing that the defendant's conduct

caused the contamination," because "to impose liability under § 5(a)(5) actual proof of

15

causation is needed." *Id.*, 649 N.E.2d at 769. Since "there was no evidence of how or exactly when that contamination occurred," *id.,* the SJC looked to the existence of duty and breach only as a means, other than through direct evidence, to establish causation.

*Griffith* and its progeny, as Plaintiff points out, have no applicability where, as here, an eyewitness account of the causation of a release of either "oil" or "hazardous material" is undisputed. The SJC's innovation in *Griffith*, not relevant here, is having crafted a rule which provide for possible liability where direct evidence of causation is, for all practical purposes, unavailable. When there is "evidence, for example, that [an underground storage] tank was improperly installed, or that is was left in the ground for an unreasonable period of time," the SJC said in *Marenghi*, 649 N.E.2d at 766, decided the same day as *Griffith*, the evidentiary hurdle might be overcome so long as the defendant had a concomitant duty to properly install the tank or remove the tank at a reasonable time. Put differently, "[e]stablishing a defendant's lack of reasonable care or omission in the presence of a duty is not a requirement under § 5(a)(5), but rather a means to satisfy the statute's liability standard when direct proof is lacking." (Pl.'s Brief at 6.) Where, as here, there is undisputed evidence of causation, there would be no need to inquire into Defendant's duty.[2]

---

[2] Defendant is correct that several "cases decided after *Griffith* and *Marenghi* also required proof of breach of duty for purposes of determining liability under [section] 5(a)(5)." (Def.'s Brief at 12.) But, as Plaintiff notes, the cited cases only confirm the SJC's holdings on how to establish liability when there is no direct evidence of causation. *See, e.g.*, *Commonwealth v. Boston Edison Co.*, 828 N.E.2d 16, 24-25 (Mass. 2005); *Newly Weds Foods, Inc. v. Westvaco Corp.*, 14 Mass. L. Rptr. 728, 2002 WL 1923864 (Mass. Super. Ct. Mar. 27, 2002); *Domestic Loan & Inv. Bank v. Ernst,*

This conclusion is bolstered by District Judge Rya W. Zobel's analysis in *Marina Bay*, which Defendant itself cites. There, the plaintiffs sued the United States government under the Federal Tort Claims Act ("FTCA"), asserting predicate liability under section 5(a)(5). *Id.*, 2004 WL 1175121, at *1 (D. Mass. May 27, 2004). The United States moved for judgment on partial findings, arguing that the plaintiffs failed to prove negligence and that the FTCA did not waive sovereign immunity for chapter 21E claims. *Id.* Judge Zobel granted the motion because "liability under Chapter 21E is 'without regard to fault' and simply does not require a '*wrongful* act or omission' that is a necessary prerequisite to the FTCA's waiver of sovereign immunity." *Id.* (citing *Dalehite v. United States*, 346 U.S. 15, 45 (1953), with emphasis added by Judge Zobel). "Where, as here," Judge Zobel continued, "there has been no showing of negligence or other tortious conduct, plaintiffs' claims under Chapter 21E are barred." *Id.* (footnote omitted).

As indicated, the First Circuit affirmed Judge Zobel's decision. *See Marina Bay*, 407 F.3d at 424. In doing so, the court, as described, rejected the argument "that any violation of Chapter 21E [must be] 'negligent or wrongful.'" *Id.* Instead, the court read the "without fault" language in section 5(a)(5) to "simply mean[] that a prior owner cannot be held liable absent a showing that the prior owner caused the contamination." *Id.* Thus, "[t]he plaintiff need not show that the prior owner was negligent or wrongful in doing so." *Id.*

In summary, this court believes that a negligence standard of liability is not

---

1998 WL 1284185 (Mass. Super. Ct. Apr. 17, 1998).

required for Plaintiff here to succeed under section 5(a)(5).  Rather, Plaintiff will need to show only that Defendant "caused" the contamination.  In the court's opinion, Plaintiff may be able to do so based solely on Lappies' testimony.  In other words -- beyond the "hazardous material" definition issue addressed above in the context of section 5(a)(2)) -- there exists yet another reason to deny Defendant's motion vis a vis section 5(a)(5).  Accordingly, the court will recommend that Defendant's motion with respect to Counts II and III -- insofar as those counts may be read to allege liability under section 5(a)(5) -- be denied.

