UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


JAMES V. CARIDDI,            )
          Plaintiff          )
                             )
          v.                 )  CIVIL ACTION NO. 05-30111-MAP
                             )
CONSOLIDATED ALUMINUM        )
CORP.,                       )
          Defendant          )


MEMORANDUM AND ORDER REGARDING
REPORT AND RECOMMENDATION RE
CROSS MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 22, 30 & 37)

March 20, 2007

PONSOR, D.J.

I. INTRODUCTION

Plaintiff James V. Cariddi seeks reimbursement of past and future clean-up costs from the previous owner of his property, Defendant Consolidated Aluminum Corporation. On May 10, 2005, he brought this action, alleging violations of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq. (Count One) and Mass. Gen. Laws ch. 21E ("Chapter 21E") (Count Two), and requesting a declaratory judgment under 28 U.S.C. §§ 2201 et seq. as to Defendant's liability for future response costs (Count Three).

Defendant denies liability and has moved for summary judgment on all three counts of the complaint. Plaintiff

opposes this motion and has filed his own motion for partial summary judgment, which seeks judgment as a matter of law on Count Two and a declaration that Defendant is liable for response costs pursuant to Chapter 21E on Count Three.

The cross-motions were referred to Chief Magistrate Judge Kenneth P. Neiman, who issued a Report and Recommendation suggesting that: (1) Defendant's motion be allowed with respect to Count One, but denied with respect to Counts Two and Three; and (2) Plaintiff's motion for partial summary judgment be denied.

Both parties have filed objections to the Report and Recommendation. Based on a <u>de novo</u> review, the court will adopt Judge Neiman's recommendation concerning the CERCLA claim and allow Defendant's motion with respect to Count One. However, because it is clear on the undisputed facts of record that Defendant released "waste oil," a "hazardous material" under Chapter 21E, § 5(a)(2), the court will not adopt the recommendation with respect to Counts Two and Three. Instead, the court will allow Plaintiff's motion for partial summary judgment on these two counts. With the issue of liability on Counts Two and Three disposed of in Plaintiff's favor, the case will be set down for a status conference to address the issue of damages.

## II. <u>BACKGROUND</u>

-2-

The background of this dispute is relatively straightforward, and neither party has objected to the summary of the facts set forth by Judge Neiman.[1]

Plaintiff is the current owner of property located at 106-108 State Road in North Adams, Massachusetts.  From 1961 to 1967, Pfister Aluminum Tubing Corporation and Phelps Dodge Aluminum Products Corporation (the "Former Operators") owned this property and used the premises primarily to draw aluminum tubing down to smaller diameters.  (Dkt. No. 32, Ex. A, Lappies Aff. ¶¶ 3-8.)  Defendant acquired the property in 1967 and continued to use the facility for this purpose until 1976, when it conveyed the property to Plaintiff.

Norman R. Lappies ("Lappies"), the only witness with personal knowledge of the business practices of Defendant or the Former Operators, worked at the facility from 1961 until a few months before Defendant transferred the property to Plaintiff in 1976.  According to him, "the operations at the Facility did not change materially as ownership of the Facility changed."  (Id. ¶ 5.)

It is undisputed that the process of drawing aluminum tubing was a "messy one" (id. ¶ 11), which involved the use

---

[1] Additional background facts can be found in the Report and Recommendation on Defendant's Motion to Dismiss.  (See Dkt. No. 18.)

of four types of oil or petroleum products: light oil, heavy oil, mineral spirits, and kerosene (Dkt. No. 32, Ex. A, Lappies Dep. 53:7-19, 70:11-12, 174:1-8).

According to Lappies' undisputed affidavit, Defendant and the Former Operators employed "large quantities of drawing oil to lubricate the dies through which the tubing was pulled." (Lappies Aff. ¶ 11.)  This drawing oil "would splash onto the wood floor from the machinery and also drip onto the floor from lengths of tubing being transferred from one drawing machine to another."  (Id.)

> To cope with the continuous regular buildup of oil on the floor, it was a routine practice . . . to have workers . . . apply[] mineral spirits solvent to the floor to thin the oil and then us[e] squeegees to direct the oil through cracks and holes in the wood floor into the basement below . . . . .

(Id. ¶ 12; see also Lappies Dep. 182:15 (characterizing this as a "common practice in the old days").)

During his deposition, Lappies testified that the accumulation of petroleum products in the earthen basement produced small "lakes," and employees were often forced to dig "ditches to divert the oil."  (Lappies Dep. 145:10-23.)

