UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.05-30111-MAP

| | | |
|---|---|---|
| James V. Cariddi, | ) | **LEAVE TO FILE GRANTED ON** |
| Plaintiff | ) | **JANUARY 16, 2008** |
| | ) | |
| | ) | **AMENDED AND SUPPLEMENTED** |
| v. | ) | **COMPLAINT** |
| | ) | **[Jury Trial Demanded]** |
| Consolidated Aluminum Corporation, | ) | |
| Defendant | ) | |

## NATURE OF THE ACTION

This is an action for declaratory and injunctive relief and for the recovery of response costs incurred by plaintiff to address releases to the environment resulting from defendant's storage, arrangement for disposal or disposal of oil and hazardous materials, including used oil and mineral spirits, during defendant's and defendant's predecessors' ownership and operation of certain real estate located in North Adams, Massachusetts. Plaintiff, the current owner of the contaminated property who did not cause or contribute to the contamination of the property, seeks the Court's entry of judgment against defendant declaring defendant's liability to plaintiff and ordering defendant 1) to clean up the contaminated property in accordance with applicable law; 2) to reimburse plaintiff for his reasonable and necessary response costs incurred through the date of judgment; 3) to reimburse plaintiff for his reasonable and necessary response costs incurred in the future after judgment enters; and 4) to pay plaintiff's reasonable attorneys' fees and experts' fees incurred to advance the purposes of M.G.L. c. 21E and to establish and enforce plaintiff's claims against defendant under M.G.L. c. 21E.

1

## PARTIES

1.      Plaintiff, James V. Cariddi ("Mr. Cariddi"), resides at 1125 State Road, North Adams, Massachusetts.

2.      Defendant, Consolidated Aluminum Corporation ("Conalco"), is a New York corporation with a usual place of business at 17-17 Route 208, Fairlawn, New Jersey.  Conalco is the successor by merger to Phelps Dodge Aluminum Products Corporation ("Phelps Dodge").

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a), in that the action is between citizens of different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

4.      This action is properly brought in this district pursuant to 28 U.S.C. §1391(a)(2), in that this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which the property that is the subject of this action is situated.

## FACTS COMMON TO ALL COUNTS

5.      Plaintiff is the current owner of improved real estate at 506-508 State Road, North Adams, Massachusetts (the "Property") formerly belonging to Defendant. The Property is more particularly described in the deed transferring the property from Conalco to Mr. Cariddi, a copy of which is attached as Exhibit A.

6.      The facility on the Property ("Facility") operated as a textile mill from the late nineteenth century until approximately the mid-1950s.  A flume (no longer operational) running under the Facility was used to generate power for the textile mill.

2

7.      In or about 1959, Pfister Manufacturing Corporation ("Pfister," a.k.a. Pfister Aluminum Tubing Corporation) occupied and used a portion of the Facility on the Property for the business of drawing and fabricating aluminum tubing.

8.      Modern Aluminum Anodizing Corporation ("MAA") occupied and used a portion of the Facility, in its business of anodizing the aluminum tubing made by Pfister and subsequently by Phelps Dodge and Conalco (the three firms hereinafter collectively referred to as the "Former Operators").

9.      Until Conalco departed from the Facility, there were agreements with MAA that precluded MAA from doing any work for companies other than the Former Operators.

10.     On August 25, 1967, the Property was transferred to Phelps Dodge, which continued the business of drawing and fabricating aluminum tubing.

11.     Subsequently, Phelps Dodge was merged into Conalco, which continued the business of drawing and fabricating aluminum tubing at the Facility until it discontinued the operations sometime in 1976.

12.     Conalco transferred the Property to Mr. Cariddi on November 10, 1976 in consideration of Mr. Cariddi's payment of $125,000 to Conalco.

13.     From the time he purchased the Property through to the present, Mr. Cariddi has used a portion of the Facility as a warehouse and offices for a wholesale toy distribution business owned by him.  MAA continued to operate leased portions of the Facility until 2004, when it moved its anodizing operations to a new facility located elsewhere.  MAA continues to lease space from Mr. Cariddi for storage.

14.     Norman R. Lappies ("Mr. Lappies") worked at the Facility on the Property from 1961, when Pfister Manufacturing Corporation hired him as a machine operator. Mr. Lappies was later promoted to Foreman and then to Plant Manager, which position he held until shortly before Conalco shut down operations at the Facility on the Property in 1976. A true and accurate copy of a signed statement by Mr. Lappies dated September 10, 2003 is attached as an exhibit to Exhibit D.

15.     Mr. Lappies observed during the course of his employment at the Facility MAA's use of hazardous materials and its discharge of process wastes (including acids) to the flume under the Facility prior to MAA hooking up to the City sewer system.

16.     During the period from 1961 through 1976, there were drawing machines on the first floor of the Facility directly above the Generator Room in the Facility, in the same area within the Facility currently used as a warehouse for Mr. Cariddi's toy distribution business.

17.     Drawing aluminum tubing at the Facility during the period of 1961 through 1976 involved used oil and mineral spirits splashing onto the floor from the machinery and equipment and dripping onto the floor from lengths of tubing being transferred from one drawing machine to another. In addition, there were occasions when oil-filled hoses burst, spraying used oil all over the work area. Oily tubing was cleaned in open top tanks containing mineral spirits solvent, and used oil and used mineral spirits solvent spilled to the floor in the work area when tubing was removed from the tanks. Used mineral spirits solvent was stored in underground storage tanks, one located outdoors, and two located below the work area. A distillation unit separated some of the oily wastes from the used solvent, and the distilled solvent was reused.

18.     During the period from 1961 through 1976, routine maintenance practices included scheduling workers on Sundays, when most operations were shut down, to remove waste oil spills from the work area immediately adjacent to the drawing machines by applying mineral spirits solvent to the floor to thin the oil and then using squeegees to direct the oil through cracks and holes in the wood floor into the basement below, where the waste oil and mineral spirits accumulated. Waste oil was not shipped to an off-site location during the period of time when Mr. Lappies worked at the Facility.

19.     While Mr. Cariddi has owned the Property, his toy warehousing and distribution operations have not included any industrial machinery containing significant amounts of oil or mineral spirits solvent and there have been no spills, leaks or releases of oil or mineral spirits solvent from those operations.

20.     On April 25, 2001, North Adams Fire Chief Roger Rougeau telephoned the Massachusetts Department of Environmental Protection ("MADEP") to report "oily sludgy material" found in the basement of the Property by a Fire Inspector.

21.     On April 27, 2001, Joanne Flescher of MADEP performed a site inspection. During a second site inspection on May 16, 2001, Ms. Flescher collected two soil samples from the basement. (The basement floor of the Facility is dirt for the most part.) Laboratory analysis of the samples showed that Total Petroleum Hydrocarbons exceeded the reportable concentration specified in the Massachusetts Contingency Plan ("MCP"), 310 C.M.R. § 40.0000 *et seq.*

22.     On or about October 24, 2001, a Release Notification Form was submitted on Mr. Cariddi's behalf to the MADEP.

23.    On or about November 21, 2001, MADEP mailed a Notice of Responsibility ("NOR") to Mr. Cariddi at Cariddi Sales assigning Release Tracking Number 1-13902 to the Disposal Site and specifying actions required pursuant to the MCP.

24.    Mr. Cariddi engaged Maxymillian Technologies, Inc. ("Maxymillian") and its Hazardous Waste Site Cleanup Professional (a.k.a. Licensed Site Professional or "LSP"), Robert F. MacLean ("Mr. MacLean"), to begin response actions.

25.    On or about October 24, 2002, a Phase I Initial Site Investigation Report and Tier Classification prepared by Maxymillian under the supervision of Mr. MacLean was submitted to MADEP on Mr. Cariddi's behalf, including a Numerical Ranking System Scoresheet classifying the Disposal Site as a Tier IB (priority) Disposal Site. Also included was a Form BWSC 02 - Tier IB Initial Application for Response Action Permit for Tier I Disposal Sites.

26.    On or about February 28, 2003 MADEP mailed a Decision to Grant Tier IB Permit Application to Mr. Cariddi.

27.    On March 27, 2003, Mr. Cariddi retained Kevin J. O'Reilly ("Mr. O'Reilly") of O'Reilly, Talbot & Okun Associates, Inc. ("OTO") as LSP.  Mr. O'Reilly notified MADEP of a Condition of Substantial Release Migration, which triggered a requirement to perform an Immediate Response Action ("IRA") pursuant to Section 40.0412(3) of the MCP.

28.    On April 24, 2003, MADEP received an IRA Plan from Mr. O'Reilly to remove oil from the basement with a vacuum truck, and conduct a confined-space entry

into the flume area. The IRA was orally approved by MADEP's Bernard Fish the same day.

29. Clean Harbors Environmental Services, Inc. ("Clean Harbors") in May 2003 removed approximately 1,000 gallons of oil and oily water from the basement of the Property. In connection with these response actions, a white sludge with streaks of a darker material was discovered in the flume area. Laboratory analysis of the sludge mixture indicated the presence of 6,300 milligrams per liter ("mg/L") of petroleum hydrocarbons and lower concentrations of heavy metals including arsenic, barium, calcium, cadmium, chromium, lead, mercury, magnesium, silver and zinc.

30. The waste oil and mineral spirits solvent Conalco generated and mismanaged at the Property are hazardous materials as defined in M.G.L. c. 21E, §2.

31. Mr. Cariddi, through his environmental consultants Maxymillian, OTO and Clean Harbors, has cooperated with MADEP and has incurred response costs for assessment and remediation that have been required by Massachusetts law to address conditions at and in the vicinity of the Disposal Site on the Property. Response actions are ongoing.

32. Mr. Cariddi has already incurred reasonable and necessary expenses related to assessment and remediation of the Disposal Site and its vicinity in excess of $75,000.00. Projected reasonable and necessary response costs to achieve a Response Action Outcome under the Massachusetts Contingency Plan ("MCP"), 310 CMR 40.0001 *et seq.*, are likely to exceed Mr. Cariddi's ability to pay for response costs necessary to achieve at the Property a condition of no significant risk to health, safety, public welfare or the environment as required under Chapter 21E and the MCP.