## B.  PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

In his cross motion, Plaintiff claims he is entitled to summary judgment with respect to his section 21E claims.  The court disagrees.

Plaintiff's argument with respect to section 5(a)(2) can be disposed of in fairly short order.  As indicated, section 5(a)(2) applies only if "hazardous material" is at play. Since the court believes that genuine issues of material fact exist on that issue, it will recommend that Plaintiff's motion, insofar as it seeks a finding of liability under section 5(a)(2), be denied.  To be sure, Plaintiff's argument that the spilled "oil," whether alone or in combination with the mineral spirits, was "used" oil -- and, hence, "waste oil" -- appears quite strong.  However, the court deems it premature to make that finding as a matter of law.

Plaintiff's section 5(a)(5) argument requires a bit more analysis.  As indicated, section 5(a)(5) applies to "hazardous material" or "oil."  It also appears that one or both of those terms applies to the material (or materials) Defendant released.  Thus, unlike

18

section 5(a)(2), there appears to be no question that section 5(a)(5) has been properly

invoked.  Moreover, as discussed, liability under section 5(a)(5) involves a

determination, in the first instance, as to whether Defendant "caused" the release.

Since that fact is undisputed, it would appear that Plaintiff might be entitled to summary

judgment with respect to his section 5(a)(5) claims.

     The court, however, will not go that far in its recommendation.  As Defendant

notes, even under section 5(a)(5) there must be a "causal link" between the release

and the contamination.  *See John Beaudette, Inc. v. J.P. Noonan Transp., Inc.*, 644

N.E.2d 218, 220 (Mass. 1995); *Providence & Worcester R.R. v. Chevron U.S.A.*, 622

N.E.2d 262, 264-65 (Mass. 1993).  For present purposes, the court does not deem that

link to have been established as a matter of law.  An explanation is in order.

     As indicated, Plaintiff does not dispute that four types of oil or petroleum

products were used by Defendant in drawing aluminum tubing: light oil, heavy oil,

mineral spirits and kerosene.  Nor is there any dispute that only these oils, as stated by

Lappies, could have seeped through the floor or been pushed through holes or cracks

to the basement below.  Defendant, however, has submitted the expert affidavit of Dr.

Michael J. Wade who reviewed chromatograms of laboratory samples taken from the

property.  (Document No. 24 ("Wade Aff.") ¶ 2.)  In Dr. Wade's opinion, none of the four

oils used by Defendant in its aluminum tubing operation -- which were concededly

released to the basement -- were identified in the chromatograms.  (*Id.*, Exhibit 1

("Wade Report") at 1, 5-8.)  Moreover, Plaintiff does not dispute that oil was present in

the basement six years *before* Defendant owned the property and operated aluminum

19

drawing activities.  (Def's. Facts at 5.)

In other words, there is a genuine issue of material fact as to whether the oil or hazardous material which Defendant "caused" to be released to the basement is the same oil or hazardous material for which Plaintiff now claims response action costs. For this reason, the court will recommend that Plaintiff's cross motion for summary judgment, with respect to section 5(a)(5), be denied.  Given the fact that the court is prepared to recommend that Plaintiff's motion be denied with respect to section 5(a)(2) as well, it will recommend that the entirety of Plaintiff's cross motion for summary judgment be denied.

## IV.  CONCLUSION

For the foregoing reasons, the court recommends that Defendant's motion for summary judgment be ALLOWED as to those portions of Counts I and III dealing with CERCLA, but otherwise DENIED, and that Plaintiff's cross motion for partial summary judgment be DENIED.[3]

---

[3]  The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

DATED: November 15, 2006

                                    ____/s/ Kenneth P. Neiman____
                                    KENNETH P. NEIMAN
                                    Chief Magistrate Judge