In 2001, a North Adams fire inspector found an "oily, sludgy material" in the basement (Dkt. No. 25, Def.'s Mem. in Support of Mot. for Summ. J. 2), and Plaintiff was forced to commence response actions pursuant to Chapter 21E.

Plaintiff now contends that Defendant was at least partly responsible for contamination present on the property. As noted above, he filed his three-count complaint on May 10, 2005.

During discovery, Defendant propounded interrogatories that asked Plaintiff to identify, by chemical name, the hazardous substances and materials that Plaintiff maintains were found on the property. In response, Plaintiff provided one list identifying "hazardous substances" and another identifying "hazardous materials."[2] Each list contained the names of numerous metals, semi-volatile organic compounds ("SVOCs"), and volatile organic compounds ("VOCs"). The "hazardous materials" list also identified "waste oil."

In moving for summary judgment, Defendant submitted the affidavits and reports of two experts, Lawrence Feldman and Michael Wade. According to Feldman, aside from "waste oil," the hazardous substances and materials identified by Plaintiff are either natural components of Massachusetts soils, found in soils of industrial sites, or common constituents of petroleum products. (Feldman Aff. ¶ 11.)

According to Wade, samples taken from the basement

---

[2] As will be discussed, whereas the federal statute imposes liability for the discharge of "hazardous substances," the state statute prohibits the discharge of "hazardous materials."

between 2002 and 2005 by third parties were of such poor
quality that he could not determine the definitive presence
(or absence) of light oil, heavy oil, mineral spirits, or
kerosene.  (See Dkt. No. 24, Ex.1, Wade Report.)  In
reaching this conclusion, Wade notes his disagreement with
the findings of the Alpha Analytical Laboratory ("Alpha")
expressed in a report dated May 11, 2004.  (Dkt. No. 24,
Wade Aff. ¶¶ 4-5.)  While this report has not been supplied
by either party, it appears that Alpha stated that at least
two samples "most closely resemble[] some type of motor
oil/waste oil."  (Id. ¶ 3 (quoting Alpha Report).)  Wade
asserts that "Alpha's characterization of these oil samples
as containing . . . motor oil and/or waste oil does not
agree with its own laboratory findings, is not reliable, and
is without scientific basis."  (Id. ¶ 4.)

### III. STANDARD OF REVIEW

Summary judgment is proper when there is "no genuine
issue as to any material fact and . . . the moving party is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  "Once the moving party avers the absence of genuine
issues of material fact, the nonmovant must show that a
factual dispute does exist . . . ."  Velazquez-Fernandez v.
NCE Foods, Inc., 476 F.3d 6, 10 (1st Cir. 2007) (citation
omitted).

-6-

An issue is "genuine" if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party," and a fact is "material" if "it is one that might affect the outcome of the suit under the governing law." <u>Velez-Rivera v. Agosto-Alicea</u>, 437 F.3d 145, 150 (1st Cir. 2006).

"The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." <u>Mandel v. Boston Phoenix, Inc.</u>, 456 F.3d 198, 205 (1st Cir. 2006) (citations omitted). Instead, cross-motions require a court to decide "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Adria Int'l Group, Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

IV. <u>DISCUSSION</u>

A. <u>CERCLA</u>.

Plaintiff has objected to the Magistrate Judge's recommendation that Defendant's motion for summary judgment be allowed on his CERCLA claim, set forth in Count One.

1. <u>Legal Standard</u>.

CERCLA "was enacted to address the growing problem of toxic wastes. It is a broad response and reimbursement statute," which "imposes strict liability on responsible parties." <u>Dedham Water Co. v. Cumberland Farms Dairy, Inc.</u>,

-7-

889 F.2d 1146, 1150 (1st Cir. 1989) (citations omitted).

Former owners of "hazardous substance" disposal facilities

or those who dispose of "hazardous substances" at any

facility are among the Act's "covered persons."  42 U.S.C. §

9607(a)(2)-(4).

     In defining the term "hazardous substance," CERCLA

"incorporate[s] various lists of substances from other

environmental statutes," Narragansett Elec. Co. v. United

States Envtl. Prot. Agency, 407 F.3d 1, 2 (1st Cir. 2005),

but expressly excludes "petroleum, including crude oil."