33.     On May 13, 2002, Mr. Cariddi, through legal counsel, notified Conalco pursuant M.G.L. c. 21E, § 4A of his intent to seek damages and reimbursement from Conalco for response costs related to the assessment and remediation of conditions at the Disposal Site attributable and caused by Conalco's operations in the Facility or the Property. A true and accurate copy of the letter is attached hereto as Exhibit B.

34.     By letter dated June 10, 2002, Conalco denied responsibility to pay contribution, to pay for or to perform response actions, contending that Conalco, as a past owner/operator could be held liable under M.G. L. c. 21E only if it caused the release, and stating Conalco had seen nothing indicating that it caused the release of oil on the site. A true and accurate copy of this letter is attached hereto as Exhibit C.

35.     By letter dated February 5, 2004, Mr. Cariddi notified Conalco pursuant M.G.L. c. 21E, § 4A of his intent to seek damages and reimbursement from Conalco for response costs related to the assessment and remediation of conditions at the Disposal Site, including therewith a copy of the September 10, 2003 Statement of Mr. Lappies demonstrating Conalco did cause multiple releases of waste oil and mineral spirits solvent at the Property. A true and accurate copy of this letter to Conalco is attached hereto as Exhibit D.

36.     By letter dated October 29, 2004, Conalco, through legal counsel, again refused to pay contribution, reimbursement or equitable share to Mr. Cariddi or to participate in the performance of the response actions mandated by MADEP, contending, on the basis of a brief investigation, that M.G. L. c. 21E only imposes liability upon Conalco as a past owner/operator that disposed of oil and hazardous materials if there is evidence that Conalco had a specific and contemporaneously recognized obligation to

dispose of oil and hazardous materials in a way that would have prevented contamination. A true and accurate copy of this second letter from Conalco is attached hereto as Exhibit E.

37.    MADEP in correspondence dated July 19, 2007 informed Conalco of its legal responsibilities under state law to address the release at the Property and established Interim Deadlines for Conalco to perform necessary response actions by specific deadlines.  A copy of DEP's correspondence is attached hereto as Exhibit F.

38.    MADEP in cover correspondence dated December 11, 2007 and in an enclosed Notice of Noncompliance informed Conalco that Conalco had failed to perform required response actions by Interim Deadlines established in prior MADEP correspondence.  MADEP identified specific actions to be taken and established Interim Deadlines to perform the required actions.  Copies of MADEP's December 11, 2007 cover letter and Notice of Noncompliance are attached here to as Exhibit G.

39.    Mr. Cariddi has incurred and continues to incur costs, including attorneys' and experts' fees, in connection with the initiation and pursuit of claims against Conalco, the commencement and prosecution of this litigation against Conalco under M.G.L. c. 21E, and in addressing MADEP's claims and directives that he perform response actions at the Property to address the conditions Conalco caused.

## COUNT I

### (M.G.L. c. 21E)

40.    Mr. Cariddi incorporates the allegations contained in paragraphs 1 though 39 above.

41.    Conalco stored oil and hazardous materials, including used oil and mineral spirits solvent, at the Facility when Conalco owned and operated the Facility.

42.    Conalco arranged for disposal of oil and hazardous materials, including used oil and mineral spirits solvent, at the Facility when Conalco owned and operated the Facility.

43.    Conalco disposed of oil and other hazardous materials, including used oil and mineral spirits solvent, at the Facility when Conalco owned and operated the Facility.

44.    Conalco's storage, arrangement for disposal or disposal of oil or hazardous materials, including used oil and mineral spirits solvents, or some combination thereof, at the Facility caused the release to the environment of oil and hazardous materials, including used oil and mineral spirits solvents, as a result of which Mr. Cariddi has incurred and will in the future incur necessary response costs consistent with the MCP.

45.    Conalco caused or is otherwise legally responsible for one or more releases of oil and hazardous materials, including used oil and mineral spirits solvent, at the Facility.

46.    Conalco is liable to Mr. Cariddi pursuant to M.G.L. c. 21E for his past and future response costs incurred to assess and cleanup releases of oil and other hazardous materials, including used oil and mineral spirits solvent, at and near the Property.

### COUNT II

### (Declaratory Judgment and Injunctive Relief)

47.    Mr. Cariddi incorporates the allegations contained in paragraphs 1 though 46 above.

10

48.     There is an actual and present controversy between Mr. Cariddi and Conalco involving payment for Mr. Cariddi's past and future reasonable and necessary response costs and performance of response actions required to comply with M.G.L. c. 21E and the MCP.

49.     Conalco is a responsible party obliged to perform response actions to achieve a condition of no significant risk to health, safety, public welfare or the environment for any foreseeable period of time as set forth in M.G.L. c. 21E and the MCP.

50.     Mr. Cariddi has incurred response costs associated with the release of oil and hazardous materials, including used oil and mineral spirits solvent, and will incur response costs in the future in an as yet undetermined amount.

51.     Mr. Cariddi is entitled to a declaratory judgment under 28 U.S.C. §§ 2201 *et seq*. declaring Conalco is liable to Mr. Cariddi for his past and future response costs incurred to address releases of oil or hazardous materials, including used oil and mineral spirits, for which Conalco is responsible.

52.     In addition or in the alternative, with respect to future response actions, Mr. Cariddi is entitled to an injunction ordering Conalco to perform necessary and appropriate response actions to clean up releases of oil or hazardous materials, including used oil and mineral spirits, for which Conalco is responsible at the Property so as to achieve a condition of no significant risk to health, safety, public welfare or the environment for any foreseeable period of time, in accordance with M.G.L. c. 21E and the MCP.

## COUNT III

(Costs "including Attorney and Expert Witness Fees" Under M.G.L. c.21E, §15)

53.     Mr. Cariddi incorporates the allegations contained in paragraphs 1 though 52 above.

54.     Mr. Cariddi's assertion of claims under M.G.L. c. 21E and commencement and prosecution of this civil action against Conalco have been and are a suit by a Massachusetts resident "to enforce the requirements of M.G.L. c. 21E or to abate a hazard related to oil or hazardous materials in the environment" within the meaning of, M.G.L. c. 21E, §15.

55.     Mr. Cariddi's assertion of claims under M.G.L. c. 21E and commencement and prosecution of this civil action against Conalco have advanced and continue to advance the purposes of M.G.L. c. 21E.

56.     Conalco is liable to Mr. Cariddi under M.G.L. c. 21E, §15, which provides that the Court "may award costs, including reasonable attorney and expert witness fees, to any party other than the commonwealth who advances the purposes" of M.G.L. c. 21E.

## COUNT IV

(Litigation Costs and Reasonable Attorneys' Fees under M.G.L. c. 21E, §4A)

57.     Mr. Cariddi incorporates the allegations contained in paragraphs 1 though 56.

58.     Since at least May of 2002, it has been reasonably clear that Conalco has been and is liable to reimburse Mr. Cariddi for the reasonable and necessary response costs he has incurred and continues to incur and that Conalco has been and is responsible

12

to assess and clean up the releases to the environment of oil and hazardous material, including used oil and mineral spirits, at the Property in accordance with the requirements of M.G.L. c. 21E and the MCP.

59.    Notwithstanding that its liability as a responsible party has been and remains reasonably clear, Conalco has not participated in good faith in settlement negotiations called for under M.G.L. c. 21E, §4A.

60.    Notwithstanding that its liability as a responsible party has been and remains reasonably clear, Conalco has failed and continues to fail without reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the costs of such response action or of other liability pursuant to the provisions of M.G.L. c. 21E.

61.    Mr. Cariddi is entitled to an award of litigation costs and reasonable attorneys' fees against Conalco pursuant to M.G.L. c.21E, §4A(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays this Honorable Court to:

1.    Enter judgment for plaintiff and against defendant in such amount as plaintiff establishes as his response costs incurred through the date judgment enters, together with interest thereon from the date plaintiff incurred such costs through the date of judgment;

2.    Enter judgment for plaintiff and against defendant declaring defendant responsible to pay all future response costs incurred by plaintiff to address releases of oil or hazardous materials for which the Court determines

13

defendant is responsible and ordering defendant to pay plaintiff such costs as they are incurred;

3.   Enter judgment for plaintiff and against defendant ordering defendant to clean up the Property in compliance with M.G.L. c. 21E and the MCP;

4.   Enter judgment for plaintiff and against defendant awarding plaintiff his costs including attorney and expert witness fees, in accordance with M.G.L. c. 21E, §15;

5.   Enter judgment for plaintiff and against defendant awarding plaintiff his litigation costs and reasonable attorneys' fees under M.G.L. c. 21E, §4A; and

6.   Enter judgment for plaintiff and against defendant awarding such further relief as the Court may deem just, equitable and proper.