See 42 U.S.C. § 9601(14).  Both the EPA and the courts have

interpreted this so-called "petroleum exclusion" so as "to

remove from the coverage of CERCLA those otherwise hazardous

substances which are inherent in petroleum, but not

hazardous substances that are added to, or mixed with, a

petroleum product during or after use." Niecko v. Emro

Mktg. Co., 769 F. Supp. 973, 981 (E.D. Mich. 1991) (emphasis

in original) (citations omitted), aff'd, 973 F.2d 1296 (6th

Cir. 1992); see also 50 Fed. Reg. 13460 (Apr. 4, 1985) (EPA

commentary to final rule-making).

     "If a specifically listed hazardous substance is

indigenous to petroleum and is present as a result of the

release of petroleum, such substance will fall within the

petroleum exclusion unless it is present at a concentration

-8-

level that exceeds the concentration level that naturally
occurs in the petroleum product." Cose v. Getty Oil Co., 4
F.3d 700, 704 (9th Cir. 1993) (emphasis in original)
(citation omitted).

    The majority of courts have held that defendants have
the burden to prove the applicability of this exception.
See, e.g., Johnson v. James Langley Operating Co., 226 F.3d
957, 963 n.4 (8th Cir. 2000); but see United States v.
Poly-Carb, Inc., 951 F. Supp. 1518, 1526 n.6 (D. Nev. 1996)
(placing the burden on plaintiff to prove exception's
inapplicability based on the fact that exception is found in
the "definitions" section of the statute rather than among
§ 9607(b)'s affirmative defenses).  This court will adopt
the majority approach.

    2.  Analysis.

    In concluding that Defendant had met its burden of
proving the applicability of the "petroleum exclusion," the
Magistrate Judge focused on the following facts:
(1) Defendant only used light oil, heavy oil, mineral
spirits, and kerosene; (2) each of these substances is an
oil or petroleum product; (3) Plaintiff initially reported a
release of "oil" to the Massachusetts Department of
Environmental Protection ("DEP"); (4) reports generated by
the Licensed Site Professional refer to the materials

released as "oil" or "oily waste"; (5) the DEP identified the property on its website as an "oil" site rather than a "hazardous material" site; and (6) the hazardous substances identified by Plaintiff are either natural components of Massachusetts soils, found in soils of industrial sites, or common constituents of petroleum products.

Plaintiff does not dispute these facts, but contends that summary judgment on Count One is nonetheless inappropriate, since a reasonable fact finder could conclude that Defendant released hazardous substances by adding mineral spirits to the oil it used in the manufacturing process and bringing this mixture "into contact with other substances at the Property (e.g., whatever happened to be on the floor)." (Dkt. No. 31, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. & Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. 13.)  This argument is unpersuasive for two reasons.

First, it is undisputed that all the mineral spirits in use between 1967 and 1976 were distilled from petroleum. (Feldman Aff. ¶ 5.)  Since the EPA considers "mineral spirits distilled from petroleum" to be within the ambit of the "petroleum exclusion" (Id. (citing the EPA's "fact

sheet" on the petroleum exclusion)),[3] the court must assume
that the use of mineral spirits in the cleaning process did
not produce a mixture that fell outside the petroleum
exception.  Significantly, Plaintiff has adduced no evidence
suggesting that the union of the light or heavy oil and
mineral spirits "creates a new compound that is, in itself,
a hazardous substance."  Textron Inc. By & Through Homelite
Div. v. Barber-Colman Co., 903 F. Supp. 1558, 1566 (W.D.N.C.
1995) (citations omitted).

    Second, Plaintiff has not offered any evidence
concerning the "other substances" with which the oil/mineral
spirits mixture would have "certainly come into contact."
The absence of such evidence distinguishes this case from
United States v. Alcan Aluminum Corp., 964 F.2d 252 (3rd
Cir. 1992).

    In Alcan, the defendant's "manufacturing process
involved the hot-rolling of aluminum ingots, and in order
"[t]o keep the rolls cool and lubricated," the defendant
"circulated an emulsion," which "consist[ed] of 95%
deionized water and 5% mineral oil." Id. at 256.  During
this process, it was undisputed that fragments of the

---

    [3] As the First Circuit has noted, "respect [is] usually
accorded an agency's interpretation of a statute it is charged
to execute."  P.R. Aqueduct & Sewer Auth. v. United States
Envtl. Prot. Agency, 35 F.3d 600, 604 (1st Cir. 1994) (citing
Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-45 (1984)).

aluminum ingots containing hazardous substances under CERCLA broke off into the emulsion, and efforts to filter the used emulsion prior to disposing of it failed to remove all the fragments.  Id.