## JURY DEMAND

MR. CARIDDI DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

The Plaintiff,
James V. Cariddi
By his attorneys:

Dated:  December 28, 2007

Christopher B. Myhrum
BBO No. 365980
Bulkley, Richardson and Gelinas, LLP
1500 Main Street - Suite 2700
Springfield, MA 01115-5507
Tel:  (413) 781-2820
Fax:  (413) 272-6806

593774v1

CERTIFICATE OF SERVICE

I, Christopher B. Myhrum, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/Christopher B. Myhrum
Christopher B. Myhrum

EXHIBIT  A

BOOK 673 PG 1136

CONSOLIDATED ALUMINUM CORPORATION, a corporation duly organized under
the laws of the State of New York, having its corporate offices in Saint Louis,
Missouri, surviving corporation in a merger of Phelps Dodge Aluminum Products
Corporation into Consolidated Aluminum Corporation, for consideration in the
amount of One Hundred Twenty-five Thousand (125,000) Dollars paid, grants to
JAMES V. CARIDDI, whose residence and post office address is 130 Franklin
Street, in North Adams, Berkshire County, Massachusetts, with Warranty Coven-
ants, five parcels of land in said North Adams, with the buildings and improve-
ments thereon, bounded and described as follows:

PARCEL 1:  Beginning at a point at the intersection of the westerly
line of Protection Avenue and the southerly line of State Road;
   thence southerly along the westerly line of Protection Avenue to
the northeast corner of Lot No. 51 as shown on plans entitled "Plan
of Land in Greylock Purchased by the City of North Adams from the
Berkshire Fine Spinning Assoc., Inc., Scale 1 inch = 80 ft., July,
1937, City Engineer's Office" and "Plot A of the Plan in Subdivision
of the Dwellings and Land of the Kilburn Realty Corp., North Adams,
Mass., Scale 40 ft. to the inch, June, 1933, W. N. Tuller, C. E.,
which plans are filed in the Northern Berkshire Registry of Deeds
in Drawer 6 as Plan 9, and in Drawer 4 as Plan 85, respectively;
   thence westerly 142.6 feet along the northerly line of said Lot
No. 51 to the northwesterly corner thereof;
   thence southerly along the westerly line of lots numbered 51,
50, 49 and 48, as shown on said plans, 197.2 feet to a point in
the westerly line of said Lot No. 48, being 33.0 feet northerly of
the southwesterly corner thereof;
   thence west 515.6 feet to a point;
   thence northerly to an iron pipe bearing South 3° 53' West and
418.74 feet distant from an iron pipe driven into the ground on the
southerly line of State Road as shown on a plan entitled "Plan of
Land of Alivin Anderson, North Adams, Mass., Scale 1 inch = 40 ft.,
June 4, 1949, A. B. Wright, C. E., which plan is filed in the said
Registry of Deeds in Binder 2 at Page 82;
   thence North 82° 32' West along the northerly line of land now
or formerly of Albert Richards 177.78 feet to an iron pipe driven
into the ground at the southeast corner of land of Greylock Com-
munity Club, Inc.;
   thence North 8° 2' East 397.47 feet to an iron pipe driven into
the ground on the easterly line of Greylock Community Club, Inc.;
   thence in continuation thereof North 18° 7' East continuing
along the easterly line of the Greylock Community Club, Inc., 72
feet to an iron pipe driven into the ground on the southerly line
of State Road;
   thence South 62° 1' 20" East 143.47 feet along the southerly
line of State Road to an iron pipe;
   thence continuing along the southerly line of State Road to the
westerly line of Protection Avenue, being the point and place of
beginning.

PARCEL 2:  Beginning at an iron pin in the southerly line of land
of the Boston & Maine Railroad, as shown on sheet 8 of 22 sheets
constituting a plan entitled "The Commonwealth of Massachusetts
Plan of Land in the City of North Adams, Berkshire County, showing

BOOK 673 PG 1137

- 2 -

land takings for Federal Flood Control Project taken by the Massachusetts Department of Public Works, Scale: 40 feet to the inch, July 2, 1957, R. J. McCarthy, Chief Engineer, Layout No. 4575, approved July 2, 1957", said plan being Plan 113 on file in Drawer 6 at the said Registry of Deeds;

thence South 64° 47' 17" East 426.83 feet to an iron pin;

thence South 61° 50' 47" East 94.87 feet to an iron pin as shown on sheet 9 of said plan;

thence South 71° 53' 2" East 169.08 feet to an iron pipe as shown on said sheet 9;

thence South 77° 28' 16" East 54.94 feet to an iron pipe as shown on said sheet 9;

thence North 13° 10' 48" East 137.44 feet to an iron pipe in the southerly line of the Boston & Maine Railroad as shown on said sheet 9;

thence westerly along the southerly line of the Boston & Maine Railroad to the point and place of beginning. Being Parcel B-36 as shown on said plan.

Subject to the temporary easement taken by the Commonwealth of Massachusetts as set forth in the aforesaid land taking, notice of which is recorded in the said Registry of Deeds in Book 529, Page 240.

PARCEL 3:　Beginning at a point in the easterly line of land now or formerly of Nathan and Anna Taskin on the northerly side of State Highway, Route 2;

thence easterly along said State Highway as shown on sheets 9 and 10 of said Commonwealth Plan to the westerly line of land now or formerly of Mary Louise Anderson and Rena Anderson;

thence northerly on said westerly line of Anderson land about 170 feet to the southerly line of Parcel A-20B as shown on sheet 10 of said Plan;

thence westerly along the southerly lines of Parcels A-20B and the southerly side of the Hoosac River to the easterly point of Parcel A-20, as shown on sheet 9 of said Plan;

thence along the southerly side of Parcel A-20 to the easterly line of said Taskin;

thence southerly about 65 feet to the point and place of beginning. Being Parcels B-95 and B-95B as shown on said Commonwealth Plan.

PARCEL 4:　Being Parcel B-95A, as shown on sheet 9 of said Commonwealth Plan, containing about 1,600 square feet.

PARCEL 5:　Being Parcel B-36-A as shown on sheets 9 and 10 of said Commonwealth Plan, containing about 28,100 square feet.

EXCEPTING, however, from the premises herein conveyed the parcels conveyed to Massachusetts Electric Company by deed of Greylock Associates, Inc. dated October 28, 1965 and recorded in the said Registry of Deeds in Book 597, Page 431.

SUBJECT, however, to an easement granted by Greylock Mills to the North Adams Gas Light Company by instrument dated May 25, 1925, recorded in the said Registry of Deeds in Book 320, Page 394, and to an easement granted by Greylock Associates, Inc. to the Northern Berkshire Electric Company by instrument dated April 9, 1959 and recorded in said Registry of Deeds in Book 542, Page 221.

BOOK 673 PG 1138                    - 3 -

Meaning and intending hereby to describe and to convey Parcels I, III, IV, V and VI conveyed to the above-named Phelps Dodge Aluminum Products Corporation by deed of Greylock Associates, Inc. dated August 25, 1967 and recorded in the said Registry of Deeds in Book 611, Page 279.

This deed creates no new boundaries.

Real estate taxes assessed by the City of North Adams on said premises for the current tax period are to be apportioned between the parties as of the date of this conveyance.

IN WITNESS WHEREOF, the said CONSOLIDATED ALUMINUM CORPORATION has caused its corporate seal to be hereto affixed, and these presents to be signed, acknowledged and delivered in its name and behalf by E. G. Chaves its President and G. O. Griffith its Treasurer hereunto duly authorized this _4th_ day of _November_ , 1976.

                              CONSOLIDATED ALUMINUM CORPORATION

                              By _E. Chaves_
                                 Its President

                                 _G. O. Griffith_
                                 Its Treasurer

                    STATE OF MISSOURI

Saint Louis                        _November 4_ 1976

    Then personally appeared the above-named _E. G. Chaves President_,
_G. O. Griffith Treasurer_, and acknowledged the foregoing instrument by subscribed to be the free act and deed of CONSOLIDATED ALUMINUM CORPORATION, before me,

                    _Jacqueline C. Auger_
                         Notary Public
                    My Commission Expires November 6, 1977

My commission expires:_____

BOOK 673 PG 1139

CERTIFICATE OF CORPORATE RESOLUTION

     I, JAMES L. ROOD, hereby certify that I am the Secretary of the Board of Directors of CONSOLIDATED ALUMINUM CORPORATION, a corporation organized and existing under the laws of the State of New York, and that the following is a true, correct, and complete copy of a Resolution passed at a meeting of the Board of Directors of said corporation, duly called and held at the corporate offices in Saint Louis, Missouri on March 26, 1976, and that said Resolution is now in full force and effect:

> "RESOLVED FURTHER, That the officers of the Corporation be and they
> are hereby authorized and directed to negotiate and consummate what
> they consider to be the most beneficial disposition of the facility
> located at North Adams, Massachusetts and that they are authorized
> and directed to execute and deliver any and all deeds, bills of sale
> or other transfer documents or any documents ancillary thereto nec-
> essary to effect the disposition of such assets."

A true copy

Attest:

_James L. Rood_
Secretary

BOOK 673 PG 1140

CERTIFICATE OF INCUMBENCY OF OFFICERS OF CONSOLIDATED ALUMINUM CORPORATION

It is hereby certified that E. G. Chaves is the duly elected and qualified President of CONSOLIDATED ALUMINUM CORPORATION and that G. O. Griffith is the duly elected and qualified Treasurer of said Corporation and that both were acting in such capacities at the date of execution of the deed from said Corporation to James V. Cariddi conveying title to certain premises located on State Road in North Adams, Berkshire County, Massachusetts.

_James L. Rood_
James L. Rood,    Secretary







Received & entered for record

November 10 19 76 at 4 H 04 M P M

# EXHIBIT  B

JAN-26-04 11:08 AM   CA   DDI SALES COMPANY      413  63 9098                 P.02

# DONOVAN & O'CONNOR, LLP

ATTORNEYS AND COUNSELLORS AT LAW

ONE COMMERCIAL PLACE

P.O. BOX 230

ADAMS, MASSACHUSETTS 01220-0230

PHILIP H. GRANDCHAMP
†DONALD W. GOODRICH
JOHN D. LANOUE
J. NORMAN O'CONNOR, JR.
JANICE J. COOK
DAVID B. MONGUE
†‡CHRIS S. DODIG
††GORDON P. BLACK
STEPHEN N. PAGNOTTA

OF COUNSEL
**DOUGLAS J. ROSE
JOHN I. CURTIN
CECIL DRIVER

SENIOR COUNSEL
J. NORMAN O'CONNOR

JAMES R. LOUGHMAN
MICHELLE K. MANNERS
†††DANIELLE D. AALBERTS
**MICHAEL R. PALMIERI

** Also Admitted NY
† Also Admitted VT
†† Admitted VT ONLY

(413) 743-3700

FAX (413) 743-5370

E-MAIL mail@docatty.com

EIN 04-2196966

May 13, 2002

Mr. Gunther E. Thym, President
Consolidated Aluminum Corporation
c/o Alusuisse-Lonza America, Inc.
17-17 Route 208
Fairlawn, NJ  97410

Re:   Notification of Oil or Hazardous Material Release Response Action
        Mass. G. L. c. 21E, § 4A

Dear Mr. Thym:

Identification of Person Giving Notice, Mass. G. L. c. 21E, § 4A(a)(i)

Donovan & O'Connor, LLP has been retained to represent Mr. James V. Cariddi of North
Adams, Massachusetts, the owner of that certain parcel of real estate, together with all the
improvements thereon, located at 506 State Road in the City of North Adams (hereinafter "the
State Road site"), with respect to a response action regarding the release of oil or hazardous
material at the State Road site.