Noting the inapplicability of the petroleum exclusion to "materials such as waste oil to which listed CERCLA substances have been added," Id. at 266 (citing 50 Fed. Reg. 13,460 (April 4, 1985)), the Third Circuit rejected the defendant's claim that the exclusion applied to its emulsion.  Because the defendant "admitted that the hot-rolling process add[ed] hazardous substances to the emulsion," the Alcan court held that "it ha[d] effectively conceded that its emulsion does not fall within the scope of the petroleum exclusion as construed by EPA."  Id. at 267.

In this case, Defendant has not admitted, and the record does not suggest, that its manufacturing process or the clean-up of that process added anything to the four petroleum products it used.  More importantly, while Plaintiff asserts that these products "certainly came into contact with other substances," he does not assert that these other, unnamed substances were "hazardous substances" as defined by the statute.

Instead, Plaintiff merely points to the presence of "hazardous substances" at the site and claims that the

-12-

plausible explanation for their presence offered by
Defendant's expert does not conclusively rule out other
explanations, which, if believed by a jury, would establish
Defendant's liability under CERCLA.  By placing the burden
to prove the applicability of the petroleum exclusion on the
defendant, the law does not require the defendant to refute
theories without any support in the record.[4]  As the First
Circuit has frequently noted, "summary judgment cannot be
defeated by relying on improbable inferences, conclusory
allegations, or rank speculation." Velazquez-Fernandez, 476
F.3d at 10 (citation omitted).

    Of course, if Plaintiff had offered the affidavit of an
expert explaining that the hazardous substances, which
Defendant's expert avers are commonly found at industrial
sites, were also found in the machinery to which Defendant
applied petroleum products while drawing aluminum tubes,
then a factfinder might reasonably conclude that Defendant
was not entitled to the benefits of the petroleum exclusion.
However, given the undisputed state of the record, the

---

[4] Certainly nothing in United States v. Gurley, 43 F.3d
1188, 1199 (8th Cir. 1994), suggests that defendants must
shoulder such a heavy load.  While the Gurley court did reject
the defendants' efforts to invoke the petroleum exclusion, it
did so based on the undisputed fact that they disposed of
"rerefining wastes, which contained substances that "do not
naturally occur in crude oil." Id.
    The Eighth Circuit did not discuss, or even mention, the
defendants' burden to prove the applicability of the exclusion.

Magistrate Judge's recommendation with respect to Count One and the portion of Count Three concerning CERCLA was entirely correct, and the court will adopt it.

B.    Chapter 21E.

The parties agree that Plaintiff's Chapter 21E claim arises, if at all, under either § 5(a)(2) or § 5(a)(5). Since the court will conclude that Plaintiff is entitled to summary judgment on both Counts Two and Three insofar as they allege violations of § 5(a)(2), there is no need to consider the arguments with respect to § 5(a)(5).

1.    Legal Standard.

Mass. Gen. Laws ch. 21E, § 5(a)(2) imposes liability on "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there . . . has been a release . . . of hazardous material."  Mass. Gen. Laws ch. 21E, § 5(a)(2).

Although Defendant concedes that this is a strict liability standard, it argues that it cannot be held liable because it did not own a site where the storage or disposal of any "hazardous material" occurred.  This argument rests upon the fact that Chapter 21E has its own version of CERCLA's petroleum exclusion, which expressly excludes "oil" from the term "hazardous material."  See Mass. Gen. Laws ch.

-14-

21E, § 2.

The Massachusetts General Laws define "oil" as
"insoluble or partial soluble oils of any kind or origin or
in any form, including, and without limitation, crude or
fuel oils, lube oil or sludge, asphalt, insoluble or
partially insoluble derivatives of mineral, animal or
vegetable oils." Id. (emphasis added).  However, because
the definition of "oil" expressly excludes "waste oil," the
Commonwealth's legislature has determined that "waste oil"
"is . . . a 'hazardous material' to which § 5(a)(2)
applies." Wellesley Hills Realty Trust v. Mobil Oil Corp.,
747 F. Supp. 93, 96 n.1 (D. Mass. 1990).

Accordingly, the question becomes whether the undisputed
facts of record establish that at least some of the
petroleum products initially used for lubrication at the
property became "waste oil" prior to their release.  While
Chapter 21E does not define "waste oil," the DEP has defined
the term accordingly:

> Waste Oil means used and/or reprocessed, but not
> subsequently re-refined, oil that has served its
> original intended purpose.  Waste oil includes, but
> is not limited to, used and/or reprocessed fuel
> oil, engine oil, gear oil, cutting oil, and
> transmission fluid and dielectric fluid.

Massachusetts Contingency Plan, 310 CMR 40.0006 (2006).