This letter should serve as a formal notification to Consolidated Aluminum Corporation
(hereinafter "CAC"), pursuant to Section 4A, Chapter 21E, Massachusetts General Laws (the
*Massachusetts Oil & Hazardous Material Release Prevention Act*, hereinafter "OHMRPA"), that
Mr. Cariddi intends to undertake a necessary and appropriate response action, in accordance
with the provisions of OHMPRA, and that Mr. Cariddi reasonably believes that CAC is liable
over to Mr. Cariddi for reimbursement of the costs of such a response action, pursuant to Mass.
G. L. c. 21E, §§ 4 and 5.

Mr. Cariddi took title to the State Road site from CAC by warranty deed dated November 4,
1976, and recorded in the evidence of land records at the Northern Berkshire Registry of Deeds
in Book 637 at Page 1136 on November 10, 1976 (a true copy of which *Warranty Deed* is
attached hereto as Exhibit "1"). The State Road site comprises several interconnected factory
and warehouse buildings now or formerly in operation in North Adams, and presently occupied
in part by Mr. Cariddi's business, Cariddi Sales Company, Inc.

JAN-26-04 11:08 AM   CA   DDI SALES COMPANY      413  63 9098              P.03

Mr. Gunther E. Thym, President
May 13, 2002
Page 2

Identification of Response Action, Mass. G. L. c. 21E, § 4A(a)(ii)

On or about October 24, 2001, the Massachusetts Department of Environmental Protection (hereinafter "DEP") received a *Release Notification Form* indicating that the State Road site had been subject to a release of oil (*Release Notification Form*, attached hereto as Exhibit "2"). The notice sent to DEP concerned a soil sample taken from the State Road site on or about May 16, 2001, which sample indicated petroleum hydrocarbon contamination in the soil at a level of 31,000 mg/Kg.

On or about November 21, 2001, Mr. Cariddi received a *Notice of Responsibility* letter from DEP notifying him that the State Road site had been subjected to a release of oil and/or hazardous materials in quantities in excess of the applicable reportable concentrations (*Notice of Responsibility*, attached hereto as Exhibit "3"). DEP opined in such notice that the State Road site is a disposal site requiring a response action as set forth in OHMPRA, including, but not limited to, the submission of a "Phase I Initial Site Investigation Report" by a Massachusetts "Licensed Site Professional."

In consonance with DEP's demands, Mr. Cariddi has engaged a licensed site professional to assist in the necessary and appropriate response action (*Maxymillian Technologies, Inc. Proposal*, dated 11/15/01, attached hereto as Exhibit "4").

Description of Legal & Factual Basis for Claim, Mass. G. L. c. 21E, § 4A(a)(iii)

Pursuant to Mass. G. L. c. 21E, § 4A(a), Mr. Cariddi hereby makes demand upon CAC, as Mr. Cariddi's predecessor in title to the State Road site to reimburse Mr. Cariddi for any and all reasonable costs associated with the proposed response action.

CAC is liable over to Mr. Cariddi for these costs pursuant to Mass. G. L. c. 21E, §§ 4 and 5(a)(1) and (5), insofar as CAC was the owner of the locus at the time that the oil was released at the State Road site, and may have caused the release of oil onto the State Road site. *See: Griffith v. N.E.T.&T. Co.*, 414 Mass. 824 (1993).

Statement of Reimbursement Demanded, Mass. G. L. c. 21E, § 4A(a)(iv)

Mr. Cariddi anticipates that the preparation of the "Phase I Initial Site Investigation Report" will entail out-of-pocket costs to Mr. Cariddi of at least $52,000, and Mr. Cariddi has already expended $10,000 for the investigation of the first report of the release. Mr. Cariddi can also anticipate the onerous possibility of tens or hundreds of thousands of dollars of costs associated with the State Road site remediation. Mr. Cariddi intends to hold CAC strictly liable for all of the costs and fees associated with the response action and site clean-up.

Kindly note that a response to this demand is due, pursuant to Mass. G. L. c. 21E, § 4A(a) within forty-five (45) days of your receipt of this notice.

JAN-26-04 11:09 AM  CF  DDI SALES COMPANY      41: 63 9098        P.04

Mr. Gunther E. Thym, President
May 13, 2002
Page 3

Please govern yourself accordingly.

Very truly yours,

DONOVAN & O'CONNOR, LLP

Douglas J. Rose

DJR:MGR

cc:    Mr. James V. Cariddi

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Gunther E. Thym, President
Consolidated Aluminum Corporation
c/o Alusuisse-Lonza America, Inc
17-17 Route 208
Fairlawn, NJ    97410

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly) | B. Date of Delivery 5/17/02

C. Signature
X _____  ☐ Agent  ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Copy from service label)
   7001 1940 0004 6921 8743

PS Form 3811, July 1999        Domestic Return Receipt        102595-00-M-0952

# EXHIBIT  C

# LEWIS, RICE & FINGERSH, L.C.

### ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
JWEYHRICH@LEWISRICE.COM

JOSEPH H. WEYHRICH
DIRECT (314) 444-7634

TEL (314) 444-7600
FAX (314) 612-7634

June 10, 2002

Mr. Douglas J. Rose, Esq.
Donovan & O'Connor, LLP
One Commercial Place
P.O. Box 230
Adams, MA  01220-0230

Re:    Consolidated Aluminum Corporation/James A. Cariddi
       Your letter to Consolidated Aluminum dated May 13, 2002

Dear Mr. Rose:

Thank you for your correspondence of May 28, 2002, enclosing copies of certain correspondence and a draft contract concerning the transfer of certain property by Consolidated Aluminum Corporation ("CAC") to James V. Cariddi.

This letter is in response to your notification to CAC pursuant to Section 4A, Chapter 21E, Massachusetts General Laws (the *Massachusetts Oil & Hazardous Material Release Prevention Act*, "OHMRPA"), wherein you state Mr. Cariddi's belief that CAC is liable for reimbursement of the costs of a response action taken pursuant to OHMPRA. CAC position is that it is not liable to Mr. Cariddi for reimbursement of any response action costs.

In your letter, you state that CAC is liable for these costs pursuant to §§ 4 and 5(a)(1) and (5) of OHMRPA because CAC was the owner of the locus at the time the oil was released, and may have caused the release of oil, citing Griffith v. N.E.T. & T., 414 Mass. 824 (1993).

Section 4 states that a person who undertakes a response action is entitled to reimbursement from any other person liable, but it is not the source of any liability for CAC.

Section 5(a)(1) states that the owner of the site of the release is liable. In Griffith, the court held that the Act imposes strict liability only on present owners of the property regardless of when the release of oil or hazardous material occurred. Therefore, CAC is not liable under §5(a)(1) because it is not a present owner.

Section 5(a)(5) states that a person who caused or is legally responsible for a release is liable. According to Griffith, a past owner can be held liable only if it caused the release of oil

LEWIS, RICE &~FINGERSH, L.C.

Mr. Douglas J. Rose, Esq.
June 10, 2002
Page 2

from the site. Therefore, it must be shown that CAC caused the release of oil in order for it to be liable under § 5(a)(5). We have seen nothing indicating that CAC caused the release of oil on the site.

Based on the foregoing, CAC believes that it is not liable and will not be paying contribution or reimbursement and will not be participating in any response action.

If you wish to discuss this matter, please contact the undersigned.

Very truly yours,

Joseph H. Weyhrich

# EXHIBIT  D



BULKLEY, RICHARDSON AND GELINAS, LLP

LAW OFFICES
1500 MAIN STREET, SUITE 2700
POST OFFICE BOX 15507
SPRINGFIELD, MA 01115-5507

TEL:  (413) 781-2820
FAX:  (413) 272-6806
E-MAIL: INFO@BULKLEY.COM

ROBERT B. ATKINSON
ROBERT A. GELINAS
STEPHEN W. SCHUPACK
PETER ROTH
RONALD P. WEISS
FRANCIS D. DIBBLE, JR.
HAMILTON DOHERTY, JR.
MICHAEL H. BURKE
PETER H. BARRY
DAVID A. PARKE
FELICITY HARDEE
CHRISTOPHER B. MYHRUM
GEORGE W. MARION
ELLEN M. RANDLE
KEVIN C. MAYNARD

MARK D. CRESS
MARY J. KENNEDY
J. MICHAEL SCULLY
JAMES C. DUDA
KELLY A. McCARTHY
DANIEL J. FINNEGAN
MELINDA M. PHELPS
DEBORAH D. FERRITER
JEFFREY E. POINDEXTER
KATHERINE A. ROBERTSON
SANDRA J. STAUB
KATHLEEN LEITAO BERNARDO
DONN A. RANDALL*
SCOTT W. FOSTER
ELIZABETH H. SILLIN

VANESSA L. SMITH
DEBRA A. QUINN
JOSHUA P. GREY
JENELLE C. DODDS
CHRISTINE Y. LE BEL
ANDREW J. DRAYER*
CHRISTOPHER J. SCOTT

COUNSEL
CAROL E. KAMM*
J. PATRICK KENNEDY*
PHILIP J. TARPEY, JR.
MARTIN D. TURPIE

*RESIDENT IN BOSTON OFFICE

February 5, 2004

<u>VIA CERTIFIED MAIL -- RETURN RECEIPT REQUESTED</u>

Joseph H. Weyhrich, Esq.
Lewis, Rice and Fingersh, LLC
500 N. Broadway, Suite 2000
St. Louis, MO 63102-2147

RE:   Notice of Intent Pursuant to Section 4A of M.G.L. c. 21E to seek Contribution,
Reimbursement or Equitable Share from Consolidated Aluminum Corporation

Dear Mr. Weyhrich:

We represent James A. Cariddi, the current owner of property in North Adams
Massachusetts ("the Property") formerly belonging to Consolidated Aluminum Corporation
("Conalco" or "CAC"). The Property is described in the copy of the deed transferring the
property from Conalco to Mr. Cariddi attached at Tab A.