Plaintiff contends that this definition encompasses at
least some of the oil that Defendant indisputably disposed

-15-

of at the property.  For the reasons set forth below, the court must agree.

    2.  <u>Analysis</u>.

    Judge Neiman concluded that neither party was entitled to summary judgment with respect to § 5(a)(2) because a genuine issue of fact exists as to whether "the petroleum products present at Defendant's site were 'used' such that they became 'waste oil.'"  (Dkt. No. 37, Report & Recommendation 12.)

    In explaining why Defendant was not entitled to judgment as a matter of law, Judge Neiman emphasized the following points: (1) the term "waste oil," as defined by the state agency charged with executing Chapter 21E, includes "used oil"; (2) "used" means "employed in something"; and (3) Lappies testified that Defendant employed large quantities of oil to draw down aluminum tubing, then employed mineral spirits "[t]o cope with the continuous regular buildup of oil on the floor."  (<u>Id.</u> (citing Lappies Aff ¶¶ 11, 12).)

    Defendant has not offered an objection to this portion of the Report and Recommendation.  Conversely, Plaintiff has objected to Judge Neiman's subsequent determination that it would be "premature" to find Defendant liable pursuant to § 5(a)(2), notwithstanding Plaintiff's "quite strong" argument to the contrary.  (<u>See</u> <u>id.</u> at 17-18.)

-16-

As Plaintiff points out, the Report and Recommendation does not identify any evidence Defendant might muster to counter his contention that Defendant is strictly liable as the former owner of a site where releases of waste oil occurred.  Since there is no dispute that Defendant released petroleum products that had served their original, intended purposes, Plaintiff maintains that there is "nothing premature about concluding the obvious[:] . . . Defendant caused a release of waste oil by intentionally disposing of used oil to the earthen floor beneath the work area."  (Dkt. No. 38, Pl.'s Objections to Recommendations on Cross-Mots. for Summ. J. 4.)

In its defense of the Magistrate Judge's recommendation on this point, Defendant simply states that "the Chief Magistrate Judge correctly noted the distinction between 'waste oil' and 'used oil,' and G.L. c. 21E's focus upon 'waste oil,' not 'used oil.'"  (Dkt. No. 40, Def.'s Response to Pl.'s Objection to Recommendations on Cross-Mots. for Summ. J. 3.)  Neither of these assertions can withstand close scrutiny.

First, as noted above, the Report and Recommendation does not draw any distinction between "waste oil" and "used oil."  Rather, it draws attention to the DEP's understanding that: "Waste Oil means used . . . oil that has served its

-17-

original intended purpose."

Second, Defendant's failure to cite any authority regarding Chapter 21E's purported differentiation between "waste oil" and "used oil" does not appear to be an oversight. As far as this court can discern, no such authority exists.

In contrast, a review of the Pattern Jury Instructions for the Superior Court of Massachusetts provides support for the definition of "waste oil" embraced by the DEP. According to the pattern instructions:

> Waste oil, or used oil, is treated as a hazardous material. Waste oil is oil that has been used and has served its original intended purpose. Waste oil is also defined as "used products primarily derived from petroleum, which include, but are not limited to, fuel oils, motor oils, gear oils, cutting oils, transmission fluids, hydraulic fluids, and dielectric fluids."

Hon. Patrick F. Brady et al., Mass. Super. Ct. Civil Practice Jury Instructions, § 9.17.5 (2001) (citing Toxic Substance Control Act, 40 C.F.R. § 761.3); see also id. § 9.17.3 ("The term oil, as used in [Chapter 21E], means fresh oil, as opposed to used oil.").

In sum, given the undisputed fact that Defendant's employees directed used petroleum products to the earthen basement at 106-108 State Road, the court must conclude that Plaintiff is entitled to judgment as a matter of law on Count Two, as well as the portion of Count Three that

alleges a violation of Chapter 21E.

V. <u>CONCLUSION</u>

For the foregoing reasons, upon <u>de novo</u> review the court will adopt the Report and Recommendation in part. Defendant's Motion for Summary Judgment (Dkt. No. 22) is hereby ALLOWED with respect to Count One and that portion of Count Three relying on federal law, and DENIED with respect to Count Two and the balance of Count Three. Plaintiff's motion for partial summary judgment (Dkt. No. 30) is hereby ALLOWED as to Count Two and as to the portion of Count Three relying on state law.

The clerk will set this case for a status conference to determine further proceedings.

It is So Ordered.

                              /s/ Michael A. Ponsor
                              MICHAEL A. PONSOR
                              U. S. District Judge