On May 13, 2002 and on May 28, 2002, Douglas J. Rose of Donovan & O'Connor, LLP
wrote to Conalco and then to you seeking reimbursement of the costs Mr. Cariddi has incurred in
responding to a release of oil and/or hazardous material that was discovered in the basement and
flume of the building he purchased from Conalco as part of the Property. Copies of these two
letters (less enclosures) are attached at Tab B. You responded to Mr. Rose in your letter dated
June 10, 2002, a copy of which is attached at Tab C. Citing the provisions of Chapter 21E of the
Massachusetts General Laws and related case law (<u>Griffith v. N.E.T. & T.</u>, 414 Mass. 834
(1993)), you stated (beginning at the bottom of page 1 and continuing onto page 2):

Section 5(a)(5) states that a person who caused or is legally responsible for
a release is liable. According to <u>Griffith</u>, a past owner can be held liable only if it
caused the release of oil from the site. Therefore, it must be shown that CAC
caused the release of oil in order for it to be liable under § 5(a)(5). We have seen
nothing indicating that CAC caused the release of oil on the site.

BULKLEY, RICHARDSON AND GELINAS, LLP

Joseph H. Weyhrich, Esq.
Lewis, Rice and Fingersh, LLC
February 2, 2004
Page 2

Based on the foregoing, CAC believes that it is not liable and will not be paying contribution or reimbursement and will not be participating in any response action.

Attached at Tab D is a signed statement by Norman R. Lappies, who was Plant Manager for the facility in North Adams on the Property now owned by Mr. Cariddi until shortly before Conalco closed it in 1976. Please note paragraph 12 of his statement, which states:

12. To cope with the continuous regular buildup of oil on the floor, it was routine practice throughout the time I worked at the Facility to have workers come in on Sunday (when most operations were shut down) to remove the waste oil. This was done by applying mineral spirits solvent to the floor to thin the oil and then using squeegees to direct the oil through cracks and holes in the wood floor into the basement below, where it accumulated. To the best of my knowledge and information, waste oil was not shipped to an off-site location while I worked at the Facility.

We trust you must agree that Mr. Lappies' statement "indicates that CAC caused the release of oil on the site" for which Mr. Cariddi has incurred response costs. Mr. Cariddi did not cause and has not contributed to the contamination at the property. Throughout the period since Mr. Cariddi purchased the property in 1976, the portion of the building located above the oil contamination in the basement has been occupied by Cariddi Sales Company, Inc., a wholesaler of toys, sporting good and general merchandise. Mr. Cariddi and Cariddi Sales Company, Inc. have not used or stored oil of the type or quantities found in the basement and flume.

Since CAC's previously stated position that it would not "paying contribution or reimbursement and will not be participating in any response action" was premised upon CAC having seen "nothing indicating that CAC caused the release of oil at the site[,]" CAC must now recognize and assume its responsibility for the conditions it caused while owning and operating the Property.

Pursuant to Massachusetts General Laws c.21E, Section 4A, Mr. Cariddi hereby makes demand upon Conalco to reimburse him for the response costs he has incurred to date, totaling $88,727.67, and for any response costs he may incur in the future as a result of the release at the property for which Conalco is responsible. The investigation of the release site is still continuing and precise estimates of future response costs have yet to be developed. However, based on the evaluation of conditions to date, and projections being developed by Mr. Cariddi's Licensed Site Professional, Kevin O'Reilly of O'Reilly,

BULKLEY, RICHARDSON AND GELINAS, LLP

Joseph H. Weyhrich, Esq.
Lewis, Rice and Fingersh, LLC
February 2, 2004
Page 3

Talbot and Okun Associates, it appears that additional response costs will likely exceed $600,000, and could exceed $1,000,000. Response actions may have to be conducted over three years or longer.

Mr. Cariddi demands that Conalco undertake and complete the necessary response actions (i) to assess fully the OHM releases at the Property; (ii) to develop and finalize reports and proposals setting forth detailed descriptions of the release conditions and alternatives to clean up the OHM releases; and (iii) to accomplish a permanent solution response action outcome for the site.

As set forth in Chapter 21E, Section 4A, Conalco must respond to this demand letter within forty-five days of receipt. The statute also provides for a period of sixty days after receipt of your response where the parties must confer and engage in good faith efforts to resolve "all disputes that may exist between them with respect to participation in or funding of the response action or other actual or potential liability in question." Chapter 21E, Section 4A(b). The consequences for failure to engage in good faith negotiations are set forth in Chapter 21E, Section 4A(d).

Given the immediacy of the situation, the delays encountered to date and the possibility that a swift and imperative response will promote a cooperative approach to problem solving, Mr. Cariddi urges you to respond in writing as promptly as possible and well before the statutory forty-five day period. I would be pleased to confer with you to discuss this matter before the sixty-day period for good faith negotiations commences. In all events, Mr. Cariddi looks forward to a timely response providing for a workable approach to completing necessary work that fully protects Mr. Cariddi's interests and compensates him for his response costs and related loss.

Thank you for your attention to this matter. Mr. Cariddi looks forward to Conalco's response.

Very truly yours,

Christopher B. Myhrum

Enclosures

cc:    James V. Cariddi
       Kevin O'Reilly

STATEMENT OF NORMAN LAPPIES
REGARDING OPERATIONS OF
CONSOLIDATED ALUMINUM CORPORATION
AND ITS PREDECESSORS AT
506-508 STATE ROAD, NORTH ADAMS, MA
(DEP RELEASE TRACKING NUMBER 1-13902)

I, Norman R. Lappies, state as follows:

1.    I was born on June 23, 1940.

2.    I reside at 155 River Road, Clarksburg, Massachusetts.

3.    I began working at the facility located at 506-508 State Road, North Adams, Massachusetts ("Facility") as a machine operator for the Pfister Aluminum Tubing Corporation ("Pfister," a.k.a. Pfister Manufacturing Corporation) in 1961.

4.    I continued working at the Facility after the business was acquired first by Phelps Dodge Aluminum Products Corp. ("Phelps Dodge") and subsequently by Consolidated Aluminum Corporation ("Conalco"). (Pfister, Phelps Dodge and Conalco are hereinafter referred to collectively as the "Former Operators.")

5.    During the course of my employment by the Former Operators, the operations at the Facility did not change materially as ownership of the Facility changed.

6.    During my continuous period of employment by the Former Operators, I was promoted initially to Foreman and then to Plant Manager.

7.    I was Plant Manager for Conalco when it decided to close the Facility in 1976 and I continued in that position until approximately one month prior to the final closing.

8.    The primary activity conducted by the Former Operators was the drawing of aluminum tubing down to smaller diameters. In addition, there were fabrication operations that involved the cutting and machining of aluminum.

9.    I have been informed that the presence of oil in the basement of the building has been reported to the Massachusetts Department of Environmental Protection ("DEP"), which assigned the Release Tracking Number 1-13902 to the release. My understanding is that the area where the most oil has been found is located inside and around the outside of a cinder block room west of the stairs descending into the basement from the first floor behind (south of) the current offices of Cariddi Sales Co. This cinder block room was called the Generator Room when I worked there and previously contained electrical equipment.

10.  Throughout the roughly 15 years I worked at the Facility, there were drawing machines located on the first floor of the Facility directly above the Generator Room in the basement.

11.  The drawing of aluminum required the use of large quantities of drawing oil to lubricate the dies through which the tubing was pulled. The operation was a messy one.

Oil would splash onto the wood floor from the machinery and also drip onto the floor from lengths of tubing being transferred from one drawing machine to another using an overhead hoist. In addition, there were occasions when oil-filled hoses burst, spraying oil all over the work area.

12.   To cope with the continuous regular buildup of oil on the floor, it was routine practice throughout the time I worked at the Facility to have workers come in on Sunday (when most operations were shut down) to remove the waste oil. This was done by applying mineral spirits solvent to the floor to thin the oil and then using squeegees to direct the oil through cracks and holes in the wood floor into the basement below, where it accumulated. To the best of my knowledge and information, waste oil was not shipped to an off-site location while I worked at the Facility.

15.   Mineral spirits solvent was also used to clean aluminum and was distilled on site to be reused. The underground storage tank ("UST") located outdoors behind the building to the west of the loading dock was used to store the recycled mineral spirits.

16.   Other than mineral spirits, I have no knowledge of other solvents being used at the Facility during my employment. Similarly, I do not know of any other hazardous materials used by the Former Operators. Wastewater discharges by the Former Operators were limited to sanitary wastes from washroom sinks and toilets.

17.   Throughout the period of my employment, another business, Modern Aluminum Anodizing ("MAA"), occupied (but did not own) the same building. Prior to the time Conalco closed down its operations, there were agreements with MAA that precluded MAA from doing work for any companies other than the Former Operators. While employed by the Former Operators, I observed MAA's use of hazardous materials and its discharge of process wastes (including acids) to the flume located under the building prior to MAA hooking up to the City sewer system. (My later employment by MAA did not begin until about 1983 and continued for about a year.)

18.   There is a hole knocked through the wall of the basement opening into the flume. This hole was already there when I began working for Pfister.

19.   There is a concrete structure in the basement located north of the hole into the flume, which appears to be an open-top process tank. It also was there when I began working for Pfister, but was not in use then.

20.   The foregoing statements are made based upon my personal knowledge, except as to those stated to be made upon information and belief, and as to such statements, I believe them to be true to the best of the information available to me.

Under penalty of perjury, I declare the foregoing to be true and accurate.

9/10/03
(Date)

Norman R. Lappies

2

EXHIBIT  E



*Bowditch*
*&Dewey*
ATTORNEYS

Direct telephone:  (508) 926-3409
Direct facsimile:  (508) 929-3012
Email:  rcox@bowditch.com

October 29, 2004

**Certified Mail, Return Receipt Requested**

Christopher B. Myhrum, Esquire
Buckley, Richardson & Gelinas
1500 Main Street
P.O. Box 15507
Springfield, MA  01115

      Re:    Response of Consolidated Aluminum Corporation to James V. Cariddi's
               Section 4A of Chapter 21E Notice Letter

Dear Mr. Myhrum:

      As you know, this law firm represents Consolidated Aluminum Corporation ("Conalco") in connection with claims asserted by James V. Cariddi concerning oil contamination at real property owned by Mr. Cariddi located at 506 State Road, North Adams, Massachusetts (the "Property"). Pursuant to G.L. c. 21E, § 4A(a), I am responding on behalf of Conalco to Mr. Cariddi's notice letter dated February 5, 2004 ("Notice").

      Mr. Cariddi's Notice describes prior correspondence to Conalco seeking reimbursement of costs Mr. Cariddi allegedly incurred in responding to a release of oil discovered in the basement of the building on the Property which Mr. Cariddi purchased from Conalco in 1976.  Because Mr. Cariddi presented no facts indicating that the release of oil was caused by Conalco so as to give rise to Conalco's potential liability under G.L. c. 21E, § 5(a)(5), Conalco previously informed Mr. Cariddi that it would not contribute or reimburse or participate in response actions, as demanded.

      Mr. Cariddi subsequently obtained the written statement of Norman P. Lappies.  In his statement, Mr. Lappies states that he worked at the Property between 1961 and 1976, both before and during the time period of Conalco's ownership.  Mr. Lappies states that the presence of oil in the basement was the result of routine practices occurring throughout the time he worked at the Property; he stated that oil used in manufacturing operations was directed by squeegees through cracks and holes in the floor of the building to the basement below where it accumulated.  Based upon Mr. Lappies' statement, Mr. Cariddi issued the Notice claiming proof of "causation" under Section 5(a)(5) and renewing his demand pursuant to Section 4A for reimbursement of past response action costs and payment of or undertaking and completing necessary future response actions.

Christopher B. Myhrum, Es___ .re
October 29, 2004
Page 2

Following receipt of Mr. Cariddi's Notice, and on behalf of Conalco, I contacted you. We thereafter exchanged information consistent with the dispute resolution purposes of Section 4A. Specifically, I requested and you provided me with documents concerning the response actions undertaken on behalf of Mr. Cariddi by various consultants. You also provided me with historic information on compliance activities associated with the Property; photographs and a video of the basement and response actions; and field notes and other supporting documents generated in connection with response actions including chromatographs of sampling data. We also visited the Property with our respective environmental consultants and met briefly with Mr. Cariddi.

In addition to obtaining information from you relevant to the Property and Mr. Cariddi's claims, Conalco also investigated its prior ownership and historic manufacturing activities at the Property in North Adams. That investigation, however, was short lived as Conalco has no records or documents concerning former ownership or activities occurring at the Property. No current or former employee of Conalco was identified who had any information regarding the Property. As a result, all information which we have obtained to date regarding the Property and its historic uses has come to us through you, Mr. Lappies or public records.

Because Mr. Cariddi's claim against Conalco is based solely upon G.L. c. 21E, Section 5(a)(5), which requires the demonstration of causation or legal responsibility in order to give rise to liability, we agreed that the validity of the statements made by Mr. Lappies are central to both Mr. Cariddi's claims and Conalco's potential responsibility for the response actions. As a result, we agreed to take Mr. Lappies' deposition pursuant to the procedures available under the Massachusetts Rules of Civil Procedure ("MRCP"). Conalco petitioned the Berkshire Superior Court pursuant to Rule 27 of the MRCP and by Order dated August 27, 2004, the Court (Ford, J.) authorized our taking the deposition of Mr. Lappies.

At his deposition on September 29, 2004, Mr. Lappies described the aluminum tube manufacturing process at the Property and the manner in which oil was used. He described his personal observations and participation in the periodic cleaning of oil from the work area floor by the application of mineral spirits and the directing of oil with mops and squeegees to holes and cracks in the floor so that it fell to the earthen basement below. He stated that his personal observations and frequency of such activities were greater during his earlier years as an employee at the Property; and less frequent when he was a supervisor or manager. He also testified that the practice of removing oil from the surface of the floor by causing it to be directed to the basement below was not contrary to any known standard in existence at the time, that the practice was not against any company policy or directive; and that he understood other facilities in the area followed similar practices to remove oil.

Having now reviewed Mr. Lappies' deposition transcript in conjunction with our research and analysis of the legal standard for establishing liability of a prior owner for oil contamination under G.L. c. 21E, §§4 and 5(a)(5), we believe that Mr. Cariddi has no viable claim under Section 5(a)(5) against Conalco for the reasons that follow.

Section 5(a)(5) provides in relevant part that "any person who otherwise caused or is legally responsible for a release or a threat of release of oil or hazardous material from a vessel or site, shall be

liable, without regard to fault . . . ." The decisions construing this section have focused on the parameters under which a prior owner or operator may "cause" or be "legally responsible"[1] for oil contamination. The SJC addressed this issue in its 1994 – 1995 term in <u>Griffith v. New England Telephone & Telegraph Company</u>, 420 Mass. 365 (1995) and <u>Marenghi v. Mobil Oil Corp.</u>, 420 Mass. 371 (1995). In <u>Griffith</u>, the SJC noted that the trial court judge found, based on expert testimony, that underground tanks caused the site contamination. The SJC concluded, however, that in order to impose liability under Section 5(a)(5), a party claiming another "caused" contamination must produce evidence of a duty to prevent contamination. "Absence some duty on the part of the defendant to prevent contamination of the site from the tanks, the judge's finding [that the underground tanks caused the site contamination] adds nothing to the case that was previously before us in <u>Griffith I</u>.[2]" 420 Mass. at 369. Likewise in <u>Marenghi</u>, the SJC held that the plaintiff lacked evidence that the defendant "could have or should have done anything to prevent" contamination (a leak from a tank) or was "unreasonable" in leaving a tank in service for more than 22 years. 420 Mass. at 374. Thus, both <u>Griffith</u> and <u>Marenghi</u>, embrace a negligence–based theory of liability requiring not only the existence of a duty, but also a breach of that duty.

Cases subsequent to <u>Griffith</u> and <u>Marenghi</u> have applied this negligence–based causation standard for purposes of imposing liability under Section 5(a)(5). In <u>Newly Weds Foods, Inc. v. Westvaco Corporation</u>, Middlesex Superior Court, C.A. No. 99-5194-C, 2002 WL 1923864, the instructions given to the jury on causation imposed "reasonable person" test:

> Plaintiff must prove that some conduct of the defendant, either an act or a failure to act, caused the release of oil. The statute does not describe the type of conduct necessary to establish liability. If the plaintiff establishes, as it alleges here, by a fair preponderance of the credible evidence, that the defendant acted *unreasonably* in some manner with respect to the UST, by for instance improper installation of a tank without appropriate means of access for maintenance of the tank, or leaving the tank in the ground for an *unreasonable* length of time, or by failing to detect a leak by *reasonably* monitoring or maintaining the tank, or by leaving the tank in the ground when it *knew or should have known* that it was releasing or was likely to release oil, or if defendant *knew or should have known* that oil was released into the ground from the tank and *unreasonably* failed to remove the contaminated soil, then that would be sufficient conduct to establish liability, provided that plaintiff has also shown that the conduct caused the contamination which required remediation.

<u>Newly Weds Foods</u>, at 3 (emphasis added).

---

[1]  The Notice does not suggest that Conalco is "legally responsible" for the oil contamination under Section 5(a)(5). The term "legal responsibility" appears to relate to a party's contractual obligations to prevent or correct releases. <u>Griffith</u>, 420 Mass. at 367-68; <u>Marenghi</u>, 420 Mass. at 373-74. Because we have been provided with no information of any contractual obligation imposed upon Conalco with respect to its use of oil, we assume that Mr. Cariddi's claim is based solely upon the "otherwise caused" language of Section 5(a)(5) and do not address the "legally responsible" aspect of Section 5(a)(5) further in this response.

[2]  <u>Griffith v. New England Telephone & Telegraph Company</u>, 414 Mass. 824 (1993) ("<u>Griffith I</u>"). In <u>Griffith I</u>, the SJC noted that given the definitions of "oil" and "hazardous material" and the liability structure of Section 5(a)(2) – (4), "past owners or operators of sites contaminated by oil . . . can not be held strictly liable for oil contamination occurring while they owned or operated the site." <u>Griffith I</u>, 414 Mass. at 829.

Christopher B. Myhrum, Es      e
October 29, 2004
Page 4

In short, in order for a plaintiff to recover under Section 5(a)(5), it must be established that the alleged act or omission of the defendant which gives rise to the contaminating event was unreasonable in consideration of all the circumstances at the time or based on the failure to comply with some duty that would have prevented the contamination.

Mr. Lappies testified that "it was common practice in the old days" to remove oil from the facility in the manner in which he describes. Deposition Transcript of Norman R. Lappies, p. 182 (hereinafter "Lappies Depo. Trans., p. __"). The practice was not against any company policy or contrary to any industry standard or practice. (Lappies Depo. Trans., pp. 184–185). Mr. Lappies did not think there was anything wrong with the practice at the time. (Lappies Depo. Trans., pp. 183–84). We conducted limited independent investigations seeking to establish what standards were generally followed by industrial facilities using oil during the time period in which Conalco owned the Property (1967 – 1976) and, as a general matter, confirmed that the practices occurring at the Property were not contrary to any standard, policy or guidance or otherwise contrary to what a reasonable person would do given the circumstances. For these reasons, Conalco must deny responsibility for the oil contamination found in the basement of Mr. Cariddi's Property.

We must note that even if it is established that Conalco's activities were contrary to industry standards, thereby giving rise to a breach of duty to trigger Section 5(a)(5) liability, other intervening causes would limit Conalco's potential exposure. First, Mr. Lappies testified that oil was present in the basement floor when he first saw it in 1961 (Lappies Depo. Trans., pp. 145-147, 203), and that the floor cleaning practices occurred with greater frequency during his early years at the Property. (Lappies Depo. Trans., pp. 179–180). We assume that the floor cleaning activities occurred with greater frequency between 1961 and 1967, prior to Conalco's ownership of the Property. Thus, based on Mr. Lappies' testimony there was a significant quantity of oil present on the basement floor prior to Conalco's involvement with the Property for which Conalco has no responsibility.[3] Second, we note that Mr. Lappies provided testimony concerning the sprinkler system discharging on account of a fire and, in the field notes of Mr. Cariddi's environmental consultant, Mr. Cariddi reported a sprinkler system discharge. We assume that the discharges of large quantities of water to the basement would cause any existing oil to spread to other areas.

There are also several issues which Conalco reserves the right to raise, if necessary, at a future date relating to Mr. Cariddi's claims. These issues relate to whether the response actions were necessary and appropriate and/or reasonable; whether other parties should be participating in response actions; and whether the harm caused by the alleged release is divisible. The core dispute, however, is the one of legal interpretation of the "otherwise caused" standard of Section 5(a)(5). We have reviewed the facts

---

[3]  As noted above, Conalco has no records or information regarding its activities or business operation in North Adams. The available public records indicate that Phelps Dodge Aluminum Products Corporation acquired the Property from Greylock Associates, Inc. in August 1967. The deed is signed on behalf of Greylock Associates, Inc. by "F.W. Pfister." As a result, we assume that there is a relationship between the Greylock Associates, Inc. and "Pfister Aluminum Tubing Corporation a/k/a Pfister Manufacturing Corporation" referenced in Mr. Lappies' affidavit. The Secretary of the Commonwealth, however, reported no information regarding Pfister. We have no information of any relationship between Pfister and Conalco and therefore assume, based upon the available public records, that the Pfister business was transferred to Phelps Dodge (which subsequently merged into Conalco) when the Property was transferred in 1967 and that Conalco has no responsibility or liability for Pfister's activities.

Christopher B. Myhrum, Esquire
October 29, 2004
Page 5

and the case law and determined that because our Courts apply a negligence-based standard to this provision of Section 5(a)(5), Conalco has no liability.  While some legal commentators have suggested otherwise,[4] we believe that the "catch all" liability provision of Chapter 21E is not to be intended and should not be interpreted or applied so broadly as to make parties liable for oil contamination resulting from practices which were acceptable at the time.

Finally, we note that the Notice does not propose an equitable share to be borne by Mr. Cariddi. Section 4 is specific in that where two or more persons are liable pursuant to Section 5 "each shall be liable to the other for their equitable share of cost of such response action." Mr. Cariddi is liable under Section 5(a)(1).  In addition, Mr. Lappies testified that the machinery, equipment and tanks used in the aluminum tube manufacturing process were left at the Property when Conalco closed the facility. (Lappies Depo. Trans. pp. 141-143).  The version of the purchase and sale agreement signed by Mr. Cariddi in 1976 suggests that fixtures and equipment would remain at the Property following its sale.[5]  Consequently, we strongly suspect (given the then current practices for handling oil) that the removal of the equipment also led to releases of oil in the basement.  Furthermore, we suspect that Mr. Cariddi has known about the condition of the basement for some time.  He took no action to address the oil contamination until the condition was brought to the attention of the Fire Department and then the DEP some 26 years after he first took ownership.  Under these circumstances, should Conalco have any liability under Sections 4 and 5(a)(5), Mr. Cariddi's equitable share would be significant.

As you know, G.L. c. 21E, § 4(A)(b) provides a 60-day period for the parties to confer in good faith in an effort to resolve all disputes.  If you are in possession of information – of a factual nature or by way of legal analysis – which you consider appropriate for Conalco to review, please bring it to my attention.  Conalco is willing to review this matter in good faith effort towards resolution.  Conalco's position, however, is that it has no responsibility under Section 5(a)(5) for the oil contamination present at Mr. Cariddi's Property in North Adams.

Very truly yours,

Robert D. Cox, Jr.

RCDjr/igm
Cc:     Consolidated Aluminum Corporation

---

[4]  See Seth H. Handy, "Beyond the 'Metaphysical': Oil Contamination and Causation Under Massachusetts General Laws Chapter 21E, Section 5(a)(5)," 88 Mass. L. Rev. 90, 96 - 100 (2003).

[5]  Specifically, the agreement signed by Mr. Cariddi (only) states that the sale includes "the equipment and fixtures described in a letter of August 5, 1976" from seller to Ernest H. Rosasco.  While we do not have a copy of that letter, the agreement does not mention any equipment to be removed from the Property.

# EXHIBIT F



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENERGY & ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
WESTERN REGIONAL OFFICE
436 Dwight Street • Springfield, Massachusetts 01103 • (413) 784-1100

DEVAL L. PATRICK
Governor

TIMOTHY P. MURRAY
Lieutenant Governor

IAN A. BOWLES
Secretary

ARLEEN O'DONNELL
Commissioner

**URGENT LEGAL MATTER**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

**July 19, 2007**

Consolidated Aluminum Corporation
Mr. Vincent Divito, Chief Executive Officer
c/o Lonza America, Inc.
17-17 Route 208
Fairlawn, NJ  97410

Re:  North Adams
RTN 1-13902
506-508 State Road

---

### NOTICE OF RESPONSIBILITY
### INTERIM DEADLINES

---

*This is an important notice.*
*Promptly respond to any requests contained herein.*
*Failure to respond to any such requests could result in*
*serious legal consequences.*

Dear Mr. Vincent Divito:

The Department of Environmental Protection (the "Department" or "MassDEP") was notified of a release of oil and/or hazardous materials on the property at 506 State Road in North Adams, Massachusetts, which requires one or more response actions.  Specifically, the Department was notified on April 25, 2001, of a release of oil and oily sludge to soils at the site.  Release Tracking Number (RTN) 1-13902 was assigned to the site.

The purpose of this letter is to provide you ("you" refers to Consolidated Aluminum Corporation) with notice of your legal responsibilities under state laws and regulations to address this release. The attached summary is intended to provide you with information about your liability under Massachusetts General Law Chapter 21E (M.G.L. c. 21E) and to assist you in deciding what actions to take in response to this notice.

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-298-2207.

DEP on the World Wide Web:  http://www.mass.gov/dep
♲ Printed on Recycled Paper

## Statutory Liabilities

The Department has reason to believe that you are a potentially responsible party (PRP) with liability under Section 5A of M.G.L. c. 21E. This is due to the release of oil and/or hazardous materials at the above site. This liability is "strict", meaning that it is not based on fault, but solely on your status as owner, operator, generator, transporter, disposer or other person specified in said Section 5A. This liability is also "joint and several", meaning that you are liable for all response costs incurred at a disposal site even if there are other liable parties.

You should be aware that you may have claims against third parties for damages, including claims for contribution or reimbursement for the costs of cleanup. Such claims do not exist indefinitely but are governed by laws, which establish the time allowed for bringing litigation. The Department encourages you to take any action necessary to protect any such claims you may have against third parties.

## Actions Undertaken To Date At The Site

On April 25, 2001, the North Adams Fire Department provided oral notification to the Department of a release of used oil and oily sludge containing metal particulates to soil at 506 State Road. On November 21, 2001, a Notice of Responsibility was issued to Cariddi Sales Company, the operator of the site at that time. On May 30, 2003, a Tier IB Permit, submitted by Mr. James Cariddi, became effective for the site. The Phase II Comprehensive Site Assessment Report and the Phase III Remedial Action Plan were submitted on November 18, 2005. Immediate Response Actions, including the pumping and removal of 1029 gallons of oil from the site (basement and subsurface structure) in March 2007, have been performed on behalf of Mr. Cariddi.

Documentation provided as Appendix G in the Phase II Report/ Phase III Plan submitted November 18, 2005, along with the findings and rulings, including many undisputed facts, in the March 20, 2007 Memorandum and Order Regarding Report and Recommendation Re Cross Motions for Summary Judgment, Civil Action No. 05-30111-MAP (U.S.D.C.), indicate that Consolidated Aluminum Corporation (also known as Conalco) released waste oil (a hazardous material) to the environment on a regular basis during its operations at the site.

Response actions to address the soil and groundwater contamination at this site have not been completed.

## Necessary Response Actions And Applicable Deadlines

Submit to the Department for the subject site:

1. An Immediate Response Action (IRA) evaluation by a Licensed Site Professional (LSP) in compliance with the MCP to determine the effectiveness of current IRA activities and a proposal for additional IRAs, if needed, by **September 14, 2007**.

2. A revised Phase III Remedial Action Plan, if determined to be necessary by an LSP, and a Phase IV Remedy Implementation Plan or, if appropriate, a Response Action Outcome Statement in accordance with the MCP by **October 1, 2007.**

3. A Phase IV Final Inspection and Completion Report by **December 31, 2007**.

The above deadlines constitute Interim Deadlines in accordance with 310 CMR 40.0167 and 40.0170(5). If you need an extension of an Interim Deadline, you must submit a request for an extension to the Department within 30 days of the date of this letter.

No disposal site will be deemed to have had all the necessary and required response actions taken for it unless and until all substantial hazards presented by the release and/or threat of release have been eliminated and a level of no significant risk exists or has been achieved in compliance with M.G.L. c. 21E and the MCP.

The MCP requires persons undertaking response actions at a disposal site to submit to the Department a Response Action Outcome Statement prepared by a Licensed Site Professional upon determining that a level of no significant risk already exists or has been achieved at the disposal site.

## Procedures To Follow To Undertake Response Actions

You must employ or engage a Licensed Site Professional to manage, supervise or actually perform all response actions which you intend to undertake at this disposal site. You may obtain a list of the names and addresses of Licensed Site Professionals by contacting the Board of Registration of Hazardous Waste Site Cleanup Professionals by telephone at (617) 556-1145 or in person or by mail at One Winter Street, 6th Floor, Boston, Massachusetts 02108.

Representatives from the Department are available to meet with you to review the technical and regulatory issues of concern. Please contact **Michael Scherer at 413/755-2278 or Kathleen Fournier at 413/755-2267** if you have any questions concerning this Notice.

Sincerely,

This final document copy is being provided to you electronically by the Department of Environmental Protection. A signed copy of this document is on file at the DEP office listed on the letterhead.

Anna Symington
Deputy Regional Director
Bureau of Waste Site Cleanup

Encl: 21E Liability Summary
    Western Area LSP List

Certified Mail #: 7005 3110 0001 3150 9473

*Notice of Responsibility 1-1390 Consolidated Aluminum Corporation*
*Interim Deadline*

1-13902norid KF

  cc:    Site Files, BWSC, WERO
          Mr. Robert Cox, Esquire, Bowditch & Dewey, LLP, 311 Main St., Worcester, MA  01615
          Mr. James V. Cariddi, 506 State Road, North Adams, MA  01247


  ecc:   North Adams Chief Municipal Officer
          North Adams Board of Health
          Denise Andler, DEP-WERO

EXHIBIT  G



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENERGY & ENVIRONMENTAL AFFAIRS
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**WESTERN REGIONAL OFFICE**
436 Dwight Street • Springfield, Massachusetts 01103 • (413) 784-1100

DEVAL L. PATRICK
Governor

TIMOTHY P. MURRAY
Lieutenant Governor

IAN A. BOWLES
Secretary

LAURIE BURT
Commissioner

CERTIFIED MAIL # 7005 3110 0001 3150 9374

Consolidated Aluminum Corporation                     **December 11, 2007**
c/o Attorney Robert Cox
Bowditch & Dewey, LLP
311 Main Street
Worcester, MA  01615-0516

RE:    **NOTICE OF NONCOMPLIANCE**
North Adams
506-508 State Road
RTN(s): 1-13902
NON-WE-07-3128
Failure to Comply with Massachusetts
Contingency Plan Deadlines

Dear Mr. Robert Cox:

The Department of Environmental Protection (the Department) has determined that Consolidated Aluminum Corporation (hereafter referred to as "you") is not in compliance with one or more requirements enforced by the Department.  The Department's records indicate that you are a Potentially Responsible Party (PRP) for one or more releases of oil and/or hazardous materials at the disposal site (the site) named above.  As of the date of this Notice, you are not in compliance with regulatory deadlines for investigating and cleaning up the disposal site.  Specifically:

- You failed to submit either a Revised Phase III Remedial Action Plan if necessary, and a Phase IV Remedy Implementation Plan, or, if appropriate, a Response Action Outcome Statement by November 30, 2007, in accordance with the Interim Deadline established in a Department letter dated September 11, 2007.

If the required actions are not completed by the deadlines specified below, an administrative penalty may be assessed for every day after the date of this Notice that the noncompliance occurs or continues.  Such a penalty may be assessed in an amount of up to $1,000.00 per violation per day.

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-298-2207.

DEP on the World Wide Web:  http://www.mass.gov/dep
♻ Printed on Recycled Paper

Attached is a Notice of Noncompliance that describes (1) the requirement violated, (2) the date and place that the Department asserts the requirement was violated, (3) either the specific actions which must be taken in order to return to compliance or direction to submit a written proposal describing how and when you plan to return to compliance and (4) the deadline for taking such actions or submitting such a proposal. These requirements are governed by Massachusetts General Laws Chapter 21E, and the regulations adopted thereunder (310 CMR 40.0000 – the Massachusetts Contingency Plan or "MCP"). Please consult the MCP for the complete explanation of these requirements. The MCP may be viewed on the Department's web page at http://www.mass.gov/dep/bwsc/regs.htm. Copies may be purchased through the State Book Store in the State House (617-727-2834).

The Department reserves its rights to exercise the full extent of its legal authority in order to obtain full compliance with all applicable requirements, including, but not limited to, criminal prosecution, civil action including court-imposed civil penalties, or administrative action, including administrative penalties imposed by the Department.

If you have any questions about this Notice or any of the requirements contained in it, please contact Kathleen Fournier at 413-755-2267 or Michael Scherer at 413-755-2278.

In responding to this Notice of Noncompliance, please reference the Release Tracking Number, RTN 1-13902, and the Enforcement Tracking Number, NON-WE-07-3128, to ensure proper tracking of your response.

Sincerely,

This final document copy is being provided to you electronically by the
Department of Environmental Protection. A signed copy of this document
is on file at the DEP office listed on the letterhead.

Anna Symington
Deputy Regional Director
Bureau of Waste Site Cleanup

Certified Mail #: 7005 3110 0001 3150 9374

Enc.    Notice of Noncompliance

cc:    Mr. James Cariddi, 506 State Road, North Adams, MA  01247
       Mr. Vincent Divito, CEO, c/o Lonza America, Inc., 90 Boroline Road, Allendale, NJ  07401

ecc:   North Adams Chief Municipal Officer
       North Adams Health Department
       Kevin O'Reilly, LSP-of-Record
       Attorney Christopher Myhrum   cmyhrum@bulkley.com
       Denise Andler, DEP-WERO

<u>NOTICE OF NONCOMPLIANCE</u>

NON-WE-07-3128
RTN(s) 1-13902

**THIS IS AN IMPORTANT LEGAL NOTICE.**
**FAILURE TO RESPOND COULD RESULT IN SERIOUS LEGAL CONSEQUENCES.**

**NAME OF ENTITY IN NONCOMPLIANCE:**
Consolidated Aluminum Corporation  c/o Attorney Robert Cox, 311 Main Street,
Worcester, MA  01615-0516

**LOCATION WHERE NONCOMPLIANCE OCCURRED OR WAS OBSERVED:**
RTN 1-13902   506-508 State Road, North Adams

**DATES WHEN NONCOMPLIANCE OCCURRED OR WAS OBSERVED:**
11/30/07 -  (due date for submittal of a revised Phase III Remedial Action Plan, if determined to
be necessary by an LSP, and a Phase IV Remedy Implementation Plan or, if appropriate, a
Response Action Outcome Statement)

**DESCRIPTION OF REQUIREMENT(S) NOT COMPLIED WITH:**

**Violation of 310 CMR 40.0167** – failure to comply with an Interim Deadline

On 04/25/01, the North Adams Fire Department provided oral notification to the Department of a
release of used oil and oily sludge containing metal particulates to soil at 506 State Road.  On
11/21/01, a Notice of Responsibility was issued to Cariddi Sales Company, the operator of the
site at that time.  On 05/30/03, a Tier IB Permit, submitted by Mr. James Cariddi, became
effective for the site.  The Phase II Comprehensive Site Assessment Report and the Phase III
Remedial Action Plan were submitted on 11/18/05.  Immediate Response Actions, including the
pumping and removal of 1029 gallons of oil from the site (basement and subsurface structure) in
March 2007, have been performed on behalf of Mr. Cariddi.

Documentation provided as Appendix G in the Phase II Report/ Phase III Plan submitted
11/18/05, along with the findings and rulings, including many undisputed facts, in the 03/20/07
Memorandum and Order Regarding Report and Recommendation Re Cross Motions for
Summary Judgment, Civil Action No. 05-30111-MAP (U.S.D.C.), indicate that Consolidated
Aluminum Corporation (also known as Conalco) released waste oil (a hazardous material) to the
environment on a regular basis during its operations at the site.

On 07/19/07, a Notice of Responsibility was issued to you ("you" refers to Consolidated
Aluminum Corporation) which required the submittal of an Immediate Response Action (IRA)
evaluation by 09/14/07, the submittal of a revised Phase III Plan if necessary and a Phase IV
Plan, or Response Action Outcome Statement by 10/01/07, and submittal of a Phase IV Final
Inspection and Completion Report by 12/31/07.  In response to that Notice, Attorney Robert Cox

NON-WE-07-3128, RTN: 1-135
Page 2

wrote the Department on your behalf requesting an extension of each of the Interim Deadlines for 60 days.

In response to your extension request, an Interim Deadline Letter dated 09/11/07 granted the extension request and established deadlines of 11/13/07, for submittal of the IRA evaluation, 11/30/07, for the submittal of a revised Phase III Plan if necessary, and a Phase IV Remedy Implementation Plan or, if appropriate, a Response Action Outcome Statement. A deadline of 02/28/08, was also established for submittal of the Phase IV Final Inspection and Completion Report.

On 11/14/07, Attorney Cox wrote the Department on your behalf requesting a 30-day extension of the deadlines established in the Interim Deadline Letter dated 09/11/07. The reason given for the extension request is that Conalco will need extra time to allow for an agreement with the site owner on the nature of anticipated response actions and an access agreement. Attorney Cox also noted that an IRA Status Report had been submitted on 07/30/07, by Kevin O'Reilly, LSP, on behalf of Mr. Carriddi, and that another IRA Status Report is due to be submitted in January 2008, and questioned the need for an additional IRA evaluation. To date, the required documents have not been submitted to the Department.

**ACTION(S) TO BE TAKEN AND THE DEADLINE(S) FOR TAKING SUCH ACTION(S):**

Submit to the Department:

1) A Revised Phase III Remedial Action Plan, if determined to be necessary by an LSP, and a Phase IV Remedy Implementation Plan, or, if appropriate, a Response Action Outcome Statement in accordance with the MCP **by December 31, 2007**.

2) The Phase IV Final Inspection and Completion Report, or if appropriate, a Response Action Outcome Statement in accordance with the MCP **by March 31, 2008.**

If the required actions are not completed by the deadlines specified, an administrative penalty may be assessed for every day after the date of this Notice that the noncompliance occurs or continues. The Department reserves its rights to exercise the full extent of its legal authority in order to obtain full compliance with all applicable requirements, including, but not limited to, criminal prosecution, civil action including court-imposed civil penalties, or administrative action, including administrative penalties imposed by the Department.

For the Department of Environmental Protection:

This final document copy is being provided to you electronically by the
Department of Environmental Protection. A signed copy of this document
is on file at the DEP office listed on the letterhead.

Date: _____          _____

Anna Symington
Deputy Regional Director
Bureau of Waste Site Cleanup